ACCEPTED
03-14-00718-CV
4673712
THIRD COURT OF APPEALS
AUSTIN, TEXAS
3/27/2015 1:44:11 PM
JEFFREY D. KYLE
CLERK

Appeal No. 03-14-00718-CV

IN THE COURT OF APPEALS FOR
THE THIRD DISTRICT OF TEXAS
AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
3/27/2015 1:44:11 PM
JEFFREY D. KYLE
Clerk

CITIZENS AGAINST THE LANDFILL IN HEMPSTEAD; MICHAEL
McCALL; WAYNE KNOX; and THE CITY OF HEMPSTEAD,

Appellants,

v.

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,
and PINTAIL LANDFILL, LLC,

Appellees.

## BRIEF OF APPELLEE, TEXAS COMMISSION
## ON ENVIRONMENTAL QUALITY

On Appeal From the 201st Judicial District Court,
Travis County, Texas, Cause No. D-1-GN-13-002918

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil
Litigation

JON NIERMANN
Chief, Environmental Protection
Division

NANCY ELIZABETH OLINGER
Assistant Attorney General
State Bar No. 15254230

CYNTHIA WOELK
Assistant Attorney General
State Bar No. 21836525

DANIEL C. WISEMAN
Assistant Attorney General
State Bar No. 24042178
Environmental Protection Division
P. O. Box 12548
Austin, TX 78711-2548
Tel: 512.475.4013 / Fax: 512.320.0052

ATTORNEYS FOR APPELLEE, TEXAS COMMISSION
ON ENVIRONMENTAL QUALITY

Date: March 27, 2015

**ORAL ARGUMENT CONDITIONALLY REQUESTED**

# TABLE OF CONTENTS

                                                                        **Page**

**TABLE OF CONTENTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

**INDEX OF AUTHORITIES**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

**STATEMENT OF THE CASE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**ISSUES PRESENTED**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1.    **The TCEQ did not err by authorizing Pintail's transfer station's activities by registration, rather than permit.** (Responsive to Appellants' First Issue). . . . . . . . . . . . . . . . . . . . . . 1

    2.    **The TCEQ's issuance of the registration did not violate any due process rights.** (Responsive to Appellants' Second Issue). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    3.    **The TCEQ did not err by issuing more than two notices of deficiency.** (Responsive to Appellants' Third Issue). . . . . . . . . . . 1

**STATEMENT REGARDING ORAL ARGUMENT**.. . . . . . . . . . . . . . . . . . . 2

**STATEMENT OF FACTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**SUMMARY OF THE ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**ARGUMENT AND AUTHORITIES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.    **Standard of Review**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    II.    **The TCEQ did not err by authorizing Pintail's transfer station's activities by registration, rather than permit.** (Responsive to Appellants' First Issue). . . . . . . . . . . . . . . . . . . . . . 8

        A.    **The TCEQ had authority to issue the registration for Pintail's Type V transfer station.**. . . . . . . . . . . . . . . . . . . . . 9

1.      The TCEQ has broad regulatory authority.. . . . . . . 11

2.      The TCEQ's rules provide for authorization by registration for many solid waste management activities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

3.      The TCEQ properly interpreted 30 Tex. Admin. Code § 330.9(b)(3).. . . . . . . . . . . . . . . . . . . . . . . . . . 13

4.      30 Tex. Admin. Code § 330.9(f) was not applied to Pintail's registration application.. . . . . . . . . . . . 15

III.    The TCEQ's issuance of the registration did not violate any due process rights.  (Responsive to Appellants' Second Issue).. . . 18

IV.    The TCEQ did not err by issuing more than two notices of deficiency.  (Responsive to Appellants' Third Issue). . . . . . . . . . . 21

A.      The TCEQ is not limited to two NODs.. . . . . . . . . . . . . . 25

B.      The TCEQ acted reasonably.. . . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION AND PRAYER.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

LIST OF ACRONYMS AND SHORTHAND TERMS. . . . . . . . . . . . . . . . . 34

INDEX TO APPENDIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# INDEX OF AUTHORITIES

**Cases**                                                                                  **Page**

*City of El Paso v. Pub. Util. Comm'n,*
 883 S.W.2d 179 (Tex. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*City of Plano v. Pub. Util. Comm'n,*
 953 S.W.2d 416 (Tex. App.—Austin 1997, no pet.). . . . . . . . . . . . . . . . . . 7

*City of Port Arthur v. Sw. Bell Tel. Co.,*
 13 S.W.3d 841 (Tex. App.—Austin 2000, no pet.). . . . . . . . . . . . . . . . . 21

*Coastal Habitat Alliance v. Pub. Util. Comm'n,*
 294 S.W.3d 276 (Tex. App.—Austin 2009, no pet.). . . . . . . . . . . . . . 19, 20

*Collins v. Tex. Natural Res. Conservation Comm'n,*
 94 S.W.3d 876 (Tex. App.—Austin 2002, no pet.). . . . . . . . . . . . . . . . 8, 21

*H.G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd.,*
 36 S.W.3d 597 (Tex. App.—Austin 2000, pet. denied). . . . . . . . . . . . . . . 8

*KEM Tex., Ltd. v. Tex. Dep't of Transp.,*
 No. 03-08-00468-CV, 2009 WL 1811102
 (Tex. App.—Austin June 26, 2009, no pet.) (mem. op.). . . . . . . . . . . . . . 19

*McDaniel v. Tex. Natural Res. Conservation Comm'n,*
 982 S.W.2d 650 (Tex. App.—Austin 1998, pet. denied). . . . . . . . . . . . . . 12

*McMaster v. Pub. Util. Comm'n of Tex.,*
 No. 03-11-00571-CV, 2012 WL 3793257
 (Tex. App.—Austin Aug. 31, 2012, no pet.) (mem. op.). . . . . . . . . . . . . . 20

*Phillips Petrol. Co. v. Tex Comm'n on Envtl. Quality,*
 121 S.W.3d 502 (Tex. App.—Austin 2003, no pet.). . . . . . . . . . . . . . . . . 8

**Cases (cont'd)**                                                                          **Page**

*Proctor v. Andrews,*
   972 S.W.2d 729 (Tex. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Reliant Energy, Inc. v. Pub. Util. Comm'n,*
   153 S.W.3d 174 (Tex. App.—Austin 2004, pet. denied). . . . . . . . . . . . . . . 8

*R.R. Comm'n v. Tex. Citizens for a Safe Future & Clean Water,*
   336 S.W.3d 619 (Tex. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Sierra Club v. Tex. Comm'n on Envtl. Quality,*
   No. 03-11-000102-CV, 2014 WL 7463875
   (Tex. App.—Austin Dec. 3, 2014, no pet.). . . . . . . . . . . . . . . . . . . . . 27, 28

*Stark v. Geeslin,*
   213 S.W.3d 406 (Tex. App.—Austin 2006, pet. denied). . . . . . . . . . . . . . . 7

*Tex. Citizens for a Safe Future,*
   336 S.W.3d 629. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Tex. Comm'n on Envtl. Quality v. Bosque River Coal.,*
   413 S.W.3d 403 (Tex. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Tex. Dep't of Health v. Long,*
   659 S.W.2d 158 (Tex. App.—Austin 1983, no writ). . . . . . . . . . . . . . . . . 29

*Tex. Health Facilities Comm'n v. Charter Medical-Dallas, Inc.,*
   665 S.W.2d 446 (Tex. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Rules**                                                                      **Page**

30 Tex. Admin. Code
  Ch. 305. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 29
  Ch. 330. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12, 23, 29
    § 330.3(33). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    § 330.3(117). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    § 330.7.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    § 330.9.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17
    § 330.9(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 16
    § 330.9(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16
    § 330.9(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9, 13, 14, 15, *passim*
    § 330.9(f).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17, 18
    § 330.11.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    § 330.13.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    § 330.25.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Tex. R. App. P.
  38.1(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  38.1(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Statutes**

Tex. Health & Safety Code
Ch. 361. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
§ 361.002(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
§ 361.002(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
§ 361.011.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
§ 361.061.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
§ 361.090.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
§ 361.111(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
§ 361.321.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
§ 361.321(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
§ 361.428(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Statutes (cont'd)** **Page**

Tex. Water Code
§ 5.103(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
§ 5.351. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## STATEMENT OF THE CASE

This is an administrative appeal from the decision of the Texas Commission on Environmental Quality (TCEQ[1] or Commission) to issue Pintail LLC (Pintail) a registration for a municipal solid waste (MSW) management site. The registration authorizes Pintail to construct and operate a Type V transfer station. After the registration was issued, Appellants Citizens Against the Landfill in Hempstead (CALH),[2] Michael McCall, Wayne Knox and the City of Hempstead (Hempstead) filed suits appealing the agency's decision. The district court consolidated the suits into a single case. Pintail intervened to defend its registration. The district court upheld the order.

## ISSUES PRESENTED

1. **The TCEQ did not err by authorizing Pintail's transfer station's activities by registration, rather than permit.** (Responsive to Appellants' First Issue)

2. **The TCEQ's issuance of the registration did not violate any due process rights.** (Responsive to Appellants' Second Issue)

3. **The TCEQ did not err by issuing more than two notices of deficiency.** (Responsive to Appellants' Third Issue)

---

1. A list of acronyms and shorthand terms follows the Certificate of Service page in this brief.

2. The acronym CALH will usually be used to refer to Citizens against the Landfill in Hempstead, Michael McCall, and Wayne Knox, collectively.

**STATEMENT REGARDING ORAL ARGUMENT**

Because the issues have been adequately addressed in the briefs, the Commission does not believe that oral argument is necessary. However, if the Court grants Appellants' request for oral argument, the Commission asks to be heard.

**STATEMENT OF FACTS**

The TCEQ objects to the argumentative nature of portions of Appellants' Statement of Facts. Rule 38.1(g), Texas Rules of Appellate Procedure, calls for a Statement of Facts that is "without argument." The Commission also objects to Appellants' Statement of the Case and Issues Presented as being argumentative and assuming facts that are not supported by the record.

Solid waste management facilities in Texas require authorizations from the TCEQ. The two most common types of authorizations are permits and registrations. For example, an entity proposing to construct and operate a new municipal solid waste landfill must obtain a permit.[3] Some transfer stations only require a registration.

On August 1, 2011, Pintail filed with the TCEQ an application for a registration requesting authority to build and operate a municipal solid waste transfer

---

3. *See* TEX. HEALTH & SAFETY CODE, Ch. 361 (Solid Waste Disposal Act); 30 TEX. ADMIN. CODE Ch. 330 (Municipal Solid Waste rules). Attached to this brief as Appendices D and E are Texas statutes (excerpts and not whole chapters) and agency rules (excerpts) relied upon.

station.[4] The proposed transfer station would be on the same site that Pintail was, by an earlier-filed application, seeking authority to construct and operate a landfill.[5] Pintail asked for its transfer station application to be processed in accordance with 30 Tex. Admin. Code § 330.9(b)(3), which requires a registration for a transfer station used to transfer 125 tons per day or less of municipal solid waste. Over the course of several months, the TCEQ's Executive Director (ED) sent Pintail five Notice of Deficiency letters (NODs) concerning its transfer station application, and Pintail revised and supplemented the application several times.[6]

Unlike with a landfill permit application, there is no opportunity for a contested-case hearing on a solid waste transfer station *registration* application. There is, however, an opportunity for the public to make written comments on the

---

4. Generally speaking, a transfer station is a facility where waste or recyclable materials are unloaded from collection vehicles and temporarily held until they are moved to landfills or other facilities.

5. 1 A.R. 1 (registration application).

In this brief, citations to the Administrative Record will be in the following form: [Volume number] A.R. [Item number]. At times, the citation will be followed by additional information such as the title of the document or descriptive words about it. Citations to the Clerk's Record will be by C.R. followed by page number or numbers. There are two supplemental Clerk's Records; the TCEQ does not cite to documents in either one.

6. 2 A.R. 13, 4 A.R. 22, 5 A.R. 24, 5 A.R. 32, and 7 A.R. 39. Copies of the NOD letters are attached to this brief as Appendix Item A.

application.  Here, the ED issued a formal written response to the public comments.[7]

After the ED considered the completed application and the public comments made in response to it, the ED approved and issued the requested registration—No. 40259—on July 23, 2013.[8]  The registration authorized Pintail to receive up to 94 tons per day of waste for processing.[9]  It further provided:

> The registrant is authorized to separate, store, and transfer construction and demolition waste as defined in 30 TAC Section (§) 330.3(33), from the construction and demolition of residential, community, commercial, institutional, and recreational activities.  All waste must be transferred to an authorized disposal facility.  The facility is also authorized to recover recyclable materials and transfer the recovered recyclable materials to an authorized facility.

The City filed a motion with the TCEQ Commissioners asking them to overturn the ED's decision;[10] CALH also filed a motion to overturn.[11]  The motions were

---

7.  7 A.R. 53 (ED's response to comments).  A copy is attached to this brief as Appendix Item B.

8.  7 A.R. 55 (issuance of registration).  A copy is attached to this brief as Appendix Item C.

9.  *Id*., p. 3.

10.  8 A.R. 59 ([City of Hempstead's] Motion to Overturn Issuance of Municipal Solid Waste Facility Registration No. 40259).

11.  8 A.R. 58 (Citizens Against the Landfill in Hempstead's Motion to Overturn the Executive Director's Approval of MSW Registration No. 40259 for a Type V Processing and Recycling Facility).

overruled by operation of law.[12]   Appellants brought this suit,[13] challenging the agency's issuance of the registration.  After briefing and a hearing, the district court upheld the agency decision to issue the registration.

## SUMMARY OF THE ARGUMENT

The district court judgment affirming the agency's order should be affirmed. The TCEQ acted within its discretion to authorize this transfer station by registration rather than by permit.  The Solid Waste Disposal Act requires permits for certain facilities and less-stringent authorizations for others.  However, for most facilities the Legislature has given the TCEQ a choice, and the Act provides that the TCEQ *may* require and issue permits for facilities like the transfer station at issue here.

Consistent with this grant of discretion, the TCEQ has promulgated rules that provide for registration, rather than permitting, for applications for transfer stations that, like this one, will transfer 125 tons of waste per day or less.  Although Appellants read the rule differently, they cannot overcome the plain reading of the

---

12.  8 A.R. 66 (October 17, 2013 letter overruling motions to overturn).

13.  Three suits were consolidated under cause number D-1-GN-13-002918: Two were filed by the City of Hempstead (Cause No. D-1-GN-13-002930, entitled *City of Hempstead, Texas v. Texas Commission on Environmental Quality and Pintail Landfill, L.L.C.*;  Cause No. D-1-GN-13-003842, entitled *City of Hempstead, Texas v. Texas Commission on Environmental Quality*); and one was filed by CAHL and two individuals (Cause No. D-1-GN-13-003844, entitled *Citizens Against the Landfill in Hempstead, Michael McCall, and Wayne Knox v. Texas Commission on Environmental Quality*.)

rule or the deference due to the agency's interpretation of its own regulations. The same is true for Appellants' other complaints regarding the application of the TCEQ's regulations. The TCEQ's interpretation is supported by the rules' plain language and, in any event, is reasonable.

Nor did the TCEQ's issuance of a registration in this case deprive Appellants of due process. Their pleadings failed to identify any vested interest, nor did they make the necessary "concrete assertions" about how any such interests would be harmed by the issuance of a registration rather than a permit. In any event, even if Appellants had made such a showing, this Court has made clear that a contested-case hearing is not a requisite of due process. As the Legislature provided, Appellants participated in the registration process by submitting comments, and the agency responded to those comments. Appellants received all the process they were due.

Finally, Appellants' complaints about the number of notices of deficiency issued by the TCEQ are without merit. Appellants fail to cite a rule, statute, or case that supports the argument that issuing more than two notices of deficiency is error. Instead, Appellants rely on a flow chart attached to a report submitted to the Legislature. But rather than binding the agency to a particular policy (something that cannot be accomplished in such an informal manner), the flow chart merely provides a general overview of the registration process. Ultimately, in the absence of an

applicable rule or statute, the TCEQ enjoys discretion in the procedure by which it conducts its proceedings. Issuing additional notices of deficiency is simply not reversible error.

## ARGUMENT AND AUTHORITIES

### I. Standard of Review

This case primarily involves challenges to the agency's interpretation of its own statutes and rules. Statutory interpretation presents a question of law that courts review de novo.[14] A court's primary objective is to effectuate the legislature's intent.[15] "When . . . a statutory scheme is subject to multiple interpretations, [courts] must uphold the enforcing agency's construction if it is reasonable and in harmony with the statute."[16] If the statute can reasonably be read as the agency has ruled, and that reading is in harmony with the rest of the statute, the court should accept the interpretation, even over other reasonable interpretations.[17]

In contrast, an "agency's construction of its rule is *controlling* unless it is

---

14. *R.R. Comm'n v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011).

15. *Stark v. Geeslin*, 213 S.W.3d 406, 416 (Tex. App.—Austin 2006, pet. denied).

16. *Tex. Citizens for a Safe Future*, 336 S.W.3d at 629.

17. *City of Plano v. Pub. Util. Comm'n*, 953 S.W.2d 416, 421 (Tex. App.—Austin 1997, no pet.).

plainly erroneous or inconsistent" with the statute.[18] "Because the interpretation represents the view of the regulatory body that drafted and administers the rule, the agency interpretation, if reasonable, becomes a part of the rule itself."[19]

In cases such as this, the issue before courts is whether there is some basis in the record for the agency's action. "Under [the substantial-evidence] standard of review, the proper test is whether the evidence in its entirety is sufficient that reasonable minds could have reached the conclusion the agency must have reached."[20] Substantial evidence supports a decision if the decision is reasonable or rational.[21] A court should affirm the agency's decision if substantial evidence in the record supports any permissible ground for the decision under the statute and rules.[22]

## II. The TCEQ did not err by authorizing Pintail's transfer station's activities by registration, rather than permit. (Responsive to Appellants' First Issue)

Appellants contend that the TCEQ erred by authorizing a transfer station by a

---

18. *Phillips Petrol. Co. v. Tex. Comm'n on Envtl. Quality*, 121 S.W.3d 502, 507 (Tex. App.—Austin 2003, no pet.) (emphasis added).

19. *Id*. at 508.

20. *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd.*, 36 S.W.3d 597, 602 (Tex. App.—Austin 2000, pet. denied).

21. *Reliant Energy, Inc. v. Pub. Util. Comm'n*, 153 S.W.3d 174, 206 (Tex. App.—Austin 2004, pet. denied).

22. *Collins v. Tex. Nat. Res. Conserv. Comm'n,* 94 S.W.3d 876, 882 (Tex. App.—Austin 2002, no pet.).

registration rather than a permit.[23]  Their argument—that a permit was required since processing and storage activities will take place at the transfer station facility—lacks merit.

## A. The TCEQ had authority to issue the registration for Pintail's Type V transfer station.

Pintail applied for a "Type V Registration" for its proposed facility,[24] requesting the registration be processed in accordance with 30 Tex. Admin Code § 330.9(b)(3). The application indicated that the activities covered by the registration would include storage and processing.[25]

The application explained that while, eventually, Pintail planned to operate the proposed construction and demolition (C & D) waste processing and recycling operation in conjunction with the proposed landfill, it sought the Type V registration in order "to begin a C & D waste recycling and transfer operation prior to commencement of landfill operations."[26]

Pintail's Type V registration will only accept C & D waste; it will not accept

---

23. Appellants' Initial Brief, p. 29.

24. 1 A.R. 1 (Pintail's Type V Registration Application).

25. 1 A.R. 1, p. 2.

26. 1 A.R. 1, p. I-1.  Pintail also explicitly acknowledged that operation of the C & D facilities in conjunction with the landfill will require further authorizations and it stated that when such further authorizations are necessary, it will submit a request for them. *Id.*

municipal solid waste, special wastes or industrial wastes.[27]   The registration

application described the activities at the transfer station:

- "[A]ll recyclable materials from the incoming waste will be placed in roll-off boxes or other suitable containers in areas separate from the waste processing area . . ."

- "The recyclable materials will be taken to an appropriate end-use market, such as scrap metal recyclers, junk yards, concrete crushing plants, compost facilities, or paper/cardboard/plastics recyclers in the local Waller County or surrounding area."

- "Any other wastes that are not recyclable will be placed in transfer trailers or other suitable containers for landfill disposal."

- "The roll-off boxes filled with recyclables will be hauled to their respective markets as the boxes have been filled."[28]

The application then stated that:

The transfer trailers or other suitable containers that contain non-recyclables (i.e., waste) will be hauled to a landfill for disposal when full or at a minimum of once per day, unless severe weather or other unforeseeable conditions prohibit it.  On average, the wastes will not be allowed to accumulate on site for more than 24 hours.  The maximum time for wastes to remain at the site will be 72 hours.[29]

---

27.  1 A.R. 1, p. I-2.  It also will not accept "lead acid storage batteries; used motor vehicle oil; used oil filters; whole used or scrap tires; refrigerators, freezers, air conditioners or other items containing chlorinated fluorocarbons (CFC); bulk or noncontainerized liquid waste from nonhousehold sources; regulated hazardous waste; polychlorinated biphenyls (PCB) waste; radioactive materials; or other wastes prohibited by TCEQ regulations."

28.  1 A.R. 1, p. II-5.

29.  1 A.R. 1, p. II-5.

### 1. The TCEQ has broad regulatory authority.

The Legislature's charge to the Commission in the Texas Solid Waste Disposal Act (the Act) is "to safeguard the health, welfare and physical property of the people and to protect the environment by *controlling* the management of solid waste . . . ."[30]

On page 40 of their brief, Appellants appear to assert that the Act *requires* the Commission to authorize solid waste management activities by permit rather than by registration unless there is a specific exception to what Appellants call "the general permitting requirement." Unfortunately, Appellants' mistaken view of the Act informs the rest of their argument.

Although the statute instructs the Commission to require and issue permits to some kinds of facilities,[31] and forbids imposition of permitting requirements for other kinds,[32] for most facilities the Commission is explicitly given a choice. The Health and Safety Code says:

> Except as provided by Section 361.090 with respect to certain industrial solid waste, the commission *may* require and issue permits authorizing

---

30. TEX. HEALTH & SAFETY CODE § 361.002(a)(emphasis added). Section 361.011, specific to municipal solid waste (but excepting municipal hazardous waste), also speaks of controlling all aspects of management of such waste.

31. TEX. HEALTH & SAFETY CODE §§ 361.002(b)(concerning hazardous waste facilities) and 361.428(b)(concerning mixed municipal solid waste composting operations).

32. The TCEQ is not allowed to require permits for non-commercial, on-site collection, handling, storage, processing, and disposal of non-hazardous industrial solid waste. *See* TEX. HEALTH & SAFETY CODE § 361.090.

and governing the construction, operation, and maintenance of the solid waste facilities used to store, process, or dispose of solid waste under this chapter.[33]

The Austin Court of Appeals has held that the Solid Waste Disposal Act gives the Commission "the authority to administer the act using different levels of regulation, including both permitting and registration."[34]

### 2. The TCEQ's rules provide for authorization by registration for many solid waste management activities.

The Commission's rules regarding municipal solid waste are in 30 Texas Administrative Code, Chapter 330.[35] Subsection (a) of Rule 330.9, which is titled "Registration Required," explicitly states that storage and processing activities *may* be authorized by a registration:

> Except as provided in §§ 330.7, 330.11, 330.13, or 330.25 of this title . . . *no person may cause, suffer, allow or permit any activity of storage, processing, removal, or disposal of any municipal solid waste (MSW) unless that activity is authorized by a registration or other authorization*

---

33. TEX. HEALTH & SAFETY CODE § 361.061 (emphasis added).

34. *McDaniel v. Tex. Natural Res. Conservation Comm'n*, 982 S.W.2d 650, 652 (Tex. App.—Austin 1998, pet. denied).

The Commission actually has four tiers of regulation for solid waste facilities: permit, registration, notification and exempt.

35. Hereafter, some mentions of rules in 30 Tex. Admin. Code Chapter 330 will be referred to simply by the specific rule number, i.e. Rule 330.9, rather than by a full citation.

*from the commission. . . .* [36]

### 3. The TCEQ properly interpreted 30 Tex. Admin. Code § 330.9(b)(3).

Subsection (b) of Rule 330.9 describes specific types of MSW transfer stations for which a registration is required, including at (b)(3): "a facility used in the transfer of MSW that transfers or will transfer 125 tons per day or less." Pintail applied for a registration pursuant to this rule. The TCEQ evaluated the application and determined that, since Pintail's application indicates that the transfer station will transfer less than 125 tons per day, it was eligible for a registration pursuant to the rule.

Appellants argue that Rule 330.9(b)(3) cannot apply because there will be some processing and storage occurring at the facility in conjunction with the transfer activities. According to Appellants, 330.9(b)(3) only applies when transfer of MSW is the *only* activity occurring at the transfer station. Appellants support their argument by citing to various definitions of MSW management in other subchapters of the MSW rules.

Appellants' interpretation of the Commission's rules is unreasonable because it is too narrow. Their assertion that processing and storage are "distinct waste

---

36. 30 TEX. ADMIN. CODE § 330.9(a) (emphasis added).

management activities"[37] implies that a transfer station could somehow be operated without these activities. But the fact that "transfer station," "processing," and "storage" have different definitions does not mean that the Commission does not have authority to authorize all of these activities by registration, rather than a permit. These types of activities are not only typical of a transfer station, they are intrinsically related to the transfer operation. The TCEQ's Executive Director stated in his response to CALH's motion to overturn that "it would be nearly impossible to operate a transfer station without the storage or processing of waste."[38] For example, the processing definition in the rules is quite broad and includes "volume reduction."[39] Many transfer stations consolidate and transfer wastes by compaction. Appellants' interpretation of Rule 330.9(b)(3) would mean that, in that case, the transfer station could be authorized by registration, but a permit would be required for any compaction. Since it would be impossible to operate a transfer station without some processing or storage activities, Appellants' interpretation would render the rule—and the statutory provision it tracks, Tex. Health & Safety Code § 361.111(a)(3)—a nullity.

---

37. Appellants' Initial Brief at 35.

38. 8 A.R. 62, p. 4 (Executive Director's Response to Motions to Overturn).

39. 30 TEX. ADMIN. CODE § 330.3(117).

The district court correctly found that the TCEQ's interpretation of its own rule to include processing and storage activities that are incidental to the transfer of solid waste when issuing a registration pursuant to Rule 330.9(b)(3) is reasonable. In this case, the processing and storage activities that were *incidental* to the transfer station activities were included in the registration for the operation of Pintail's low-volume transfer station.

Pintail is only authorized to engage in those activities it described in its application that are necessary to the operation of the transfer station. These activities are limited. For example, the registration states that the maximum storage time for unprocessed and processed wastes is 72 hours, after which the wastes must be transferred to an authorized disposal facility.[40]

### 4. 30 Tex. Admin. Code § 330.9(f) was not applied to Pintail's registration application.

The bulk of Appellants' argument regarding their first issue concerns a rule that the TCEQ did not apply when it evaluated Pintail's application: Rule 330.9(f). That rule states as follows:

> (f) A registration is required for any new MSW Type V transfer station that includes a material recovery operation that meets all of the following requirements.
>     (1) Materials recovery. The owner or operator must recover 10% or more by weight or weight equivalent of the total incoming waste

---

40. 7 A.R. 55, p. 3.

stream for reuse or recycling; ensure that the incoming waste has already been reduced by at least 10% through a source-separation program; or, also operate one or more source-separation recycling programs in the county where the transfer station is located and those source-separation recycling programs manage a total weight or weight equivalent of recyclable materials equal to 10% or more by weight or weight equivalent of the incoming waste stream to all transfer stations to which credit is being applied. The owner or operator must demonstrate in the registration application the method that will be used to assure that the 10% requirement is achieved.

(2) Distance to a landfill. The transfer facility must demonstrate in the registration application that it will transfer the remaining nonrecyclable waste to a landfill not more than 50 miles from the facility.

Appellants' assertion that "330.9(f) expressly applies to *any* transfer station that includes materials recovery operations"[41] is incorrect. The rule says that a MSW Type V transfer station that includes a material recovery operation *and* that meets all of the requirements in subsections (a) and (b) must obtain a registration. It does not say that *all* MSW Type V transfer stations that include a material recovery operation must either comply with the requirements of subsections (a) and (b) or obtain a permit.

The subsections of Rule 330.9 specify different instances in which a registration is required. It is possible that a facility could come under more than one of the subsections. For example, here it is possible that Pintail could have designed

_____

41. Appellants' Initial Brief at 32. (Emphasis in original.)

its operations to meet the requirements of 330.9(f) and then, accordingly, chosen to apply to the TCEQ for a registration pursuant to that subsection of 330.9. However, Pintail chose to apply for registration under 330.9(b)(3), and that is the subsection that the TCEQ considered when evaluating Pintail's application.

Finally, in their brief, Appellants make two incorrect statements regarding the TCEQ's argument below.[42] First, Appellants state[43] that "TCEQ attorneys adopted the new interpretation that Rule 330.9(f) only applies to transfer stations that include a material recovery operation if the facility exceeds the waste volume limitation set forth in Rule 330.9(b)(3)." That is not and was not the TCEQ's position.

Second, Appellants write[44] that the "TCEQ contended for the first time in hearing before the district court that the requirements of 330.9(f) were inapplicable to this Facility." This statement is misleading and inaccurate. Since none of the Appellants mentioned Rule 330.9(f) in their opening briefs in district court,[45] the TCEQ's responsive district court brief did not mention Rule 330.9(f). The first and

---

42. There is no transcript of the trial court proceedings, so all statements made by the Appellants regarding the merits hearing are necessarily outside of the record.

43. Appellants' Initial Brief at 32.

44. Appellants' Initial Brief at 36.

45. C.R. 389-447 (Citizen's Against the Landfill in Hempstead, Michael McCall, and Wayne Knox's Brief in Reply); C.R. 448-502 (City of Hempstead's Reply Brief).

only mention of Rule 330.9(f) in the district court briefing was by CALH in its Reply Brief.[46]  Thus, the first opportunity the TCEQ had to address 330.9(f) was at the hearing.  The TCEQ's position on Rule 330.9(f) remains the same:  the TCEQ did not apply Rule 330.9(f) when issuing Pintail's registration because the application was submitted pursuant to a different rule—330.9(b)(3).

**III.  The TCEQ's issuance of the registration did not violate any due process rights.** (Responsive to Appellants' Second Issue)

CALH and Hempstead contend that the TCEQ's issuance of a registration rather than a permit violated their due process rights.  However, as explained above, there is no statutory right to a contested-case hearing: the Legislature granted the TCEQ discretion to issue registrations for transfer stations like this one, rather than requiring a more formal permitting process.  Nor did Appellants properly allege a vested property right that was infringed by the issuance of the registration.  In the absence of such a statutory right, or a demonstration that a vested property right has been infringed by the agency action, the Constitution does not require a contested-case hearing:  "a person's desire to intervene in a proceeding before [an agency] is not a vested property interest entitled to protection under federal and state

---

46.  C.R. 402-404, 408.

constitutions."[47]

The first inquiry in a procedural due process claim is whether the plaintiff has been deprived of a property or liberty interest deserving protection under the federal or state constitutions.[48] If a plaintiff fails to allege the deprivation of such an interest, the plaintiff has failed to state a due process claim.[49] Here, Appellants' due process claims fail because, among other reasons, they lack a vested property right that has been infringed by the issuance of the registration.

In their pleadings before the district court, Appellants failed to identify a property interest giving rise to their alleged due process rights. Hempstead's live petition gave no description of an affected property right, [50] and in its live petition, CALH cited only to the Health & Safety Code as the source of its due process rights and did not identify a vested property right allegedly affected by the issuance of the registration.[51] On appeal, Appellants baldly state that they "have property interests

---

47. *Coastal Habitat Alliance v. Pub. Util. Comm'n*, 294 S.W.3d 276, 286 (Tex. App.—Austin 2009, no pet.).

48. *KEM Tex., Ltd. v. Tex. Dep't of Transp.*, No. 03-08-00468-CV, 2009 WL 1811102, at *6 (Tex. App.—Austin June 26, 2009, no pet.) (mem. op.).

49. *Id.*

50. C.R.223-233 (First Amended Original Pet., pp. 1-11).

51. C.R. 207-208 (Plaintiffs' First Amended Pet., pp. 12-13).

that would be affected by the proposed facility."[52]  As their only example of such interests, Appellants claim in their briefing that CALH has members that reside near the proposed location that rely on water wells and that Hempstead has water wells nearby.

However, Appellants cannot show how the issuance of a transfer-station registration deprives residents of their property rights.  Indeed, there is no right to exclude transfer stations from the vicinity of one's property.  Instead, Appellants merely assert in their briefing that they rely on water wells near the location of the proposed facility.  They do not explain how that activity would be affected by the proposed transfer station, and, more importantly, they did not make this showing before the district court.  Absent the requisite "concrete assertions" about the nature of the alleged harm, this mere speculation is not sufficient to invoke due process protections.[53]

Moreover, as this Court has held, the issuance of a permit in itself does not deprive a neighboring landowner of any concrete liberty of property interest: "[T]he issuance of a permit does not authorize any injury to persons or property or an

---

52. Appellants' Initial Brief at 41.

53. *See McMaster v. Pub. Util. Comm'n of Tex.*, No. 03-11-00571-CV, 2012 WL 3793257, (Tex. App.—Austin Aug. 31, 2012, no pet.) (mem. op.); *see also Coastal Habitat Alliance*, 294 S.W.3d at 286-87.

invasion of any other property rights."[54] Even if a private property interest were at issue, "due process never requires all the trial-like procedures of a statutory contested case hearing."[55] Thus, even had Appellants identified a vested property interest at stake in the proceeding, due process may be satisfied without the contested-case hearing they sought.

Finally, Hempstead's due process claims fail for the additional reason that, as a municipality, Hempstead lacks due process rights against the State.[56] In any event, Appellants received all the process they were due: the opportunity to submit written comments to the TCEQ concerning Pintail's registration.[57] Their due process claims are without merit.

## IV. The TCEQ did not err by issuing more than two notices of deficiency. (Responsive to Appellants' Third Issue)

After Pintail applied for a registration to construct and operate a solid waste transfer station, staff of the TCEQ's Executive Director sent several letters to the

---

54. *Collins v. Tex. Natural Res. Conservation Comm'n*, 94 S.W.3d 876, 883 (Tex. App.—Austin 2002, no pet.).

55. *Id.* at 884.

56. *City of Port Arthur v. Sw. Bell Tel. Co.*, 13 S.W.3d 841, 845 (Tex. App.—Austin 2000, no pet.) (citing *Proctor v. Andrews*, 972 S.W.2d 729, 734 (Tex. 1998)).

57. The ED considered and responded to the submitted comments. *See* 7 A.R. 53 (ED's response to comments), attached to this brief as Appendix Item B.

company noting deficiencies in its application. TCEQ engineering specialist Ruben Meza, Jr. sent the first letter on August 15, 2011.[58] Mr. Meza identified four pieces of information that "must be provided prior to further application review."[59] They appeared to be minor and routine: the signing qualifications of the person who signed the application; a property owner affidavit with standard text to replace the one with modified text; a date on the Core Data Form; and a "listing of all permits or construction approvals received or applied for." Once Pintail supplied that information, Mr. Meza obviously undertook a more detailed, technical review of the registration application. That review resulted in an October 27, 2011 notice of deficiency (NOD) that listed 39 deficiencies, some of which were clearly minor.[60] For example, number 35 said, "Table 5-1, page IV-8, contains references to the facility's registration number, but does not provide the facility's registration number. Please revise this table to include the facility's registration number (MSW 40259)."[61] Other deficiencies were more significant. Mr. Meza said in the letter (and subsequent ones) that the additional information was necessary to show compliance with Title 30 of the

58. 2 A.R. 3 (August 15, 2011 letter from TCEQ staff member to Pintail).

59. *Id*.

60. 2 A.R. 13 (NOD 1).

61. *Id*. at page 6.

-22-

Texas Administrative Code Chapters 305 and 330. Many items cited a particular agency rule on which the demand for information was based. Christine Bergren, a manager in the TCEQ's Waste Permits Division, who granted Pintail an extension of time to respond to the NOD, described the October 27 letter as the "first technical NOD letter."[62]

After Pintail responded to the first technical NOD, Mr. Meza sent a second on February 17, 2012.[63] It listed 22 deficiencies, nearly half of which had not been noted by Mr. Meza in the first NOD. The others concerned previously mentioned deficiencies that had not been addressed to TCEQ's satisfaction. Pintail responded and Mr. Meza sent a follow-up NOD on April 12, 2012, with a list of 13 deficiencies.[64] Most were deficiencies that had not been previously noted. Just three concerned deficiencies that been identified earlier but had not been addressed to

---

62. 2 A.R. 16.

In general, TCEQ staff initially reviews an application for administrative completeness and then reviews it for technical completeness. During administrative completeness review, staff primarily determines whether application forms have been completely filled out with appropriate information and filing fees have been paid. Technical review is more rigorous. As appropriate, the application is reviewed by professionals such as engineers, geologists, or hydrologists to determine if it meets the environmental and health-related goals of applicable rules and statutes. If staff reviewers find deficiencies in the information or have questions about it, they communicate that to the applicant, including through notices of deficiency.

63. 4 A.R. 22 (NOD 2).

64. 5 A.R. 24 (NOD 3).

TCEQ's satisfaction. Pintail requested (and the TCEQ granted) additional time to respond because some items required coordination with other agencies.[65]

On June 25, 2012, Mr. Meza sent a fourth NOD,[66] noting just one deficiency. It concerned a letter from Texas Department of Transportation saying the department was working on information related to traffic in the area of the proposed facility but needed a traffic impact assessment report from Pintail before it could complete its work. TCEQ said in its NOD, "Please note that we cannot declare the RA technically complete until TXDOT provides a determination regarding potential traffic impacts for this site." Pintail apparently sent information to TxDOT, but the TCEQ deemed it inadequate in a fifth (and final) NOD dated August 16, 2012.[67] Mr. Meza complained that the traffic impact assessment report from Pintail to TxDOT contained extensive information about the traffic that will be generated by the adjacent landfill but did "not include a separate discussion regarding the proposed transfer station." He directed Pintail to provide the transfer station information to TxDOT.

Pintail responded to each NOD. Each successive NOD showed that Pintail had cooperated and made considerable progress. Once Pintail had met all requirements,

---

65. 5 A.R. 27.

66. 5 A.R. 32 (NOD 4).

67. 7 A.R. 39 (NOD 5).

its application was declared technically complete.[68]

## A. The TCEQ is not limited to two NODs.

The TCEQ issues NODs when it needs additional information from an applicant in order to make a better-informed decision. NODs are a normal and expected part of the TCEQ's review process. A thorough review of an application will commonly result in NODs, and it is not uncommon for the agency to issue more than two NODs on an application. No rule, statute, or case limits the number of NODs an applicant for a solid waste transfer station registration may receive.

Appellants point to a sentence in an October 27, 2011 NOD letter from the TCEQ's Mr. Meza to Pintail saying that a "third notice of technical deficiency will not be issued." Appellants also cite what they describe as "TCEQ policies outlined in the MSW registration process description, which is located in the TCEQ Sunset Evaluation Report."[69] This appears to be a reference to a flow chart in a report to the Legislature. Appellants contend that the sentence in Mr. Meza's letter and the flow chart express "clearly established TCEQ policy" that binds the TCEQ to issue no more than two NODs.[70] But Appellants are wrong.

---

68. 7 A.R. 54.

69. *See* Appellants' Initial Brief at 43-44. Appellants also refer to another document that they describe vaguely as "a consistent TCEQ instruction to its staff." *Id*. at 45.

70. *See*, *e.g*., Appellants' Initial Brief at 43.

Mr. Meza's letter is essentially part of a warning to Pintail that it needs to submit the requested information or risk having its application returned. After all, another sentence in the letter said just that: "Failure to submit a satisfactory response to each of the noted deficiencies *may* result in the application being returned due to technical deficiencies."[71] The flow chart does not establish a binding policy.[72] Rather, it merely provides a general overview of the registration process. It was included in an agency report as a part of a general description of the agency's various functions. It lacks nuance, omits many details, and necessarily summarizes an example or a process—for the benefit of persons in the Legislative branch who are not intimately involved with it. The flow chart was not intended to limit the agency's flexibility or discretion in handling an application.

## B. The TCEQ acted reasonably.

Appellants cited Water Code § 5.351 and Health & Safety Code § 361.321 as the jurisdictional bases for their suits.[73] Under those provisions, the issue is whether

71. 2 A.R. 13, p. 7 (NOD 1) (emphasis added).

72. Moreover, the TCEQ's written response to public comments shows that the agency does not have a rule that limits the number of NODs that an applicant may be sent, the municipal solid waste section does not have a policy on the number of NODs, and the decision on whether to return an application such as this is made on a case by case basis. 7 A.R. 53 (Responses 10 and 12 on p. 8).

73. C.R. 197 (CALH's First Amended Petition, p. 2); C.R. 224 (City of Hempstead's First Amended Petition, p. 2.).

the agency's action is invalid, arbitrary, unreasonable, or an abuse of discretion.[74]

The TCEQ's discretion arises generally from its exclusive jurisdiction to authorize and regulate certain activities (such as solid waste disposal) and its expertise in the field.[75] The long-standing test to determine whether an agency has acted arbitrarily or unreasonably or has abused its discretion is if the agency fails to consider a factor the Legislature directed it to consider, considers an irrelevant factor, or weighs only relevant factors but still reaches a completely unreasonable result.[76] Here, none of those occurred, and the agency acted reasonably and did not abuse its discretion or act arbitrarily.

The administrative record supports the reasonableness of TCEQ's handling of the NODs. It shows that TCEQ's Mr. Meza did not point out all deficiencies in the early NODs. It would have been unfair to return the application before Pintail had been provided notice of and an opportunity to rectify all shortcomings in the application. Evidence shows that Pintail did not ignore the NODs but rather

---

74. TEX. HEALTH & SAFETY CODE § 361.321(e); *see Tex. Comm'n on Envtl. Quality v. Bosque River Coal.*, 413 S.W.3d 403, 404 (Tex. 2013) (where court describes its decision in another case as concluding that the TCEQ did not abuse its discretion).

75. *Sierra Club v. Tex. Comm'n on Envtl. Quality,* No. 03-11-000102-CV, 2014 WL 7463875 at *5 (Tex. App—Austin Dec. 3, 2014, no pet.).

76. *City of El Paso v. Pub. Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994); *Sierra Club,* 2014 WL 7463875 at *5.

endeavored to fully respond. Eventually, Pintail supplied the requested information. Appellants have shown no valid reason for the TCEQ to punish that effort. In addition, an April 2012 TCEQ interoffice memorandum shows there is flexibility in the agency's processes:

> If the response to the 2[nd] NOD does not satisfactorily address the deficiencies, the PM [Project Manager] should discuss the issues with the TL [Team Leader] to determine the next course of action.[77]

This language clearly shows that applications aren't necessarily returned when the response to a second NOD fails to resolve all deficiencies.[78] There is a need for the agency to have flexibility since circumstances can vary widely.

In light of the substantial evidence supporting the agency's action, the agency reached a reasonable result and there was no abuse of discretion. "[T]he existence of substantial evidence in the record supporting [an agency's] decision is a factor—often a dispositive factor—in determining whether [the agency] abused its discretion."[79]

---

77. 8 A.R. 61, p. 4. (Office of Public Interest Counsel's Response to Motions to Overturn).

78. The attorney representing the ED in the agency proceeding reinforced this point. He wrote that municipal solid waste "[a]pplications are typically not returned unless an applicant chooses not to respond to NOD's by providing additional or clarifying information to address application deficiencies." 8 A.R. 62, p. 4.

The ED's response to public comments said, "The TCEQ MSW Permits Section does not have a specific policy regarding the return of an application. The return of an application is considered on a case by case basis." 7 A.R. 53, p. 8.

79. *Sierra Club*, 2014 WL 7463875 at *5.

In addition, the TCEQ considered only relevant factors during its review: the application, the rules and the statute. For example the third and fourth NODs showed that the information was being requested to demonstrate compliance with 30 Texas Admin. Code Chapters 305 and 330.[80] In some instances, they pointed to specific rule-based requirements for which they were demanding information.[81]

Any limitations on the number of opportunities to cure deficiencies would be *procedural* requirements. Even if there had been a rigid two-NOD practice in the past (and there wasn't), it is well settled that a litigant does not have a vested right in a judicial or administrative procedure.[82] Thus, Appellants would have no lawful basis to complain if the agency had changed past procedures so that more NODs were allowed for this application.

Although Appellants' argument on this issue spans about five pages, it is

"Throughout the long history of the substantial evidence rule the existence of substantial evidence has been equated with fair and reasonable conduct on the part of the agency. Conversely, agency decisions that are unsupported by substantial evidence have been deemed arbitrary and capricious. Thus, the two terms have many times been considered two sides of the same coin." *Tex. Health Facilities Comm'n v. Charter Medical-Dallas, Inc.*, 665 S.W.2d 446, 454 (Tex. 1984).

80. 5 A.R. 24 (NOD 3); 5 A.R. 32 (NOD 4).

81. *Id*.

82. *Cf.*, *Tex. Dep't of Health v. Long*, 659 S.W.2d 158, 160 (Tex. App.—Austin 1983, no writ) (Legislature may make changes applicable to future procedural steps in pending cases, and same legal principles should govern changes in administrative procedures; this principle of law rests upon premise that no litigant has vested right in procedural remedy).

probably nonetheless fair to describe it as a bare assertion of error.[83] Appellants failed to cite a rule, statute, or case that supports their notion that it was "an abuse of discretion, unlawful procedure, and an unreasonable error of law" to provide Pintail more than two notices of deficiency.[84] An agency like the TCEQ employs many people who write many letters and memos and probably create numerous flow charts. Taken to its extreme, Appellants' argument—that words in mid-level employees' memos or letters, and lines and arrows in flow charts, amount to binding policy statements—would eviscerate rulemaking, which is the primary way for the agency to establish binding policy[85] and is done only by the agency's Commissioners. For all these reasons, the TCEQ urges the Court to overrule Appellants' third issue.

## CONCLUSION AND PRAYER

For the reasons in this brief, the Commission requests this Court to affirm the decision below.

---

83. *See* Tex. R. App. P. 38.1(i) (a brief must "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

84. Appellants' Brief at 47.

85. "[T]he commission must adopt rules when adopting . . . any agency statement of general applicability that interprets or prescribes law or policy or describes the procedure or practice requirements of an agency. . . ." Water Code § 5.103(c).

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General For Civil Litigation

JON NIERMANN
Chief, Environmental Protection Division

_/s/ Nancy Elizabeth Olinger_
NANCY ELIZABETH OLINGER
Assistant Attorney General
Texas Bar Number 15254230

_/s/ Cynthia Woelk_
CYNTHIA WOELK
Assistant Attorney General
Texas Bar No.21836525
Cynthia.Woelk@texasattorneygeneral.gov

_/s/ Daniel C. Wiseman_
DANIEL C. WISEMAN
Assistant Attorney General
Texas Bar No.24042178
Daniel.Wiseman@texasattorneygeneral.gov

Environmental Protection Division
P.O. Box 12548
Austin, Texas  78711-2548
Tel: (512) 463 2012
Fax: (512) 320 0052

ATTORNEYS FOR TEXAS COMMISSION
ON ENVIRONMENTAL QUALITY

-31-

# CERTIFICATE OF COMPLIANCE

I certify that the computer program used to prepare this document reported that there are 6968 words in the pertinent parts of the document, per T.R.A.P. 9.4(i)(2).

/s/ Nancy Elizabeth Olinger
Nancy Elizabeth Olinger

# CERTIFICATE OF SERVICE

On March 27, 2015, I served the above and foregoing on each person on the list below, by the method shown.

/s/ Nancy Elizabeth Olinger
Nancy Elizabeth Olinger

## LIST OF PERSONS SERVED

Mr, Terry L. Scarborough
Mr. Michael L. Woodward
mwoodward@hslawmail.com
Ms. V. Blayre Pena
bpena@hslawmail.com
Mr. Wesley P. McGuffey
wmcguffey@hslawmail.com
HANCE SCARBOROUGH, LLP
400 West 15th Street, Suite 950Austin, Texas 78701
*Attorneys for Appellants, CALH, Michael McCall and Wayne Knox*
***Via 1st Class Mail & E-service***

Ms. Monica M. Jacobs
monica.jacobs@kellyhart.com
Ms. Diana L. Nichols
diana.nichols@kellyhart.com
KELLY HART & HALLMAN, LLP
301 Congress Avenue, Suite 2000
Austin Texas 78701
*Attorneys for Appellant City of Hempstead*
***Via 1st Class Mail & E-service***

Mr. Paul R. Tough
ptough@msmtx.com
Mr. Brent W. Ryan
bryan@msmtx.com
McELROY, SULLIVAN, MILLER, WEBER & OLMSTEAD, LLP
P. O. Box 12127
Austin. Texas 78711
*Attorneys for Appellee Pintail Landfill, LLC*
***Via 1st Class Mail & E-service***

-33-

# LIST OF ACRONYMS AND SHORTHAND TERMS

| Acronym or shorthand term | Meaning |
|---|---|
| the Act | Solid Waste Disposal Act (Texas Health & Safety Code, Chapter 361) |
| A.R. | Administrative Record |
| C & D | Construction and Demolition |
| CALH | Citizens Against the Landfill in Hempstead |
| ED | Executive Director of the TCEQ |
| MSW | Municipal Solid Waste |
| NOD | Notice of Deficiency |
| TCEQ | Texas Commission on Environmental Quality |

# INDEX TO APPENDIX

| Item | Description |
|------|-------------|
| A | Copies of Notice of Deficiency (NOD) Letters (2 A.R. 13, 4 A.R. 22, 5 A.R. 24, 5 A.R. 32, 7 A.R. 39) |
| B | Executive Director's Response to Comments (7 AR 53) |
| C | Issuance of Registration (7 A.R. 55) |
| D | Statutes<br>Texas Health & Safety Code<br>§ 361.002<br>§ 361.011<br>§ 361.061<br>§ 361.090<br>§ 361.111<br>§ 361.321<br>§ 361.428<br>Texas Water Code<br>§ 5.103<br>§ 5.351 |
| E | Rules<br>30 Tex. Admin. Code<br>§ 330.3<br>§ 330.9 |

# Appendix

A

Bryan W. Shaw, Ph.D., *Chairman*
Buddy Garcia, *Commissioner*
Carlos Rubinstein, *Commissioner*
Mark R. Vickery, P.G., *Executive Director*



# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

October 27, 2011

Mr. Ernest Kaufmann
Pintail Landfill, LLC
24644 Highway 6
Hempstead, Texas 77445

Re:     Pintail Landfill Transfer Station - Waller County
        Municipal Solid Waste (MSW) - Registration No. 40259
        Registration Application (RA) – First Technical Notice of Deficiency (NOD)
        Tracking Nos. 14835575, 14874930, & 14916883; RN106192735/CN603939349

Dear Mr. Kaufmann:

The MSW Permits Section has completed the review of the registration application dated August 1, 2011, and the revisions dated August 8, 2011, and August 29, 2011. The application was prepared by Biggs and Mathews Environmental and submitted on behalf of Pintail Landfill, LLC. Additional information must be presented to demonstrate compliance with Title 30 Texas Administrative Code (30 TAC) Chapter 305 and Chapter 330. The information requested below is necessary for a complete registration application and must be addressed prior to further technical review. When making revisions to maps, drawings, and figures which are replicated throughout the application, each map, drawing, and figure needs to be revised throughout the application.

A.  Dated cover letter transmitting the revised RA should accompany the revised application;

B.  Each item of concern should be addressed in the transmittal letter and the applicant's response to the item should be immediately following the item of concern;

C.  The applicant should indicate where in the revised RA the revisions have been made by reference to part, section, and page number; and

D.  Please include an original certification statement with the revision, in accordance with 30 TAC Section (§)305.44. The certification statement should indicate the name, title, and address of the responsible official.

## Part I and Part I Attachments

1.  The title page of the RA and the title pages for Part I, II, III, and IV of the RA do not list the facility's MSW registration number and the city where the facility is located. In accordance with 30 TAC §330.57(g)(2), please revise the title pages stated above to ensure that the facility's MSW registration number and the city that the facility is located in shall be included. The facility referenced above has been assigned MSW registration number 40259.

2.  Upon reviewing the land use maps located on pages IIB-7 and IIB-8, it appears that some of the land area within a one mile radius of the facility property boundary has not been given a land use classification. In accordance with 30 TAC §305.45(a)(6)(B) and §330.61(g), please revise these figures to ensure that all land areas within a one mile radius of the facility shall be classified by land use (e.g., residential, commercial, agricultural, recreational, industrial, undeveloped, ect.).

3. The color coding used on the maps located on pages IIB-8 and IIB-9 is not legible and code distinct when reproduced on black and white photocopy machines. In accordance with 30 TAC §330.57(h)(2), please revise these maps to ensure that they will be legible and code distinct when reproduced on black and white photocopy machines.

4. The drawings contained on pages IIB-7, IIB-8, and IIB-9 do not contain a revision block and a drawing number. In addition, the scale on each of these figures does not match the description provided for each scale. In accordance with 30 TAC §330.57(h)(3), (4)(c), and (4)(e), please revise the drawings stated above to ensure that they will be submitted at a standard engineering scale and that they will contain a revision block and a drawing number.

5. The aerial photographs located on pages IIE-44 through IIE-49 do not contain a north arrow. In accordance with 30 TAC §330.57(h)(5)(a), please revise the aerial photographs stated above to ensure that they will contain a north arrow.

6. The RA does not address the requirements contained in 30 TAC §330.73, regarding additional standard permit and registration conditions for MSW facilities. Please revise the RA to include a discussion regarding all applicable regulations associated with the cited rule.

## Part II and Part II Attachments

7. Section 2.2, Volume and Rate of Disposal, page II-4 states, "The waste acceptance rate will vary over the life of the facility depending on market conditions." Please note that the statement above does not specify the maximum waste acceptance rate for the facility. In addition, Part III, Section 4, Waste Management Unit Design, page IIIA.7, states that the maximum waste acceptance rate for the facility is approximately 94 tons per day. In accordance with 30 TAC §330.61(b)(1)(B), please revise the statements above to ensure that a consistent maximum waste acceptance rate for the facility is provided.

8. Section 2.2, Volume and Rate of Disposal, page II-4, contains a discussion regarding the regulations associated with 30 TAC §330.125(h), regarding the recordkeeping requirements associated with the annual waste acceptance rate at a MSW landfill facility. Please note that 30 TAC §330.125(h) is not applicable to MSW storage and processing facilities. Please remove all language associated with 30 TAC §330.125(h) from the RA.

9. Section 2, Waste Acceptance Plan, page II-3, states, "Non-recyclable materials will be transported to a properly permitted Type I or Type IV landfill that is located within 100 miles of the proposed facility." In addition, Section 2.3, Waste Storage and Disposal, page II-5 contains a similar statement. Please note that these statements do not clearly specify the intended destination of the nonrecyclable waste received at the facility. In accordance with 30 TAC §330.61(b)(1)(B), please revise these statements to include the name, permit number, and distance from the transfer station with respect to each landfill that the facility will use to dispose of nonrecyclable waste.

10. Part II of the RA does not indicate whether there are any hospitals within one mile of the facility. In accordance with 30 TAC §330.61(c)(4) and §330.61(g), please revise Part II of the RA to verify whether there are any hospitals located within one mile of the facility. If there are any hospitals located within one mile of the facility, please ensure to revise the land use maps in RA to depict their location.

11. The RA does not include a general location map that depicts the location and surface type of all roads within a one mile radius of the facility that will normally be used by the owner or operator for entering or leaving the facility. In accordance with 30 TAC §330.61(c)(5), please revise the RA to include a map that will depict the items mentioned above.

12. Section 12.1, Water Wells, indicates that there is a single story residential structure in the northwestern portion of the site and another single story residential structure in the west central portion of the site. It is noted that these structures are not depicted in the facility layout maps. Please note that all structures within the registration boundary must be depicted on the facility layout maps. In accordance with 30 TAC §330.61(d)(4), please revise the facility layout maps to ensure that all structures within the registration boundary are depicted.

13. Part II of the RA does not indicate whether there are any archaeological sites adjacent to the facility. In accordance with 30 TAC §330.61(c)(12), please revise all applicable parts of the RA to indicate whether there are any archaeological sites adjacent to the facility. If there are any archaeological sites adjacent to the facility, please ensure to revise the land use maps in the RA to depict their location. In addition, in accordance with 30 TAC §330.61(h)(4), please provide the proximity to any archaeologically significant sites within one mile of the facility.

14. The RA does not contain a map that clearly depicts the facility access control features. In accordance with 30 TAC §330.61(c)(11) and §330.61(d)(6), please revise the RA to include a map that will depict the facility access control features.

15. Part II of the RA does not include a response from the Texas Department of Transportation (TXDOT) regarding the applicants request for coordination. In accordance with 30 TAC §330.61(i)(4), please submit the response from TXDOT to demonstrate coordination.

16. Part II of the RA does not include a certification statement prepared, sealed, and signed by a licensed Professional Engineer (P.E.) indicating the owner/operator will obtain the appropriate Texas Pollutant Discharge Elimination System (TPDES) permit coverage when required. In accordance with 30 TAC §330.61(k)(3)(A), please revise Part II of the RA to include a certification statement requested above.

17. Section 12.2, Oil and Gas Wells, page II-21, states, "There is one existing abandoned crude oil or natural gas well within the Pintail Landfill Transfer Station boundary." But this section does not state whether this well has been properly capped, plugged, and closed in accordance with all applicable rules and regulations of the Railroad Commission of Texas. In accordance with 30 TAC §330.61(l)(2), please revise this section to include a certification statement regarding whether this well has been properly capped, plugged, and closed in accordance with the cited rule.

18. Appendix IID, Wetlands Documentation, page IID-6, located in Part II of the RA, indicates that the wetland jurisdiction determination provided in the RA is a preliminary evaluation based on aerial photograph interpretation and has not been surveyed per United State Army Corps of engineers (USACE) standards. In addition, this evaluation has identified features within the facility's registration boundary that may be classified as wetlands, but the RA does not include the information requested in 30 TAC §330.553, regarding wetlands determination. In accordance with 30 TAC §330.61(m)(2), please revise Appendix IID to

include a wetlands determination that shall address all applicable requirements contained in 30 TAC §330.553(b)(1) through (5). In addition, please submit a request for a jurisdictional determination to the USACE to verify the limits of wetland jurisdiction. Additionally, please submit to us this coordination with USACE and the jurisdictional determination from USACE.

19. The RA does not include a review letter from the Texas Historical Commission documenting compliance with the Natural Resources Code, Chapter 191, Texas Antiquities Code. In accordance with 30 TAC §330.61(o), please revise Part II of the RA to include a review letter from the Texas Historical Commission documenting compliance with the Natural Resources Code, Chapter 191.

20. Section 17.1.2, Buffer Zones, page II-26, states that, "The buffer zones between the registration boundary and the transfer station location are shown on Drawing IIA.11 – General Site Plan." Please note that upon review, Drawing IIA.11 does not depict the buffer zones for the facility. In accordance with 30 TAC §330.543(b)(1), please revise this drawing to ensure that the buffer zones for the facility are depicted.

21. The RA contains an evaluation performed by Half Associates, Inc., in Appendix IIE regarding threatened and endangered species that may be found within the registration boundary. The evaluation states that the following threatened and endangered species may be found within the registration boundary based on a preliminary review of publically available resources: Houston toad, white-faced ibis, wood stork, creek chubsucker, and the timber/canebrake rattlesnake. The evaluation states that the likelihood of occurrence for the white-faced Ibis, wood stork, and timber/canebrake rattlesnake is conditional, is based on migration patterns, and is not likely to occur within the registration boundary. In addition, the evaluation states that because limited information is available, the facility should contact the Texas Parks and Wildlife Department (TPWD) regarding the creek chubsucker and the US Fish and Wildlife Service (USFWS) regarding the Houston Toad. In accordance with 30 TAC §330.61(n)(1) and §330.551, regarding endangered and threatened species, please provide a letter from the TPWD and USFWS to verify whether any endangered or threatened species may be located within the registration boundary.

22. Part II, Section 17, Location Restrictions, includes a discussion regarding the regulations contained in 30 TAC Chapter 330, Subchapter M, regarding location restrictions. Please note that each discussion regarding the location restrictions specified in 330 TAC Chapter 330, Subchapter M should be certified by a licensed P.E. Please revise Part II, Section 17, to ensure that each discussion regarding the location restrictions specified above will be signed, sealed, and dated by a licensed P.E.

## Part III and Part III Attachments

23. Section 2.1, Facility Access, page IIIA-2, states, "A gate constructed of suitable fencing materials will be located on the entrance road." Please note that this statement does not clearly provide a description of the facility's entrance gate. In accordance with 30 TAC §330.63(b)(1), please revise the statement above to provide a general description of the facility's entrance gate.

24. The RA does not contain a drawing depicting all dimensions associated with the floor drainage trench, drainage sump, and the secondary containment walls associated with the contaminated water tank. In accordance with 30 TAC §330.63(b)(2)(D) and (F), please revise the RA to include a drawing that will depict all of the dimensions associated with the items specified above. Please ensure that the drawings shall depict key cross sectional and plan views for all items specified above.

25. Drawing IIIB.2, Transfer Station Layout Plan, does not state what materials will be used to construct the contaminated water tank. In accordance with 30 TAC §330.63(b)(2)(D), please revise this drawing to include the type of materials that will be used to construct the contaminated water tank.

26. The RA does not include construction details of slab and subsurface supports of all storage and processing components. In accordance with 30 TAC §330.63(b)(2)(E), please revise the RA to include generalized construction details of slab and subsurface supports of all storage and processing components. Please ensure that the drawings shall depict key cross sectional and plan views for all items specified above.

27. Part III of the RA does not address the regulations contained in 30 TAC §330.63(b)(5) regarding endangered species protection. In accordance with the cited rule, please provide a discussion regarding how the facility will be designed to protect endangered species.

28. Please provide a certification statement prepared, sealed, and signed by a licensed P.E. verifying the requirements of 30 TAC §330.63(c) regarding facility surface water drainage.

29. Section 2, Closure Requirements, page IIIC-2 includes a discussion regarding the placement of closure notification signs and suitable barriers at all access points of the facility, but this discussion does not state when these items will be placed at the facility. In accordance with 30 TAC §330.461(b), the items stated above should be placed no later than 90 days prior to the initiation of a final facility closure. In accordance with the cited rule, please revise this section to include a timeframe of when the closure notification signs and suitable barriers at all access points of the facility will be placed at the facility.

30. The facility's closure plan has not addressed the regulations associated with 30 TAC §330.459(c) and (d)(2), regarding evidence of a release from an MSW unit and timeframe for the completion of closure activities, respectively. Please revise the facility's closure plan to address the cited rules.

31. The closure cost estimate located in Appendix IIID1, Closure Cost Estimate Calculations, on page IIID1-4, has not been sealed, signed, and dated by a P.E. In accordance with 30 TAC §330.57(f)(1), please revise this document to ensure that it is signed, sealed, and dated by a P.E.

32. The RA has not address all of the regulations associated with 30 TAC §330.63(j), regarding cost estimate for closure and post-closure care. In accordance with the cite rule please revise the RA to ensure that the facility will submit a copy of the documentation required to demonstrate financial assurance as specified in 30 TAC Chapter 37, Subchapter R (relating to Financial Assurance for Municipal Solid Waste Facilities) 60 days prior to the initial receipt of waste.

**Part IV and Part IV Attachments**

33. Part IV of the RA does not provide a discussion regarding the types of waste to be received, an estimate of the amount of each waste to be received daily, the maximum and average lengths of time that the recovered material will remain at the facility, and the maximum and average waste processing times. In accordance with 30 TAC §330.203(b), please revise Part IV of the RA to include a discussion regarding the items stated above.

34. Section 3, Contaminated Water Management, page IV-4, states, "Should the discharge of contaminated water be necessary, the facility will obtain specific written authorization from the TCEQ prior to discharge. Please note that in accordance with 30 TAC §330.203(e), off-site discharge of contaminated waters shall be made only after approval under the Texas Pollutant Discharge Elimination System authority. Please revise the statement above to be in compliance with the cited rule.

35. Table 5-1, page IV-8, contains references to the facility's registration number, but does not provide the facility's registration number. Please revise this table to include the facility's registration number (MSW 40259).

36. Section 6, Fire Protection Plan, page IV-9, has not demonstrated that an adequate supply of water under pressure is available for firefighting purposes. In accordance with 30 TAC §330.221(a) and (c), please revise this section to include a discussion demonstrating that an adequate supply of water under pressure is available for firefighting purposes. Please ensure to discuss the water sources, the amount of water available from each source, the location of each water source, and the amount of water pressure available for fire protection purposes. If water tanks will be used to store water, please provide the location, the volume of water that will be stored, and the water pressure available with respect to each water tank.

37. Section 7.1, Access Control, page IV-12, does not provide the construction details associated with the perimeter fence located at the registration boundary. In accordance with 30 TAC §330.223(c), please provide a discussion regarding the construction details of the perimeter fence located at the registration boundary.

38. Section 7.4, Operating Hours, page IV-14, states that the Pintail Landfill Transfer Station is authorized for waste acceptance from 7 a.m. to 7 p.m., Monday through Saturday and authorized for facility operations from 5 a.m. to 9 p.m., Monday through Saturday. Please note that the waste acceptance and operating hours specified above are not in compliance with 30 TAC §330.229(a), regarding operating hours. In accordance with the cited rule please revise the facility waste acceptance and operating hours to ensure that waste acceptance hours will be any time between the hours of 7:00 a.m. and 7:00 p.m., Monday through Friday, and that the facility operating hours will be any time between the hours of 5:00 a.m. and 9:00 p.m., Monday through Friday.

39. The RA does not address the regulations associated with 30 TAC §330.203(c), regarding waste acceptance and analysis; 30 TAC §330.205, regarding facility-generated wastes; 30 TAC §330.207(f), regarding wastewater discharge; 30 TAC §330.229(b) and (c), regarding waste acceptance hours; and 30 TAC §330.245(a), (b), (d), (f), (h), (i), and (j), regarding ventilation and air pollution control. Please revise Part IV of the RA to include a discussion regarding the regulations stated above.

Please submit an original and three (3) copies of your application revisions within **54** days of the date of this letter. Your response must be in a form that allows for the replacement of application pages with the revised pages. According to 30 TAC §330.57(g)(6), revisions must have a revision date and note that the sheet is revised in the header or footer of each revised sheet or page. The revised text must be marked to highlight the revision. Since your application is under technical review, please use the label, **"Tech-Revision # (date)" to identify your NOD response**. In accordance with 30 TAC §305.44, please include an original certification statement with the revision. Along with the original signature, the certification statement should indicate the name, title, and address of the responsible official. Failure to submit a satisfactory response to each of the noted deficiencies may result in the application being returned due to technical deficiencies.

Please note we do not anticipate granting an extension of time to fulfill this request. Also, please be aware a third notice of technical deficiency will not be issued.

If you have any questions, please contact me at (512) 239-2580. When addressing written correspondence, please use mail code MC 124.

Sincerely,

Ruben Meza, Jr., Engineering Specialist
Municipal Solid Waste Permits Section
Waste Permits Division
Texas Commission on Environmental Quality

RM/sm

cc:     Mr. Kenneth J. Welch, P.E., Biggs & Mathews Environmental, Mansfield



Bryan W. Shaw, Ph.D., *Chairman*
Buddy Garcia, *Commissioner*
Carlos Rubinstein, *Commissioner*
Mark R. Vickery, P.G., *Executive Director*



# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

February 17, 2012

Mr. Ernest Kaufmann
Pintail Landfill, LLC
24644 Highway 6
Hempstead, Texas  77445

Re:  Pintail Landfill Transfer Station - Waller County
     Municipal Solid Waste (MSW) - Registration No. 40259
     Registration Application (RA) – First Technical Notice of Deficiency (NOD)
     Tracking No. 151850663; RN106192735/CN603939349

Dear Mr. Kaufmann:

The MSW Permits Section has completed the review of the RA dated August 1, 2011, and the revisions dated August 8, 2011, August 29, 2011, November 16, 2011, and January 18, 2012. The application was prepared by Biggs and Mathews Environmental and submitted on behalf of Pintail Landfill, LLC. Additional information must be presented to demonstrate compliance with Title 30 of the Texas Administrative Code (30 TAC) Chapter 305 and Chapter 330. The information requested below is necessary for a complete RA and must be addressed prior to further technical review. When making revisions to maps, drawings, and figures which are replicated throughout the application, each map, drawing, and figure needs to be revised throughout the application.

A.  Dated cover letter transmitting the revised RA should accompany the revised application;

B.  Each item of concern should be addressed in the transmittal letter and the applicant's response to the item should be immediately following the item of concern;

C.  The applicant should indicate where in the revised RA the revisions have been made by reference to part, section, and page number; and

D.  Please include an original certification statement with the revision, in accordance with 30 TAC Section (§)305.44. The certification statement should indicate the name, title, and address of the responsible official.

## Part I and Part I Attachments

1.  It is noted that the current submittal contained four redline/strikeout copies. Please note that all revised registration applications should include one original, two unmarked copies, and one marked copy (such as a redline/strikeout version). Please provide one original and two unmarked copies of the January 18, 2012, submittal with your next response.

2.  Page 3 of the Texas Commission on Environmental Quality (TCEQ) Part 1 Form (TCEQ Form No. 0650) states that the information regarding the public place where the administratively complete RA will be located is not applicable. It is noted that the revised Notice of Application and Opportunity to Request a Public Meeting that the facility published states that the RA is available for viewing and copying at the Waller County Clerk's Office. Please revise page 3 of the TCEQ Form No. 0650 to include the information regarding the public place where the administratively complete registration application will be located.

**Part II and Part II Attachments**

3. Our concerns listed in NOD Comment No. 15 of our October 27, 2011 letter, have not been adequately addressed. As stated previously, Part II of the RA does not include a response from the Texas Department of Transportation (TXDOT) regarding the applicants request for coordination. In accordance with 30 TAC §330.61(i)(4), please submit the response from TXDOT to demonstrate coordination. Please ensure to provide documentation that TXDOT has reviewed the new location of the facility's site entrance.

4. Our concerns listed in NOD Comment No. 19 of our October 27, 2011 letter, have not been adequately addressed. As stated previously, the RA does not include a review letter from the Texas Historical Commission documenting compliance with the Natural Resources Code, Chapter 191, Texas Antiquities Code. In accordance with 30 TAC §330.61(o), please revise Part II of the RA to include a review letter from the Texas Historical Commission documenting compliance with the Natural Resources Code, Chapter 191.

5. Part II, Section 1.1, Existing Conditions, page II-1, states that the "Proposed registration boundary is outside the City of Hempstead city limits and outside its extraterritorial jurisdiction." It is noted that the RA does not include a map depicting the City of Hempstead city limits and extraterritorial jurisdiction. Please revise Part II of the RA to include a map depicting the City of Hempstead city limits and extraterritorial jurisdiction.

6. Our concerns listed in NOD Comment No. 18 of our October 27, 2011 letter, have not been adequately addressed. Part II, Appendix IID, Wetlands Documentation, page IID-168, states that the facility has requested a preliminary jurisdictional determination from the United States Army Corps of Engineers (USACE). It is noted that the RA does not include documentation regarding the USACE jurisdictional determination. Please ensure to include all documentation regarding coordination with USACE and the jurisdictional determination from USACE with your next submittal.

7. Part II, Appendix IID, Wetlands Documentation, provides information regarding the delineation of wetlands and waters of the United States (US) within the property boundary. Upon review, it is not clear whether any of the delineated wetlands and waters of the US will be impacted during the construction of the transfer station and internal facility roadways. To clarify whether any of the delineated wetlands and waters of the US will be impacted, please revise Part II of the RA to include a drawing depicting the transfer station, internal facility roadways, wetlands, waters of the US, and the registration boundary. Additionally, please provide a discussion regarding whether any wetlands and waters of the US will be altered during the construction of the facility.

8. Part II, Appendix IIE, Appendix IIE, Endangered or Threatened Species Documentation, page IIE-71 and 72, both state that, "Because of the incidental chance for occurrence and because the suitable habitat occurs in areas (i.e. south central pond/wetland complex) that will not be impacted by the landfill, the landfill project will not cause or contribute to taking of the White Faced Ibis . . . . [and the] Wood Stork." In addition, Part II, Appendix IIE, Appendix IIE, page IIE-74 states, "However, because suitable habitat for the timber rattlesnake occurs in portions of the study area (i.e. forested areas near permanent water sources) that will not be impacted by the landfill, the landfill project will not cause or contribute to taking of the Timber Rattlesnake." Please note that the RA has not clearly identified the locations of the potential habitats for the White Faced Ibis, Wood Stork, and Timber Rattlesnake. Please provide a drawing showing the locations of the potential habitats for the White Faced Ibis, Wood Stork, and Timber Rattlesnake. Please ensure that this drawing will also depict the transfer station, internal facility roadways, and the registration boundary.

## Part III and Part III Attachments

9. Our concerns listed in NOD Comment No. 24 of our October 27, 2011 letter, have not been adequately addressed. As stated previously, the RA does not contain a drawing depicting all dimensions associated with the floor drainage trench and drainage sump. In accordance with 30 TAC §330.63(b)(2)(D) and (F), please revise the RA to include a drawing that will depict all of the dimensions associated with the items specified above. Please ensure that the drawings shall depict key cross sectional and plan views for all items specified above.

10. Our concerns listed in NOD Comment No. 25 of our October 27, 2011 letter, have not been adequately addressed. As stated previously, Drawing IIIB.2, Transfer Station Layout Plan, does not state what materials will be used to construct the contaminated water tank. In accordance with 30 TAC §330.63(b)(2)(D), please revise this drawing to include the type of materials that will be used to construct the contaminated water tank.

11. Our concerns listed in NOD Comment No. 26 of our October 27, 2011 letter, have not been adequately addressed. As stated previously, the RA does not include construction details of slab and subsurface supports of all storage and processing components. In accordance with 30 TAC §330.63(b)(2)(E), please revise the RA to include generalized construction details of slab and subsurface supports of all storage and processing components. Please ensure that the drawings shall depict key cross sectional and plan views for all items specified above.

12. Our concerns listed in NOD Comment No. 27 of our October 27, 2011 letter, have not been adequately addressed. It is noted that Part II, Appendix IIE, Endangered or Threatened Species Documentation, has identified several locations within the registration boundary that may be potential habitats for the following endangered and/or threatened species: the white-face ibis, the wood stork, the creek chubsucker, and the timber rattlesnake. Please note that Part III of the RA does not address the regulations contained in 30 TAC §330.63(b)(5) regarding endangered species protection. In accordance with the cited rule, please provide a discussion regarding how the facility will be designed to protect the potential habitats of the endangered and/or threatened species mentioned above.

13. In response to NOD Comment No. 30 of our October 27, 2011 letter, the facility stated that the requirements of 30 TAC §330.459(c) are not applicable because they will only accept construction and demolition waste. Please note the requirements of 30 TAC §330.459(c) are applicable to all MSW storage and processing facilities. As stated previously, the facility's closure plan has not addressed the regulations associated with 30 TAC §330.459(c), regarding evidence of a release from an MSW unit. Please revise the facility's closure plan to address the cited rule.

14. Part III, Appendix IIID2, page IIID2-1, states, "After the registration application is approved by TCEQ, Pintail Landfill, LLC will file the required financial assurance. A copy of the required documentation will be submitted to the executive director of the TCEQ within 60 days from issuance of the registration." Please note that in accordance with 30 TAC §330.63(j), the facility is required to submit a copy of the documentation required to demonstrate financial assurance as specified in 30 TAC Chapter 37, Subchapter R (relating to Financial Assurance for MSW Facilities) 60 days prior to the initial receipt of waste. Please revise the statement above to ensure that the facility will submit a copy of the documentation required to demonstrate financial assurance as specified in 30 TAC Chapter 37, Subchapter R, 60 days prior to the initial receipt of waste.

15. The closure cost estimates provided in Part III, Appendix IIID, Table IIID-1 and Appendix IIID1, page IIID1-4 do not include the cost for disposal of the contaminated water contained in the 5,000 gallon contaminated water storage tank. In accordance with 30 TAC §330.505, Closure Cost Estimates for Storage and Processing Units, please revise the closure cost estimates for the facility to ensure that they will include the cost for disposal of the contaminated water contained in the 5,000 gallon contaminated water storage tank.

16. Part III, page IIIA-4, states, "A water supply required to clean the tipping floor will be provided by a nearby water well and/or a pressurized tank. Hose bibs and hoses located on the west and north walls of the building will be used to wash down the concrete tipping floor." Please note that Part III of the RA does not include information regarding the pressurized water tank. In accordance with 30 TAC §330.63(b)(2)(D), please provide the generalized construction details associated with the pressurized water tank. Please ensure to discuss the tank volume and what materials will be used to construct the tank. In addition, in accordance with 30 TAC §330.63(b)(2)(B), please include the location of the pressurized water tank on the facility's Site Layout Plan.

17. Our concerns listed in NOD Comment No. 36 of our October 27, 2011 letter, have not been adequately addressed. As stated previously, Section 6, Fire Protection Plan, page IV-9, has not demonstrated that an adequate supply of water under pressure is available for firefighting purposes. In accordance with 30 TAC §330.221(a) and (c), please revise this section to include a discussion demonstrating that an adequate supply of water under pressure is available for firefighting purposes. Please ensure to discuss the water sources, the amount of water available from each source, the location of each water source, and the water under pressure available for fire protection purposes. If water tanks will be used to store water, please provide the location, the volume of water that will be stored, and the water pressure available for firefighting purposes. Also, please ensure to discuss why the supply of water under pressure at the facility is adequate for firefighting purposes.

## Part IV and Part IV Attachments

18. Part IV, Section 2.2, page IV-3, states, "If waste is stored, it will be stored in the transfer station building or in securely covered transfer trailers and/or roll-off boxes located within the building or parked in the designated parking area outside the building." Please note that the location(s) where waste will be stored outdoors has not been depicted in the facility's site layout plan. In accordance with 30 TAC §330.63(b)(2)(B), please revise Drawing IIIB.2, Transfer Station Layout Plan, to ensure that all location(s) where waste will be stored outdoors are depicted.

19. Our concerns listed in NOD Comment No. 37 of our October 27, 2011 letter, have not been adequately addressed. It is noted that Part IV, Section 7.1.1, page IV-12, states, "The property will be fenced at the transfer station's registration boundary with barb wire fencing on all sides." Please note that in accordance with 30 TAC §330.223(c), access to the facility must be controlled by a perimeter fence, consisting of a four-foot barbed wire fence or a six-foot chain-link fence or equivalent, and have lockable gates. Please note that the statement provided above does not include a description regarding the height of the barbed wire fence. In accordance with the cited rule, please revise the statement above to include the height of the facility perimeter fence and specify whether the fence will include lockable gates. In addition, it is noted that Drawing IIA.11 states, "Access control will be provided by fence along registration boundary or property boundary." Please note that the location of the perimeter fence stated in Drawing IIA.11 is not consistent with the location provided in Part IV, Section 7.1.1, page IV-12. Please revise these documents to ensure that they will include consistent information regarding the location of the facility perimeter fence.



20. Our concerns listed in NOD Comment No. 38 of our October 27, 2011 letter, have not been adequately addressed. Part IV, Section 7.4, Operating Hours, page IV-14, states, "The Pintail Landfill Transfer Station is authorized for waste acceptance from 3:00 a.m. to 5 p.m., Monday through Friday and from 3:00 a.m. to 1:00 p.m. on Saturday. . . . The Pintail Landfill Transfer Station is authorized for facility operations 24 hours per day, 7 days a week." Please note that the waste acceptance and operating hours specified above are not in compliance with 30 TAC §330.229(a), regarding operating hours. In accordance with the cited rule please revise the facility waste acceptance and operating hours to ensure that waste acceptance hours will be any time between the hours of 7:00 a.m. and 7:00 p.m., Monday through Friday, and that the facility operating hours will be any time between the hours of 5:00 a.m. and 9:00 p.m., Monday through Friday. Please note that if the facility would like to request alternative waste acceptance and operating hours from the hours specified in 30 TAC §330.229(a), they must include justification regarding why alternative waste acceptance and operating hours are necessary. If the facility would like to request alternative waste acceptance and operating hours, please revise this section to include justification regarding why alternative waste acceptance and operating hours are necessary.

In addition, it is not clear what measures will be implemented at the facility to reduce the noise that will be created due to the proposed alternative waste acceptance and operating hours. Please provide a discussion regarding what measures will be implemented to reduce the noise that may be created from the proposed alternative waste acceptance and operating hours.

21. In response to NOD Comment No. 39 of our October 27, 2011 letter, the facility states, "§330.203(c) and 330.205(a) . . . are not applicable since the Pintail Landfill Transfer Station will accept only construction and demolition wastes that will not require sampling, testing, and specifications of waste characteristics. The facility will not generate wastes". Please note that although the requirements of 30 TAC §330.203(c) and §330.205(a) may not be applicable to the construction and demolition wastes received, this rule is applicable to the contaminated water (i.e. wash water) generated by the facility. Please revise Part IV of the RA to include a discussion regarding the regulations contained in 30 TAC §330.203(c) and §330.205(a) regarding facility generated waste.

22. Our concerns listed in NOD Comment No. 39 of our October 27, 2011 letter, have not been adequately addressed. Please note that the RA does not address the regulations associated with 30 TAC §330.245(b) and (j), regarding ventilation and air pollution control. Please revise Part IV of the RA to include a discussion regarding the regulations stated above.

Please submit an original and three (3) copies of your application revisions within 30 days of the date of this letter. Your response must be in a form that allows for the replacement of application pages with the revised pages. According to 30 TAC §330.57(g)(6), revisions must have a revision date and note that the sheet is revised in the header or footer of each revised sheet or page. The revised text must be marked to highlight the revision. Since your application is under technical review, please use the label, "Tech-Revision # (date)" to identify your NOD response. In accordance with 30 TAC §305.44, please include an original certification statement with the revision. Along with the original signature, the certification statement should indicate the name, title, and address of the responsible official. Failure to submit a satisfactory response to each of the noted deficiencies may result in the application being returned due to technical deficiencies.

Please note we do not anticipate granting an extension of time to fulfill this request. Also, please be aware a third notice of technical deficiency will not be issued.

Mr. Ernest Kaufmann
Page 6
February 17, 2012

If you have any questions, please contact me at (512) 239-2580. When addressing written correspondence, please use mail code MC 124.

Sincerely,

Ruben Meza, Jr., Engineering Specialist
Municipal Solid Waste Permits Section
Waste Permits Division
Texas Commission on Environmental Quality

RM/sm

cc:     Mr. Kenneth J. Welch, P.E., Biggs & Mathews Environmental, Mansfield

 



Buddy Garcia, *Chairman*
Larry R. Soward, *Commissioner*
Bryan W. Shaw, Ph.D., *Commissioner*
Mark R. Vickery, P.G., *Executive Director*

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

April 12, 2012

Mr. Ernest Kaufmann
Manager
Pintail Landfill, LLC
24644 Highway 6
Hempstead, Texas 77445

Re:  Pintail Landfill Transfer Station - Waller County
    Municipal Solid Waste (MSW) - Registration No. 40259
    Registration Application (RA) – Technical Notice of Deficiency (NOD)
    Tracking No. 15522621; RN106192735/CN603939349

Dear Mr. Kaufmann:

The MSW Permits Section has completed the review of the RA dated August 1, 2011, and the revisions dated August 8, 2011, August 29, 2011, November 16, 2011, January 18, 2012, and March 15, 2012. The application was prepared by Biggs and Mathews Environmental and submitted on behalf of Pintail Landfill, LLC. Additional information must be presented to demonstrate compliance with Title 30 of the Texas Administrative Code (30 TAC) Chapter 305 and Chapter 330. The information requested below is necessary for a complete RA and must be addressed prior to further technical review. When making revisions to maps, drawings, and figures which are replicated throughout the application, each map, drawing, and figure needs to be revised throughout the application.

A.  Dated cover letter transmitting the revised RA should accompany the revised application;

B.  Each item of concern should be addressed in the transmittal letter and the applicant's response to the item should be immediately following the item of concern;

C.  The applicant should indicate where in the revised RA the revisions have been made by reference to part, section, and page number; and

D.  Please include an original certification statement with the revision, in accordance with 30 TAC Section (§)305.44. The certification statement should indicate the name, title, and address of the responsible official.

## Part II and Part II Attachments

1.  Our concerns listed in NOD Comment No. 3 of our February 17, 2012 letter, have not been adequately addressed. As stated previously, Part II of the RA does not include a response from the Texas Department of Transportation (TXDOT) regarding the applicants request for coordination. In accordance with 30 TAC §330.61(i)(4), please submit the response from TXDOT to demonstrate coordination. Please ensure to provide documentation that TXDOT has reviewed the new location of the facility's site entrance.

2.  Our concerns listed in NOD Comment No. 4 of our February 17, 2012 letter, have not been adequately addressed. As stated previously, the RA does not include a review letter from the Texas Historical Commission documenting compliance with the Natural Resources Code,

Chapter 191, Texas Antiquities Code. In accordance with 30 TAC §330.61(o), please revise Part II of the RA to include a review letter from the Texas Historical Commission documenting compliance with the Natural Resources Code, Chapter 191.

## Part III and Part III Attachments

3. Our concerns listed in NOD Comment No. 11 of our February 17, 2012 letter, have not been adequately addressed. As stated previously, the RA does not include construction details of subsurface supports of all storage and processing components. Please revise the RA to include a statement verifying whether there are any subsurface supports associated with the facility. In accordance with 30 TAC §330.63(b)(2)(E), if there are any subsurface supports associated with the transfer station, please revise the RA to include generalized construction details of all subsurface supports associated with the facility. Please ensure that the drawings shall depict key cross sectional and plan views for all items specified above.

4. The closure cost estimates provided in Part III, Appendix IIID1, page IIID1-4 provides a lump sum of $5,000 for general cleanup. The RA states that this includes washdown and disinfection of the facility as well as disposal of the contaminated water. Please revise the closure cost estimate calculations on page IIID1-4, to provide at a minimum, a separate line item estimate of the cost associated with washdown, disinfection, disposal of contaminated water, and the transportation costs associated with disposal of the contaminated water.

5. In response to NOD Comment No. 15 of our February 17, 2012 letter, the facility provided a cost estimate for the disposal of contaminated water at $0.05 per gallon. Please provide verification from an independent 3rd party processor that includes the unit cost for disposal of contaminated water that is provided in the facility's closure cost estimate. Please ensure that the information provided will include the unit cost for disposal of the contaminated water quoted in the facility's closure cost estimate, shall be signed by the person who provided the estimate, and will include the person's contact information.

## Part IV and Part IV Attachments

6. Part IV, Section 2.2, Volume and Rate of Transfer, page IV-3, states, "If waste is stored, it will be stored in the transfer station building or in securely covered transfer trailers and/or roll-off boxes located within the building or parked in the designated parking area outside the building." It appears that the facility is proposing to store C & D waste in transfer trailers and/or roll-off boxes outdoors. Please verify whether C & D waste will be stored outdoors in the transfer trailer/roll-off storage area. In addition, if waste will be stored outdoors, please revise the RA to include a discussion regarding how the outdoor waste storage units and area will be in compliance with 30 TAC §330.63(b)(2)(D), general construction details; 30 TAC §330.63(b)(4), water pollution control; 30 TAC §330.63(d), waste management unit design; and 30 TAC §330.207, contaminated water management.

7. Part IV, Section 3, Contaminated Water Management, page IV-4, states, "The contaminated water will then be transported offsite for treatment, testing, and disposal at a publicly owned treatment works (POTW) or a properly permitted treatment facility in accordance with its sampling and analysis plan." The RA does not specify which facility will be used to treat and dispose of the contaminated water generated onsite. In accordance with 30 TAC §330.205(a) and (b), please provide the name and permit number of the treatment facility that will be used to treat and dispose of the contaminated water generated onsite. In

addition it is not clear whether the contaminated water generated onsite will be sampled and analyzed in accordance with 30 TAC §330.203(c)(2). Please revise this section to ensure that: at a minimum, effluent from the facility will be analyzed annually for TPH, fats, oil and grease, and pH; records of each analysis will be maintained at the facility for a minimum of three years; and that all sampling and analysis shall be done according to EPA-approved methods.

8. The RA does not specify how often the contaminated water contained within the 5,000 gallon contaminated water storage tank will be disposed. In accordance with 30 TAC §330.205, please revise Part IV, Section 3, Contaminated Water Management, to specify how often the contaminated water contained within the 5,000 gallon contaminated water storage tank will be disposed.

9. Part IV, Section 4.1, states, "All solid wastes will be stored in a manner to prevent fires, ensure safety, control animals, control vectors, and contained to prevent windblown solid waste and litter." Please note that the statement above does not include procedures regarding how the facility will ensure that these requirements are achieved. In accordance with 30 TAC §330.65(a) and §330.209(b), please revise this section to include procedures regarding how odors, vectors, and windblown waste will be managed from all on-site waste and recyclable material storage areas.

10. Part IV, Section 7.14, Employee Sanitation Facilities, page IV-19, states that, "Sanitary facilities are provided for all employees and visitors at the transfer station . . . Portable sanitary facilities will be provided." It appears that all onsite domestic wastewater will be managed by a private contractor. Please clarify whether the private contractor will remove and properly disposed of all onsite domestic wastewater. In addition, please certify that domestic wastewater will not be placed in the facility's contaminated water tank.

11. Part IV, Section 7.6, page IV-15, states, "The facility will provide litter control devices, as necessary, at appropriate locations near the tipping floor and elsewhere. The litter control devices will be constructed of appropriate materials for the control of windblown material and liter." Please note that the RA does not specify what devices will be used to control windblown material and litter, and does not describe when these devises will be implemented. In accordance with 30 TAC §330.233(a)(1), please revise this section to provide a discussion regarding what devices will be used to control windblown material and litter; and the procedures of when these devices will be implemented.

12. Part IV, Section 8.1, Personnel, page IV-21, describes the role of the landfill manger in relation to the transfer station. Please note that the facility has submitted a RA for the construction and operation of a transfer station and all information in the RA should be pertaining to the transfer station. As such, please ensure that all information regarding the landfill manger is removed from the RA.

13. Part IV, Section 9.2.3, Facility Entrance Road, page IV-28, states, "Roadways are one way to expedite traffic flow." Please note that Figure IIIB.1, General Site Plan, and Figure IIIB.4, Waste Processing Plan, depict the internal facility roadways as a two lane road and not two separate one way roads. Please revise the statement above to reflect the type of road that will be used for the internal facility roadways.

Mr. Ernest Kaufmann
Page 4
April 12, 2012

Please submit an original and three (3) copies of your application revisions within 30 days of the date of this letter. Your response must be in a form that allows for the replacement of application pages with the revised pages. According to 30 TAC §330.57(g)(6), revisions must have a revision date and note that the sheet is revised in the header or footer of each revised sheet or page. The revised text must be marked to highlight the revision. Since your application is under technical review, please use the label, **"Tech-Revision # (date)" to identify your NOD response.** In accordance with 30 TAC §305.44, please include an original certification statement with the revision. Along with the original signature, the certification statement should indicate the name, title, and address of the responsible official. Failure to submit a satisfactory response to each of the noted deficiencies may result in the application being returned due to technical deficiencies.

If you have any questions, please contact me at (512) 239-2580. When addressing written correspondence, please use mail code MC 124.

Sincerely,

Ruben Meza, Jr., Engineering Specialist
Municipal Solid Waste Permits Section
Waste Permits Division
Texas Commission on Environmental Quality

RM/sdm

cc:     Mr. Kenneth J. Welch, P.E., Biggs & Mathews Environmental, Mansfield

Bryan W. Shaw, Ph.D., *Chairman*
Carlos Rubinstein, *Commissioner*
Toby Baker, *Commissioner*
Zak Covar, *Executive Director*



# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

June 25, 2012

Mr. Ernest Kaufmann
Manager
Pintail Landfill, LLC
P.O. Box 969
Hempstead, Texas 77445

Re:     Pintail Landfill Transfer Station - Waller County
        Municipal Solid Waste (MSW) - Registration No. 40259
        Registration Application (RA) – Technical Notice of Deficiency (NOD)
        Tracking No. 15897509; RN106192735/CN603939349

Dear Mr. Kaufmann:

The MSW Permits Section has completed the review of the RA dated August 1, 2011, and the revisions dated August 8, 2011, August 29, 2011, November 16, 2011, January 18, 2012, March 15, 2012, and May 31, 2012. The application was prepared by Biggs and Mathews Environmental and submitted on behalf of Pintail Landfill, LLC. Additional information must be presented to demonstrate compliance with Title 30 of the Texas Administrative Code (30 TAC) Chapter 305 and Chapter 330. The information requested below is necessary for a complete RA and must be addressed prior to further technical review. When making revisions to maps, drawings, and figures which are replicated throughout the application, each map, drawing, and figure needs to be revised throughout the application.

A.  Dated cover letter transmitting the revised RA should accompany the revised application;

B.  Each item of concern should be addressed in the transmittal letter and the applicant's response to the item should be immediately following the item of concern;

C.  The applicant should indicate where in the revised RA the revisions have been made by reference to part, section, and page number; and

D.  Please include an original certification statement with the revision, in accordance with 30 TAC Section (§)305.44. The certification statement should indicate the name, title, and address of the responsible official.

## Part II and Part II Attachments

1.  Part II, Appendix C, Texas Department of Transportation (TXDOT) Documentation, contains an April 24, 2012, letter from TXDOT regarding the applicants request for coordination. This letter states, "We have subsequently received a letter from Lee Engineering Dated March 13, 2012, requesting information regarding SH 6 and US 290 . . . and we are working to compile information related to the roadway geometrics and historical traffic counts. . . . To this point, we have not received any formal traffic impact study or application for access permits to the site. Prior to making any determination on potential traffic impacts of this proposed facility, our agency will require a full Traffic Impact Assessment from the applicant." Please note that we cannot declare the RA technically complete until TXDOT provides a determination regarding potential traffic impacts for this

site. Please revise the RA to include the Traffic Impact Assessment Report requested by TXDOT and their response to this report. In addition, please ensure that the RA will include all additional correspondence with TXDOT.

Please submit an original and three (3) copies of your application revisions within 30 days of the date of this letter. Your response must be in a form that allows for the replacement of application pages with the revised pages. According to 30 TAC §330.57(g)(6), revisions must have a revision date and note that the sheet is revised in the header or footer of each revised sheet or page. The revised text must be marked to highlight the revision. Since your application is under technical review, please use the label, **"Tech-Revision # (date)" to identify your NOD response**. In accordance with 30 TAC §305.44, please include an original certification statement with the revision. Along with the original signature, the certification statement should indicate the name, title, and address of the responsible official. Failure to submit a satisfactory response to each of the noted deficiencies may result in the application being returned due to technical deficiencies.

If you have any questions, please contact me at (512) 239-2580. When addressing written correspondence, please use mail code MC 124.

Sincerely,

Ruben Meza, Jr., Engineering Specialist
Municipal Solid Waste Permits Section
Waste Permits Division
Texas Commission on Environmental Quality

RM/sdm

cc:    Mr. Kenneth J. Welch, P.E., Biggs & Mathews Environmental, Mansfield





Bryan W. Shaw, Ph.D., *Chairman*
Carlos Rubinstein, *Commissioner*
Toby Baker, *Commissioner*
Zak Covar, *Executive Director*

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

August 16, 2012

Mr. Ernest Kaufmann
Manager
Pintail Landfill, LLC
P.O. Box 969
Hempstead, Texas 77445

Re: Pintail Landfill Transfer Station - Waller County
Municipal Solid Waste (MSW) - Registration No. 40259
Registration Application (RA) – Technical Notice of Deficiency (NOD)
Tracking No. 15987368; RN106192735/CN603939349

Dear Mr. Kaufmann:

The MSW Permits Section has completed the review of the RA dated August 1, 2011, and the revisions dated August 8, 2011, August 29, 2011, November 16, 2011, January 18, 2012, March 15, 2012, May 31, 2012, and July 20, 2012. The application was prepared by Biggs and Mathews Environmental and submitted on behalf of Pintail Landfill, LLC. Additional information must be presented to demonstrate compliance with Title 30 of the Texas Administrative Code (30 TAC) Chapter 305 and Chapter 330. The information requested below is necessary for a complete RA and must be addressed prior to further technical review. When making revisions to maps, drawings, and figures which are replicated throughout the application, each map, drawing, and figure needs to be revised throughout the application.

A. Dated cover letter transmitting the revised RA should accompany the revised application;

B. Each item of concern should be addressed in the transmittal letter and the applicant's response to the item should be immediately following the item of concern;

C. The applicant should indicate where in the revised RA the revisions have been made by reference to part, section, and page number; and

D. Please include an original certification statement with the revision, in accordance with 30 TAC Section (§)305.44. The certification statement should indicate the name, title, and address of the responsible official.

## Part II and Part II Attachments

1. Part II, Appendix C, Texas Department of Transportation (TXDOT) Documentation, contains a June 25, 2012, Traffic Impact Analysis associated with the permit application that was submitted for MSW 2377, Pintail Landfill. This report contains extensive information regarding the traffic that will be generated by the proposed landfill and does not include a separate discussion regarding the proposed transfer station. In accordance with 30 TAC §330.61(i)(4), please revise Part II of the RA to include documentation of coordination with TXDOT for traffic and location restrictions concerning the proposed transfer station. Please ensure that the information submitted to TXDOT will address all applicable information contained in 30 TAC §330.61(i), regarding Transportation.

Mr. Ernest Kaufmann
Page 2
August 16, 2012

Please submit an original and three (3) copies of your application revisions within 30 days of the date of this letter. Your response must be in a form that allows for the replacement of application pages with the revised pages. According to 30 TAC §330.57(g)(6), revisions must have a revision date and note that the sheet is revised in the header or footer of each revised sheet or page. The revised text must be marked to highlight the revision. Since your application is under technical review, please use the label, **"Tech-Revision # (date)" to identify your NOD response**. In accordance with 30 TAC §305.44, please include an original certification statement with the revision. Along with the original signature, the certification statement should indicate the name, title, and address of the responsible official. Failure to submit a satisfactory response to each of the noted deficiencies may result in the application being returned due to technical deficiencies.

If you have any questions, please contact me at (512) 239-2580. When addressing written correspondence, please use mail code MC 124.

Sincerely,

Ruben Meza, Jr., Engineering Specialist
Municipal Solid Waste Permits Section
Waste Permits Division
Texas Commission on Environmental Quality

RM/pt

cc:     Mr. Kenneth J. Welch, P.E., Biggs & Mathews Environmental, Mansfield

B



Bryan W. Shaw, Ph.D., *Chairman*
Carlos Rubinstein, *Commissioner*
Toby Baker, *Commissioner*
Zak Covar, *Executive Director*

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

July 16, 2013

To All Concerned Parties:

Re:  Pintail Landfill LLC - Pintail Landfill Transfer Station – Waller County
Municipal Solid Waste (MSW) - Registration Application No. 40259
MSW Type V Processing & Recycling Facility
Courtesy Response Letter

Thank you for the public comments you submitted to the Texas Commission on Environmental Quality (TCEQ) regarding the application submitted by Pintail Landfill, LLC (Applicant or Pintail) for proposed Registration Application No. 40259 that would authorize the construction and operation of a new Type V processing and recycling facility (Application).

The following individuals submitted timely comment letters to the TCEQ and/or provided comments at the public meeting of July 10, 2012, regarding the proposed Application.

| | | |
|---|---|---|
| Bettye Jo Adair | Emily K. Brain | Commissioner Sylvia Cedillo |
| Aisha Adams | Barbara Brandon | Stephanie Childs |
| Ashley Adams | Judy Bridges | Ricky Cleveland |
| Gloria Adams | Junior N. Bridges | Tonya Cleveland |
| Willie L. Adams | Brynn Brigham | Kyle Cline |
| Jessie W. Alexander | Lisa Brimberry | Ruth S. Connett |
| Latoya Alexander | Sharon Brister | Jesus M. Contreras |
| Shaterica Alexander | David Brounkowski | Angela Cortes |
| James P. Allison | E. Brounkowski | Asuncion Cortes |
| Eric Allmon | Frances Brounkowski | Guadalupe Cortes |
| Connie L. Amsler | Karl Brounkowski | Guillermo Cortes |
| John A. Amsler | Cassandra Brown | Miguel Cortes |
| Pat Anderson | Gail Brown | Rene Cortes |
| Julian Arellano | Thomas E. Brown | Roberto Cortes |
| Katherine Arellano | Ursulandress Brown | Bruna Cortez |
| Martha Arellano | James Buckner | Sherri D. Cox |
| Teodoro Arellano | Kathy Buckner | Jamie Crandall |
| Stacy Bacon | Alice Burland | Jackie Hopkins Craver |
| Bonnie Banks | Peter D. Burland | Alice Crawford |
| Daniel W. Banks | Yvette Burus | Patrice Creag |
| Donald H. Barnett | Angelisa Bush | A. W. Crosby |
| Jeron M. Barnett | Shirley Butler | Gertrude Crosby |
| Linda Barrs | Cristal Campbell | Michael Curtis |
| Renee E. Barry | Fran R. Carlin | Allysia Cyprien |
| Chet H. Beaty | T. L. Carlisle | Creshana Davis |
| Barbara Blackmon | Ricky Carpenter | Maria De Los Angeles Olvera |
| Brittani Giselle Bodwin | Sharron Carpenter | Maricela De Loera |
| David A. Bolin | Jacqueline Casanova | Rosa De Loera |
| Ivan Botello | Leonard Cash | Ernestina De Losa |

Betty Dean
Clinton Delespine
Carroll Denby
Sheila R. Dennis
Donna Dishroon
James Dishroon
Cyndi Dobson
David R. Dobson
Bruce Wm. Dodds
Teresa Dodds
Michael W. Dowling
Francis Drawl
Mary Ann Drawl
Kevin A. Duggan
Pat Dunaway
Diana L. Durand
Laura E
William L. Edmonds
Mickey Ellis
Christine Ellsworth
Frederick Ellsworth
B. J. Eplen
Carol Eplen
Martha Estes
Laura Fargoharson
Adam Farquhar
Diane Farquhar
Charles Faezel
Mary Lou Feazel
David Fehrenbach
Clifford Finch
Jodeci Deshae Foster
Maegan Fraga
Billy R. Frazier
James R. Fuxa
Rebecca S. Gage
William R. Gage
Ana Guadalupe Garcia
Lupe Garcia
Salvador Garcia
Albert Garfield
Lonnie Garfield
Rita Garfield
Lucille B. Garner

Maria Garza
Diana Gehring
Shanetra Gertman
Jack Gibbs
Jimmie Glover
Robert Glover
Elicia Gomez
Rosalva Gomez
Maria Gonzalez
Jackie Gooden
Bryan Grantom
Mildred Greeley
Don Gregg
Joanne Gregory
Fernando Gremer
Felicia Hagon
Joe Hall
Lula Hall
Donald Hand
Angela Hardy
Larry A. Hardy
Ruth B. Hardy
Steven Harrelson
Susan Havard
Jarred Hayes
Juan Herrera
Kevin Herrera
Margelo Herrera
Crystal Hill
Jacquelyn Hillman
Rolan G. Hillman
Noble Hiser
Theresa Hogan
Candace M. Hoke
Jimmie Don Hoke
Zach Holland
H. D. Holloman
Arnold Holloway
Norma Holloway
Bill Huntsinger
Amber L. Jackson
Sammy Jacobson
Rafael Jasso
Beatriz Jimenez

Marisol Jimenez
Miguel Jimenez
Minerva Jimenez
Johnnie Johnson
Jerelyn Mosley Jones
Lisa Jones
Quetta Jones
Robert Paul Jones
Roy W. Jurica
D. K.
R. D. Kapalske
Marilyn Keown
Kawej Kiboks
Dan B. Killough
Elizabeth Ann Killough
Nolan Kimbrey
Arleen King
Kay Kloecker
Katy Knox
Kim Knox
Shawn Knox
Ivy F. Kolaja
Keith Kolaja
Russell Kolaja
C. Kronberger
Randell Lacey
Danny H. Laney
Kim Laney
Flora Lang
Tommy Laughlin
Jahain Lewis
Janella A. Lewis
Linda Lewis
Michael Lewis
M. Marie Lewis
M. Marie Lewis-Lenton
Oddie Lockett
Adelaida Lopez
Jose S. Lopez
Maria D. Lopez
Raul Lopez
Sharon W. Lour
Emmanuel Loveth
Glynne Luetge

Jeannie D. Manuel
James P. Mares
Lisa Marin
Lee Marshall
Jaron A. Martin
Angel Martinez
Eululia Martinez
Falco Martinez
Gerardo Martinez
Ivan Martinez
Jose Jovani Martinez
Norma L. Martinez
Veronica Martinez
Lacus Mason
Donald Mathis
Elva D. Mathis
Karen McCall
Michael McCall
Joanne McCay
Robert McCay
Frankie McCoslin
James McCoslin
Melissa McCullough
Andrea McIntyre
Gerardo Medina
Veronica Medina
Maria Melchor
Louise Merter
Cherylin Gay Messer
Patrick Milan
Joyce L. Miller
Kimberly Leaonna Miller
Greg A. Mills
Suzanne Mitchell
Mike Moore
Melissa Morehead
Chris Moreno
Jose Moreno
Barbara Morrish
David Moulton
Tim Murray
Alma Nagy
David Newcomb
Melissa Newcomb

Shirley Newcome
Tony Newcome
David Nickson
Susan Nickson
Zoe Nonemaker
Robert Nueke
Latecia Oaks
Lloyd Ochterbeck
Phyllis Ogier
Stephen Ogier
Gloria Olveda
Joana Ortiz
Juan Ortiz
Mike Osborn
Sasha Pacheco
Veronica Martinez Pacheco
Kae Palt
R. Janette Parham
Ashley Parker
Patricia L. Pau
Julie K. Pazdernik
Jack L. Pearson
Laun Pearson
Marisa Perales
C. Perun
Thomas J. Perun
Peggy Peters
Deborah Petty
Mark Allen Petty
Ola Fay Phillips
Phyllis Phucas
Stacy Pratt
Patrick Pringle
Catherine Propst
T. Propst
Beulah Purris
Nancy Qualls
Edgar Quiller
John L. Quiter
Abigail Ragston
Howard Ragston
Katherine Ward Ragston
Celestino Ramirez
Miguel A. Ramirez

Rosalinda Ramirez
Doris Randall
Kathy Randall
Mia Reed
Randall Remkes
Dalilah Reyes
Lonia D. Rice
Catherine Richardson
Rochelle Ricks
Tamara Roberts
William Roberts
Bill Robinson
J. Rodriguez
Maria L. Rodriguez
Mary Rodriguez
Francis J. Rodzen
Mary Ann Rodzen
Raymond G. Rogers
Abel Romero
Maria Romero
Jackie Romine
Juan Rosales
Jessicia Emily Roscher
Kenan Rote
Joshua Rush
Ann Sadowski
David M. Sadowski
Tomas Salas
Blanca Salinas
Christina Sanchez
Martina Sanchez
David Sanders
Jesse R. Sanders
Judy L. Sanders
Patty Sanders
Cody Sandoval
Debby Day Schiel
Glen Schmidt
Carol Schmitter
Charolette Schultea
Edis M. Schwarz
H. D. Schwarz
Brittney Scott
Glenn W. Shankle

Ellen C. Shelburne
Taylor Shell
Ken Shelron
Sandy Siegmund
Rushundra M. Simpson
Alex Sinitiere
Eli Sinitiere
Jenni Sinitiere
Madeline Sinitiere
Matthew Sinitiere
Nate Sinitiere
Phillip Luke Sinitiere
Patricia Sloan
Dennis K. Smelser
Donna Annette Smelser
Kendall A. Smelser
Georgette E. Smith
James W. Smith
Lorene Smith
Loretta Smith
Misty L. Smith
Robert Smith
Lauren L. Smith-Carter
Maria Spellacy
Barbara Spreen
David Spreen
Bonnie Squier
Cathleen Steward
Sharisse Steward
Bertha Stewart
Nancy Stolz
Desirae Stravoski
J. Richard Stoker
Rick Sturkie
Commissioner Odis Styers

Diana Tatum
Charles Taylor
Gary Taylor
Jeanette Taylor
Jessica Tejeda
Joann Thibodeaux
Mary Thibodeaux
Doris J. Thomas
Fred Thomas
David Thompson
Harold D. Thompson
Laura Thompson
Michael J. Thompson
Ben Tibbs
Shirley Tigner
Charlene Todaro
Leigh Anne Tomlin
Joanna A. Tompkins
Celia Torres
Ola M. Turner
Larry Tyler
Bart Ullrice
Sheila Ullrich
Delbert W. Van Cleve
Diane Van Cleve
Megan Varner
Maria Velazquz
Claudia Vega
Rigoberto Vega
Rosalva Vega
Johnny Villalovoz
Stella Villalovoz
Terence Deon Walker
Shannon Waring
Emma Washington

Shadia Washington
Shandranique Washington
Jade Q. Washmon
Lesia Washmon
Mikky Wehman
Byrom T. Wehner
Rick Welch
Jean White
Wilton White
Dwain Wiedemany
Diane Williams
Doria Williams
Janice Williams
Joe J. Williams
Magelene Williams
Patricia Williams
Sheila Williams
Zena Wilson
Clarence Wisnoski
Shirley Wisnoski
Demeatra Wolfe
Hamidah Wolfe
Kay Wolfe
Mayor Michael S. Wolfe
Clint H. Woodburn
Michael L. Woodward
Cherry Wright
Sam Wright
Sara Wright
Paul Wunderlich
Glenda Wylie
Frank Yepp
Betty Young
Theresa Young
Criselda Zeped

The following are the public comments received for the Application followed by responses provided by staff of the TCEQ Office of Waste, MSW Permits Section and the TCEQ, Office of Legal Services, Environmental Law Division, Waste Section.

## Comment 1: Landfill Comments

A number of commenters provided comments regarding proposed Permit Application No. 2377 (MSW 2377) for Pintail Landfill which would authorize the construction and operation of a MSW Type I Landfill.

## Response 1:

The comments provided regarding the landfill permit application, MSW 2377, are outside the scope of review for the transfer station registration application, MSW 40259. It is noted that the Applicant submitted a registration application requesting authorization to construct and operate a Type V Facility which includes the storage, collection, processing, and transfer of construction and demolition (C & D) waste. In accordance with the TCEQ rules, the TCEQ staff's evaluation of the Applicant's registration application only includes reviewing items and comments associated with the Type V Facility. Please note that the Applicant's landfill permit application, MSW 2377, is a separate application which is independent from the transfer station application. Furthermore, all timely comments received by the TCEQ regarding the landfill permit application will be addressed in a separate response to comments document in accordance with the requirements of the permitting process.

## Comment 2: Landfill Application

Several commenters stated that the registration application should not be considered until a decision has been made regarding the landfill permit application for MSW 2377. Another commenter stated that this is because if the landfill permit is denied, it is not clear whether the Applicant would proceed with the construction and operation of the transfer station; and the registration would need to be modified because they would not be able to utilize the proposed landfill. A few commenters stated that authorizing the transfer station registration application for MSW 40259 will increase the chances of the Applicant obtaining a permit for the proposed landfill.

## Response 2:

The Applicant has filed two separate applications with the TCEQ – the landfill permit application, MSW 2377, and the transfer station registration application, MSW 40259. In accordance with Title 30 of the Texas Administrative Code (30 TAC) Chapter 330, each application is subject to different requirements and must be reviewed independently. Because the landfill permit application and the transfer station registration are separate and independent, a decision by the commission to act on one of the applications will have no bearing on the other. All requirements of the transfer station registration must comply with the TCEQ rules regardless of whether the proposed landfill is authorized. Furthermore, the registration application states that the transfer station will dispose of all wastes in a Type I or Type IV landfill within 100 miles of the facility.

## Comment 3: Landfill Application Denied

One commenter stated that he would like to know whether the Applicant would construct and operate the transfer station, MSW 40259, if Pintail's proposed landfill permit, MSW 2377, is denied.

**Response 3:**

This is a decision that the Applicant would have to make if the above scenario occurs. If the Applicant's registration is authorized, the TCEQ cannot force the Applicant to construct and operate the transfer station facility. However, in accordance with 30 TAC Section (§)330.71(g), if a registered facility does not commence physical construction within two years of issuance of a registration or within two years of the conclusion of the appeals process, whichever is longer, the registration shall automatically terminate and will no longer be effective.

**Comment 4: Effect of Landfill Application**

One commenter stated that he would like to know how the permit application submitted for Pintail Landfill will affect the registration application for the Pintail Landfill Transfer Station.

**Response 4:**

The Applicant has filed two separate applications with the TCEQ – the landfill permit application, MSW 2377, and the transfer station registration application, MSW 40259. In accordance with 30 TAC Chapter 330, each application is subject to different requirements and must be reviewed independently. Because the landfill permit application and the transfer station registration are separate and independent, a decision by the commission to act on one of the applications will have no bearing on the other.

**Comment 5: Registration Justification**

One commenter stated that the Applicant should be required to apply for a permit to authorize the facility because the facility is not a transfer station but rather a recycling facility, a recycling facility may only be authorized through registration if it is located at an existing permitted MSW facility owned by the applicant, and the Applicant is required to obtain a permit for a processing facility that performs waste-separation/recycling activities. This commenter also stated that the applicant seeks to circumvent the required permitting process by applying for a registration to transfer less than or equal to 125 tons per day but the Application includes material recovery which should require a separate permit.

**Response 5:**

The Application meets the requirements for a registration in accordance with 30 TAC §330.9(b)(3), for a facility used in the transfer of C & D waste that will transfer 125 tons per day or less.

**Comment 6: Consolidation of Applications**

One commenter stated that the transfer station registration application for MSW 40259 should be consolidated with the landfill permit application for MSW 2377.

**Response 6:**

The TCEQ rules have different substantive and procedural requirements for registration applications and permit applications. Therefore, the TCEQ rules do not allow the consolidation of the Applicant's transfer station registration application with its landfill permit application.

### Comment 7: Necessity for a Transfer Station

Several commenters stated that the review of a Type V transfer station application should include consideration of the need for the facility; the need should be based on new and proposed construction in an area, rather than the population and pounds of waste on a per day basis; and that the facility is not needed.

### Response 7:

30 TAC Chapter 330 includes the specific requirements that TCEQ staff can consider when reviewing a registration application. In order to qualify for a registration, the TCEQ rules require an application to meet one of the justifications listed in 30 TAC §330.9. The TCEQ rules do not establish the need for the facility as a requirement that staff can consider. Therefore, the rules do not include the consideration of new or proposed C & D projects in a service area as a justification to obtain a registration for a Type V Facility.

### Comment 8: Projected Waste Received

One commenter stated that the Applicant's computations for the maximum amount of solid waste to be received daily and annually projected for five years is based on a 5.5 day week. However, the transfer station is only to be open 5 days a week, so this is not a valid computation. Additionally, some commenters stated that the transfer station will need lots of on-going construction to justify its existence. If the Pintail Landfill is authorized, it will have a negative impact on new construction projects in the area. They commented that Pintail's daily and annual projections of the waste acceptance rate should be revised to include a more detailed analysis to incorporate any negative effects on building that could affect Pintail Transfer Station's volume and rate of disposal calculations.

### Response 8:

In accordance with 30 TAC §330.61, the owner or operator is required to include in the Waste Acceptance Plan the source and characteristics of waste that will be received at the facility. This includes a description of the general sources and generation areas contributing to the facility and an estimate of the maximum amount of solid waste to be received daily and annually projected for five years. Among other things, the waste acceptance rate projections are used to establish why the facility qualifies for a registration. Pursuant to 30 TAC §330.9(b)(3), the facility qualifies as a registration because the proposed transfer station will transfer 125 tons of waste per day or less. The projections in the Waste Acceptance Plan are based on the current conditions. Although the facility calculated its maximum waste acceptance rate based on the assumption that they would operate 5.5 days per week instead of 5 days per week, the maximum waste acceptance rate specified in the Application of 94 tons per day is below the maximum waste acceptance rate allowed by 30 TAC §330.9(b)(3). If the speculative nature of the negative effects that the proposed landfill could have on construction projects in the area comes to fruition, the diminished rate of acceptance experienced at the transfer station will still authorize this transfer station to operate under a registration due to the facility accepting less waste than originally projected. The Applicant has included the information in the Application regarding the facility's waste acceptance rate in Part II, Section 2, Waste Acceptance Plan.

## Comment 9: Profitability

One commenter asked how a transfer station that plans to receive only 10 trucks a day could be profitable.

### Response 9:

The TCEQ rules do not require a registration application to include information regarding the facility's profitability. The TCEQ's focus is to ensure that the design, construction, and operation of the facility are protective of human health and the environment. Whether a facility will be profitable is not within the scope of the executive director's review.

## Comment 10: Notice of Deficiency Letters

Several commenters have concerns regarding the number of Notice of Deficiency (NOD) letters that have been issued to the Applicant. One commenter also stated that the Application contains numerous deficiencies.

### Response 10:

The TCEQ does not have any rules which limit the number of NODs which an applicant can receive. A thorough review of an application by TCEQ staff will normally result in NODs. The TCEQ MSW Permits Section will continue to note deficiencies until they are adequately addressed by the applicant to ensure that the information in the application is accurate and complies with the TCEQ rules. The Applicant has updated their Application to revise all noted deficiencies. The executive director has reviewed the Application and determined that it satisfies the regulatory requirements.

## Comment 11: Denial of Application

Several commenters stated that the Application should be denied.

### Response 11:

After a detailed technical review of the registration application, the executive director has determined that it satisfies all regulatory requirements, and there is no basis to deny the application at this point in time.

## Comment 12: Returning an Application

A few commenters stated that they would like to know what the TCEQ's policy is regarding returning an application.

### Response 12:

The TCEQ MSW Permits Section does not have a specific policy regarding the return of an application. The return of an application is considered on a case by case basis. Typically an application will be returned if an applicant does not respond to deficiencies in the application.

## Comment 13: Contested Case Hearings

A number of commenters requested that a contested case hearing be held regarding the registration application.

### Response 13:

In accordance with 30 TAC §330.57 and §330.69, a registration application for a MSW facility is not subject to a hearing request or an opportunity for a contested case hearing. Therefore, the TCEQ cannot grant the commenters' request to hold a contested case hearing. However, this registration is subject to a Motion to Overturn which can be filed in accordance with 30 TAC §50.139.

### Comment 14: Availability of Response to Comments Letter

One commenter asked how the response to comments will be made available to the public.

### Response 14:

All timely comments submitted to the TCEQ, whether written or oral comments, are addressed in this response to comments document. The response to comments document will be made available either electronically or by mail (hard copy) to adjacent landowners, everyone on the TCEQ Chief Clerk's mailing list, and all persons who provided a written or oral comment on this Application.

### Comment 15: TCEQ's Function

One commenter asked what the function of the TCEQ is; and commented that the TCEQ does not care about the operating standards. Another commenter asked why is the TCEQ's priority to help industry rather than considering environmental quality.

### Response 15:

The TCEQ strives to protect our state's public health and natural resources consistent with sustainable economic development. The TCEQ's goal is clean air, clean water, and the safe management of waste. To accomplish the TCEQ's mission, we will: base decisions on the law, common sense, good science, and fiscal responsibility; ensure that regulations are necessary, effective, and current; apply regulations clearly and consistently; ensure consistent, just, and timely enforcement when environmental laws are violated; ensure meaningful public participation in the decision-making process; promote and foster compliance with environmental laws and provide flexibility in achieving environmental goals; and hire, develop, and retain a high-quality, diverse workforce.

### Comment 16: Public Comment Period

Several commenters stated that they are concerned about the lack of time given to the public to file complaints and provide comments.

### Response 16:

The Application has been declared technically complete and the public comment period for this Application ended on October 29, 2012. The original comment period ended on July 10, 2012. However, in response to requests from the public, the executive director extended the comment period until August 17, 2012, and subsequently to October 29, 2012.

## Comment 17: Processing of Public Comments

A few commenters requested that the public comments on the transfer station be processed the same as the comments received in relation to the Applicant's landfill permit application.

### Response 17:

In accordance with the TCEQ rules, the Applicant's registration and permit application are subject to different requirements and must be reviewed and considered independently. Specifically, registration applications must follow the procedures detailed in 30 TAC §330.69, while permit applications are subject to the procedural requirements adopted pursuant to House Bill 801, 76th Legislature, 1999. Therefore, the executive director does not process the comments received for the registration application in the same manner as the comments received for the landfill permit application.

## Comment 18: Use of Public Comments

A couple of commenters stated that TCEQ uses the information provided by the citizens to inform the Applicant of inaccurate information to allow them to correct the issue rather than denying the Application.

### Response 18:

Public participation is an important part of the application review process. Comments from the public aid TCEQ staff's review by providing important information that may reveal inaccuracies in an application that staff may have been unaware of in the initial review. It is the executive director's responsibility to ensure that the application complies with the TCEQ rules and that all noted deficiencies are revised. We encourage the public to be involved in the application review process and continue to provide the commission with their views and opinions.

## Comment 19: Applicant's Statements

One commenter stated that the Applicant informed the citizens of Waller County that they would not be applying for a transfer station and that the Applicant should have notified the citizens of Waller County prior to applying for a registration. Another commenter stated that the Applicant has failed to ensure proper public notice is correctly posted at the proposed site.

### Response 19:

The TCEQ rules do not require the Applicant to provide notice to the public prior to submitting a registration application to the commission. However, in accordance with 30 TAC §330.69(b), the owner or operator is required to provide notice of application and opportunity to request a public meeting and post notice signs at the proposed site within 45 days of the executive director's receipt of the application. On September 16, 2011, the Applicant published the Notice of Application and Opportunity to Request a Public Meeting for MSW Registration Application No. 40259 in area newspapers. Furthermore, the Applicant has posted signs at the proposed site notifying the public of the registration application pursuant to the TCEQ rules. Accordingly, the executive director has determined that the Applicant has provided proper public notice which satisfied the rule requirements.

## Comment 20: Community Input

One commenter stated that the community should have more input in the final decision of the Application.

### Response 20:

Public participation is an important part of the application review process. The review of a registration application includes public participation such as providing the public the opportunity to submit comments on an application through mail and email; request a public meeting to obtain information on the proposed application and to voice their questions and concerns at the public meeting through written and oral comments; and to file a motion to overturn the executive director's decision on an application. We encourage the public to continue to be involved in the application review process and to continue to provide the commission with their views and opinions.

## Comment 21: Application Revisions

One commenter stated that with so many revisions it is not clear what is included in the Application.

### Response 21:

In accordance with 30 TAC §330.57(i)(1), the Applicant is required to provide a copy of their Application, including all revisions and supplements to the Application, on a publicly accessible internet web site, and provide the commission with the web address link for the application materials. The Application and all revisions to the Application may be viewed online at the following address: http://www.biggsandmathews.com/permits.php. The Application is also available for review at the Waller County Clerk's Office, Waller County Courthouse, Room 217, 836 Austin Street, Hempstead, Texas 77445.

## Comment 22: Financial Relationships of the Applicant

One commenter asked the following questions: what is the financial and legal relationship between Herzog, Phillips Jorden, Green Group Holdings and all entities owned by GGH; what are the landfills and transfer stations each of these entities owns and/or operate; and what is the history of any citations, fines, lawsuits, bankruptcies, changes of ownership, and environmental or operation complaints?

### Response 22:

In accordance with 30 TAC §330.59(f), the owner or operator of the proposed facility is required to list in the application all Texas solid waste sites that the owner or operator has owned or operated within the last 10 years. Furthermore, 30 TAC §330.59(f) requires the owner or operator of the proposed facility to list all solid waste sites in all states in which the owner or operator has a direct financial interest. Part I of the Application states that Pintail Landfill, LLC will own and operate the transfer station. The Application also states that Pintail Landfill, LLC does not own or operate other landfill or transfer facilities in Texas and has no financial interests outside the State of Texas. The TCEQ is unaware of the financial and legal relationships of Green Group Holdings. The TCEQ rules only require information from the owner or operator

of the proposed facility and not from any parent company or affiliated entity. With regard to compliance history, this is a new site, so there is no existing compliance history for this facility, for the executive director to consider.

### Comment 23: Lobbyists

Several commenters stated that the Applicant hired lobbyists to persuade the granting of the registration.

### Response 23:

The executive director's staff did not consider this issue when evaluating the registration application.

### Comment 24: Lawsuits

One commenter stated that the Applicant should not be authorized to open a new facility because they have lawsuits pending on other locations due to their negligence and mismanagement.

### Response 24:

This is not an issue that the executive director's staff considers during the review of the application.

### Comment 25: Host Agreement

One commenter stated that there has been some discussion of a Host Agreement that the Applicant placed in an ad, in the newspaper, explaining parts of their offer to buy the approval of Waller County and that he would like to know what have other host agreements provided. A few of the commenters have concerns regarding the host agreement.

### Response 25:

The TCEQ is not a party to the Host Agreement and, therefore, cannot comment on the terms that are, or have been, considered by those parties involved in the negotiation of that agreement.

### Comment 26: Waller County Ordinance

Several commenters stated that the Application should be denied because the Waller County Ordinance prohibits MSW facilities in the proposed location, as well as the processing and disposal of solid waste at the proposed location. A few of the commenters stated that they wanted clarification regarding when the Application was submitted and if it was submitted before the Waller County Ordinance was filed. Some of the commenters asked why a revised application does not reset the clock for the date the corrected application was accepted. Another commenter stated that the Application should be denied because the Application did not inform the TCEQ that the Waller County Ordinance existed which prohibited disposal at the facility location.

### Response 26:

The Waller County Ordinance was not considered during the review of this application. The Waller County Ordinance prohibits the disposal of MSW in areas of the county that have not

been specifically designated as areas where MSW can be disposed. The proposed transfer station will not dispose of any MSW at the facility. All waste will be separated at the transfer station and either recycled or sent off-site to a properly authorized facility for disposal. Even if the Waller County Ordinance did apply to the transfer station, this application was filed before the ordinance was originally adopted on August 26, 2011. With respect to the date of that an application is considered to be filed with the TCEQ, the agency has historically allowed an application to be revised or amended without changing the date of receipt of application.

### Comment 27: Property Owner Affidavit

A few commenters stated that they have concerns regarding the property owner affidavit.

### Response 27:

The property owner affidavit is located in Part I of the Application. It is noted that 30 TAC §330.59(d)(2) requires that a property owner affidavit be signed by the owners which acknowledges that the State of Texas may hold the property owner jointly or severally liable for the operation and maintenance of the facility. The affidavit also must acknowledge that the State of Texas shall have access to the property during the active life and post closure care period of the facility.

### Comment 28: Property Values

Several commenters stated that the facility will negatively affect property values in the area.

### Response 28:

TCEQ's jurisdiction is established by the Legislature and is limited to the issues set forth in statute (Texas Health and Safety Code §361.011). The executive director's review of an application for a MSW registration is confined to whether an application and proposed facility design and operation satisfy the requirements of the applicable TCEQ rules. The MSW rules are promulgated under 30 TAC, Chapter 330. Accordingly, TCEQ does not have jurisdiction to consider property values when determining whether to approve or deny an application for an MSW permit or registration. However, the issuance of a registration does not authorize injury to persons or property or invasion of other property rights, or infringement of state or local law or regulation in accordance with 30 TAC §305.122(c).

### Comment 29: Sale of the Registration

One commenter stated that she is concerned that the Applicant will sell its registration for the facility if issued.

### Response 29:

The TCEQ rules do not restrict the transferring of a registration from one entity to another. However, the registration cannot be transferred to another entity without the approval of the commission. Furthermore, in accordance with 30 TAC §330.70(k)(13), transfer of a registration to another entity must be processed as a registration modification and requires public notice after issuance.

## Comment 30: Verification of Information

One commenter asked if the TCEQ was verifying the information it receives from the Applicant If so, who, at the TCEQ, is responsible for reviewing that information.

### Response 30:

The TCEQ MSW Permits Section is responsible for reviewing and verifying that the information in the Application meets all applicable regulations contained in 30 TAC Chapter 330, regarding MSW, as well as all other applicable rules.

## Comment 31: Wetland Issues

One commenter stated that the Application has identified numerous wetlands within the registration boundary, but has dismissed several of these wetlands based on a claim that they are not Waters of the United States (US).

### Response 31:

The Application includes a preliminary jurisdiction determination that was submitted to the Department of the Army, Galveston District, Corps of Engineers (COE). The preliminary jurisdiction determination is a report prepared by the Applicant and reviewed by the COE which identifies and delineates all Waters of the US within the registration boundary. In accordance with Title 33 of the Code of Federal Regulations §328.3, the definition of Waters of the US includes wetlands. Please note that when requesting a preliminary jurisdiction determination all Waters of the US and wetlands that are identified within the project area, whether they are jurisdictional or non-jurisdictional, are considered to be jurisdictional Waters of the US. In addition, a preliminary jurisdiction determination allows the applicant to identify whether a water feature within the project area meets the definition of Waters of the US and/or wetlands.

## Comment 32: Jurisdictional Wetlands

One commenter stated that the Application has only identified jurisdiction wetlands within the registration boundary and that all jurisdictional and non-jurisdictional wetlands should be identified.

### Response 32:

The Application includes a preliminary jurisdiction determination from the COE. In accordance with a COE document titled, "Regulatory Guidance Letter No. 08-02", all Waters of the US and wetlands identified in the preliminary jurisdiction determination must be classified as jurisdictional Waters of the US. Moreover, the preliminary jurisdiction determination does not allow the Applicant to classify any Waters of the US identified within the registration boundary as non-jurisdictional.

## Comment 33: Wetlands Delineation

One commenter stated that the Application has not adequately delineated federal jurisdictional wetlands.

**Response 33:**

In accordance with 30 TAC §330.61(m), the application is required to include a wetlands determination under applicable federal law in accordance with the location restriction demonstrations. It is noted that the Application includes documentation from the COE confirming the information provided in the preliminary jurisdiction determination and the delineation of all Waters of the US, including wetlands, within the registration boundary. The executive director has reviewed the Application and determined that it satisfies the rule requirements regarding wetlands.

## Comment 34: Wetlands Discussion

One commenter stated that the Application has identified wetlands within the registration boundary, but does not include a discussion regarding wetlands in accordance with 30 TAC §330.553, and therefore, the inclusion of these areas within the registration boundary constitutes a violation of TCEQ regulations.

**Response 34:**

The information in the preliminary jurisdiction determination has been reviewed and confirmed by the COE and demonstrates compliance with the location restriction demonstrations contained in 30 TAC §330.553, regarding wetlands. In addition, the Application demonstrates that the transfer station and facility roadways will not be located within wetlands and should not cause or contribute to significant degradation of wetlands. The executive director has reviewed the Application and determined that it satisfies the rule requirements regarding wetlands.

## Comment 35: Endangered Species

One commenter stated, "[The] applicant's experts conceded that several different endangered and threatened species may be present at the transfer station site. These include the plains spotted skunk, creek chubsucker, Houston toad, and timber rattlesnake. Each of these species is likely to be impacted by the construction and operation of the facility. However, the Applicant has failed to show how a taking of these species will be prevented, or how the facility will be designed to protect endangered species." Another commenter stated that she is concerned that there may be muscles in Clear Creak which may be considered an endangered species.

**Response 35:**

In accordance with 30 TAC §330.551, a facility and the operation of a facility may not result in the destruction or adverse modification of the critical habitat of endangered or threatened species. Part II of the Application, Appendix IIE, Endangered and Threatened Species Documentation, identifies four threatened or endangered species that have the potential to occur within the registration boundary: White Faced Ibis, Wood Stork, Creek Chubsucker, and the Timber/Canebrake Rattlesnake. Figure 1, located in Part II, Appendix IIE includes a drawing depicting the potential habitats where the specified endangered or threatened species may be located within the registration boundary. The Application demonstrates that the transfer station and facility roadways will not be located within these areas and should not result in the destruction or adverse modification of the critical habitat of endangered or threatened species, or cause or contribute to the taking of any endangered or threatened species. The executive

director has reviewed the Application and determined that it satisfies the rule requirements regarding endangered species.

## Comment 36: Site Operating Plan (SOP) and Endangered Species

One commenter stated that the SOP for the facility does not include any measures to ensure that the facility is operated in a manner that will protect all endangered and threatened species that may be present at the site.

## Response 36:

TCEQ rule 30 TAC §330.551 requires the operation of a MSW facility to not result in the destruction or adverse modification of the critical habitat of endangered and threatened species. The TCEQ rules which address the operational standards for MSW processing facilities do not include a separate requirement for detailing the protection of endangered and threatened species in the SOP.

## Comment 37: Site Specific Conditions Regarding Location Restrictions

One commenter stated that the discussion of site-specific conditions requiring special design considerations is inadequate. He states that the application fails to recognize site-specific conditions such as the presence of wetlands and endangered and threatened species.

## Response 37:

In accordance with 30 TAC §330.61, the Application is required to include a determination of any site-specific conditions that require special design considerations and mitigation of conditions. It is noted that Part II, Section 1.2 of the Application, states that "there are no existing site specific conditions that require special design considerations or possible mitigation of conditions." Part II of the Application also includes several discussions regarding wetlands and endangered and threatened species. The location of wetlands, Waters of the US, and the potential habitats for endangered and threatened species have been identified in Drawing IIA.11 of the General Site Plan. This drawing illustrates that the transfer station and all facility roadways will not be located in any of these areas. Therefore, the facility should not require any special design considerations. More information regarding wetlands and endangered species can be found in the Application at Part II, Section 13.2, Wetlands; Section 14, Endangered and Threatened Species; Attachment IID, Wetlands Documentation; and Attachment IIE, Endangered and Threatened Species Documentation.

## Comment 38: Non-Recyclable Waste

A few commenters stated that the Application should be revised to provide more information regarding where the non-recyclable waste will be disposed.

## Response 38:

The TCEQ rules require the Applicant to dispose of the non-recyclable waste at a properly authorized facility. Part II of the Application states that the facility will dispose of the non-recyclable waste at a Type I or Type IV landfill within 100 miles of the transfer station. The TCEQ rules do not require the Application to provide the specific names of the landfills to be used.

**Comment 39: Waste Streams**

One commenter stated that he would like to know what type of waste the transfer station will be allowed to accept; and what special waste is.

**Response 39:**

Part II of Application states that the facility is requesting to only accept C & D waste. In accordance with 30 TAC §330.3(33), C & D waste is defined as waste resulting from construction or demolition projects which includes all materials that are directly or indirectly the by-products of construction work or that result from demolition of buildings and other structures, including, but not limited to, paper, cartons, gypsum board, wood, excelsior, rubber, and plastics. In addition, the Applicant is not requesting authorization for this facility to accept special waste. In accordance with 30 TAC §330.3(148), special waste is defined as any solid waste or combination of solid wastes that because of its quantity, concentration, physical or chemical characteristics, or biological properties requires special handling and disposal to protect the human health or the environment. Several examples of special wastes are listed in 30 TAC §330.3(148)(A) through (S).

**Comment 40: Non-Approved Waste**

A couple commenters stated that they have concerns regarding the acceptance of non-approved waste at the facility.

**Response 40:**

It is noted that 30 TAC §330.225(c) prohibits the unloading of any unauthorized waste that may arrive at the facility; and requires the owner or operator of the facility to ensure that any unauthorized waste be returned immediately to the transporter or generator of the waste. In addition, the facility will have authorization to accept only the wastes that are specified in its waste acceptance plan. Furthermore, the Application seeks authorization to accept only C & D waste.

**Comment 41: New Waste Streams**

A few commenters asked whether the Application can be modified or amended in the future to accept new waste streams, including hazardous waste.

**Response 41:**

In order for a transfer station facility, which operates under a registration authorization, to accept new waste streams, the Applicant would need to submit a new registration application. However, certain types of wastes are prohibited from being accepted at MSW facilities. TCEQ rule 30 TAC §330.15(e) prohibits the acceptance of regulated hazardous waste as defined in 30 TAC §330.3(127) at an MSW facility. Therefore, the Applicant would not be authorized to accept hazardous waste at its proposed MSW facility.

**Comment 42: Waste by Railroad**

A couple commenters asked if the waste was going to be brought to the facility by rail.

**Response 42:**

The Application does not include any information regarding the acceptance of waste by rail. Therefore, the facility will not be authorized to accept waste by rail.

### Comment 43: Segregation of Waste

One commenter asked how the Applicant would segregate waste.

**Response 43:**

Part III, Section 4, Waste Management Unit Design, page IIIA-6 of the Application, states that the waste will be transported to the tipping floor and the proposed recycling operations will be conducted manually by either the laborers located on the tipping floor, the equipment operators, or a combination of both. This section also states, "After the waste has been processed and separated, the recyclables may be temporarily stored in the roll-off boxes and the non-recyclable waste will be placed in the transfer trailers, roll-off boxes, or other suitable containers for prompt landfill disposal."

### Comment 44: Waste Processing

One commenter stated that he is concerned that the facility will leave waste on the processing floor continually.

**Response 44:**

Part III, Section 4, Waste Management Unit Design, page III-A7 of the Application, states that on average the non-recyclable waste will not be allowed to accumulate on site for more than 24 hours. In addition, pursuant to 30 TAC §330.243, the facility is required to wash down all working surfaces that come in contact with wastes on a weekly basis.

### Comment 45: Traffic Concerns

Several commenters stated that they have concerns regarding traffic and the facility's Traffic Impact Analysis (TIA). Another commenter stated that the TCEQ should require the Application to include a more comprehensive TIA. One of the commenters stated that there was a lack of traffic studies. Another commenter stated that the Application does not demonstrate whether adequate turning radii have been provided. One of the commenters stated that the Application does not state whether the roadway improvements recommended by the Texas Department of Transportation (TxDOT) will be required to be constructed prior to the opening of the facility.

**Response 45:**

In accordance with 30 TAC §330.61(i), the Application is required to include data on the availability and adequacy of roads, the volume of vehicular traffic on those roads, projected volume of traffic to be generated by the facility, and documentation of coordination with TxDOT regarding traffic and location restrictions; as well as all designs of proposed public roadway improvements such as turning lanes, storage lanes, etc., associated with site entrances. The Application includes documentation from TxDOT in which TxDOT has approved the TIA and has found that the roadways accessing the facility have adequate capacity to handle the predicted volumes of site traffic and all recommended roadway improvements for the facility.

The TIA and TxDOT documentation for the proposed facility can be found in Part II, Appendix IIC of the Application. When reviewing applications, the executive director defers to TxDOT's recommendations on transportation and traffic issues regarding the traffic impacts and adequacy of state-maintained roadways. The Application has addressed all of the TCEQ applicable rule requirements regarding transportation. Part II of the Application also indicates that the roadway improvements and mitigation measures discussed in the TIA will be constructed prior to the commencement of operations at the transfer station.

## Comment 46: Truck Entrances

One commenter asked what plans has the Applicant submitted to TxDOT regarding truck traffic entering and leaving the facility on a 24 hour basis.

## Response 46:

In accordance with 30 TAC §330.61(i), the Application is required to include data on the projected volume of traffic expected to be generated by the facility on the access roads within one mile of the proposed facility. Part II of the Application states that the total number of vehicles anticipated to use the facility in the first year is 10 vehicles per day with a total trip count entering and leaving the facility of 20 trips per day. This section also states that the total number of vehicles anticipated to use the facility in the fifth year, when site traffic is estimated to be at its maximum, is 18 vehicles per day with a total trip count entering and leaving the facility of 36 trips per day.

## Comment 47: SOP and Traffic Patterns

One commenter stated that the SOP does not accurately portray the two lane internal facility roadway and the proposed traffic patterns on this roadway.

## Response 47:

Part II, Section 9.1, page II-13 of the Application, states that "the site entrance will consist of a two lane asphalt or concrete surfaced roadway." The internal facility roadway is depicted in Part III, Appendix IIIB, General Facility Design, Drawing IIIB.1, General Site Plan. In addition, the traffic patterns associated with the transfer station are depicted in Part III, Appendix IIIB, General Facility Design, Drawing IIIB.4, Waste Processing Plan. The executive director has reviewed the Application and has determined that the Application complies with the TCEQ requirements.

## Comment 48: Roadside Trash

Several commenters stated that they are concerned that the facility will increase trash around the intersection of Highway 290 and Highway 6.

## Response 48:

In accordance with 30 TAC §330.233, the Applicant is required to control windblown material and litter to minimize unhealthy, unsafe, or unsightly conditions. Any litter that is scattered throughout the facility or along fences and access roads must be picked up once a day on the days the facility is in operation. Furthermore, in accordance with 30 TAC §330.235, the facility is required to take steps to encourage that vehicles hauling waste to the transfer station are

enclosed or provided with a tarpaulin, net, or other means to effectively secure the load in order to prevent the escape of any part of the load by blowing or spilling. The facility is required to take actions such as posting signs, reporting offenders to proper law enforcement officers, adding surcharges, or similar measures. Part IV of the Application states that the facility will provide for the cleanup of waste materials spilled along and within the right of way of State Highway 6 and US Highway 290 for a distance of two miles in either direction from the facility entrance.

## Comment 49: Water Wells

A few commenters stated that all of the water wells around the proposed site were not included in the Application.

## Response 49:

In accordance with 30 TAC §330.61(c)(2), the Application is required to include a general location map depicting all known water wells within 500 feet of the facility boundary with the state well numbering system designation. Part II, Section 8.1 of the Application includes information regarding water wells within 500 feet of the facility. This section states that the facility conducted a water well search that included searching online state records and a windshield search for water wells. The water well search details and the state well numbering system identification number are listed in the table located in Part II, page II-12 of the Application. This section also states that the water wells located on site and within 500 feet of the proposed registration boundary are shown on Drawing IIA.4, Water Wells. The Applicant is not required to identify non registered wells in the Application. The executive director has reviewed the Application and determined that it satisfies the rule requirements regarding water wells.

## Comment 50: Facility Location

Several commenters stated that they have concerns regarding the facility's location.

## Response 50:

Apart from the land use compatibility requirements and the location restrictions in the TCEQ's rules, the TCEQ has no authority over the location of the proposed facility selected by the Applicant.

## Comment 51: Impact on Community

Several commenters stated that the facility will have a negative impact on the community and hinder community revitalization. A few commenters stated that the facility may lower the rating of schools in the community.

## Response 51:

The scope of executive director's review of the Application is confined to determining whether the application and design and operation of the proposed facility satisfy the requirements of the TCEQ rules. The TCEQ rules were promulgated to ensure that an MSW facility does not pose a health risk to the surrounding community. The executive director does not have the authority to consider alternative locations, benefits to the community, or disproportionate impact within a

region. These issues, along with concerns regarding the clustering of MSW facilities, are more appropriately addressed to planning authorities such as the county, city, and Houston-Galveston Area Council.

## Comment 52: Environmental Justice

Some of the commenters stated that they are concerned that the facility location was chosen based on the high minority population in the area and resulted in environmental racism.

## Response 52:

Based on state law and the agency's rules, the TCEQ does not specifically consider the issue of environmental justice when reviewing an application for a MSW Landfill. However, the TCEQ has made a strong commitment to address such issues by creating the Environmental Equity Program within the Office of the Chief Clerk. The goals of the Environmental Equity Program are to: help citizens and neighborhood groups participate in regulatory processes; serve as the agency contact to address allegations of environmental injustice; serve as a link for communications between the community, industries, and the government; and thoroughly consider all citizens' concerns and handle them fairly. Additional information on TCEQ's Environmental Equity Program can be found at the following TCEQ website http://www.tceq.texas.gov/agency/hearings/envequ.html or by calling 1-800-687-4040.

## Comment 53: Adverse Health Impacts

Several commenters stated that the facility will adversely affect the environment and the health of the community.

## Response 53:

In accordance with the Texas Health and Safety Code, it is this state's policy and the purpose of the state statutes and regulations to safeguard the health, welfare, and physical property of the people and to protect the environment by controlling the management of solid waste. The scope of the executive director's review of the Application is to determine whether the application and design and operation of the proposed facility satisfy the requirements of the TCEQ rules in order to ensure protection of human health and safety, and the environment. The executive director expects that if the facility is constructed and operated in accordance with the TCEQ regulations and the provisions of an issued authorization, that human health and the environment will be protected. In addition, 30 TAC §330.15 specifically prohibits the operation of a solid waste facility in a manner that causes, suffers, allows or contributes to the creation or maintenance of a nuisance or the endangerment of human health and welfare or the environment. Individuals are encouraged to report their concerns regarding suspected noncompliance with terms of any TCEQ authorization or environmental regulation by calling TCEQ's 24-hour toll-free Environmental Complaints Hotline at 1-888-777-3186 or by sending an e-mail to complaint@tceq.texas.gov. TCEQ investigates all complaints. If a person or facility is found to be out of compliance with the terms and conditions of an issued authorization, rule or law, the person or facility may be subject to enforcement action.

## Comment 54: Identification of Easements

One commenter stated that the Application does not clearly identify easements within the registration boundary.

## Response 54:

In accordance with 30 TAC §330.61(g), the Application is required to include a land-use map which depicts the location of drainage, pipeline, and utility easements within the facility boundaries. It is noted that the Application depicts the easements within the registration boundary in Drawing IB.1, Landownership Map, and in Drawing IIA.11, General Site Plan. Furthermore, the Application identifies the easement holders in Part 1, Appendix IB, Landownership Map and Landownership List, page IB-2. The executive director has reviewed the Application and has determined that it satisfies the rule requirements regarding easements.

## Comment 55: Historic Value

Several commenters stated that they are concerned that the property has historic value.

## Response 55:

In accordance with 30 TAC §330.61(o), an application is required to include a review letter from the Texas Historical Commission documenting compliance with the Natural Resources Code, Chapter 191, Texas Antiquities Code. It is noted that Part II of the Application includes the required review letter from the Texas Historical Commission. The letter from the Historical Commission states that there are no historically significant sites on the property.

## Comment 56: Drainage Patterns

One commenter stated that the Applicant has not made an adequate demonstration that construction and operation of the transfer station will not significantly and adversely alter drainage patterns in the area, nor has the Applicant demonstrated that surface water quality will be protected. Another commenter stated that he is concerned that the facility will increase runoff and pose a flood hazard to residences downstream.

## Response 56:

Pursuant to 30 TAC §330.63(c), a registration application for a MSW storage and processing facility is not required to include a surface water drainage report demonstrating that existing drainage patterns will not be adversely altered. However, 30 TAC §330.63(c) requires the application to include a statement that the facility design complies with the requirements of 30 TAC §330.303, relating to Surface Water Drainage for MSW Facilities. It is noted that Part III of the Application includes this statement as well as the design of a drainage swale to manage the peak discharge from the 25 year, 24 hour rainfall event. Moreover, the proposed transfer station is not located in the 100 year flood plain; and the construction and operation of the facility should have no impact on flooding offsite. The executive director has reviewed the Application and determined that it satisfies the rule requirements regarding Surface Water Drainage for MSW Facilities.

## Comment 57: Groundwater Contamination

Several commenters stated that they have concerns regarding groundwater contamination and surface water contamination. Another commenter asked if leachate would be generated at the facility and how the leachate will be managed and disposed.

## Response 57:

In accordance with 30 TAC §§330.63(b)(4) and 330.207, the Application is required to include water pollution control procedures to prevent surface water and groundwater contamination and proper disposal of wastewaters generated on site. Please note that the owner or operator is required to provide for the treatment or proper disposal to an authorized facility of wastewaters resulting from the process or from cleaning and washing. In addition, Part III of the Application states that the unloading, storage, and processing of unprocessed waste will be on a reinforced concrete slab (tipping floor) inside the transfer station building; processed waste and recyclable materials will be stored in roll-off boxes or transfer trailers within the transfer station building; and additional recyclable materials will be stored outside the transfer station building in covered roll-off boxes or transfer trailers located on top of pavement. Additionally, the facility will be designed so that all wash water and rainwater from the transfer station will be collected using a floor drain sump and placed into a 5,000 gallon contaminated water storage tank until it is properly disposed. Furthermore, this facility does not include on-site disposal of waste, will not generate leachate, and all wastes will be removed from the site in accordance with the proposed registration application. Individuals are encouraged to report their concerns regarding suspected noncompliance with terms of any TCEQ authorization or environmental regulation by calling TCEQ's 24-hour toll-free Environmental Complaints Hotline at 1-888-777-3186 or by sending an e-mail to complaint@tceq.texas.gov. The executive director has reviewed the Application and determined that it satisfies the rule requirements regarding Water Pollution Control.

## Comment 58: Contaminated Water Management

One commenter stated that the contaminated water management plan does not address the handling of domestic wastewater nor does the contaminated water management plan address the frequency with which the contaminated water storage tank will be emptied.

## Response 58:

In accordance with 30 TAC §330.207, regarding contaminated water management, requires that all liquids resulting from the operation of the solid waste facility to be disposed of in a manner that will not cause surface water or groundwater pollution. This rule also allows the owner or operator to send wastewater off site to an authorized facility. Part IV, Section 7.14, Employee Sanitation Facilities, page IV-19 of the Application indicates that the only domestic wastewater generated onsite will be from portable sanitary facilities. This section also indicates that a private contractor will remove and properly dispose of all onsite wastewater collected in the portable sanitary facilities and that the wastewater will not be placed in the facility's contaminated water storage tank. In addition, Part IV, Section 2, Contaminated Water

Management, page IV-4 states, "the contaminated water storage tank is sized to provide one month of storage. . . . The contaminated water will then be transported offsite on a monthly basis, at a minimum, for treatment, testing, and disposal."

## Comment 59: Depletion of Water

A few commenters stated that they are concerned that the facility's use of water will deplete the aquifer and water wells. Some of the commenters asked, where will the transfer station obtain water for facility operations if the groundwater beneath the facility is depleted.

## Response 59:

According to the Application, the use of water at the facility will be regulated by the Bluebonnet Groundwater Conservation District. For more information regarding the regulations associated with the use of a private groundwater well for a business, please contact the Bluebonnet Groundwater Conservation District at (936) 825-7303. In addition, if the facility cannot obtain water for facility operations through its water well they will be required to modify their registration to include the use of an alternative water source.

## Comment 60: Financial Responsibility

Several commenters asked what measures does the TCEQ take to ensure that the Applicant is financially responsible and capable of remediation. One commenter asked how long the Financial Assurance (FA) is required and where in the Application is the FA amount located. A couple of commenters asked if the amount of FA provided is adequate to satisfy the expectations of the citizens who may be affected, if is it possible that Waller County could at some point be liable for remediation costs if the Applicant decided to walk away from a failed investment, and who would assume the liability and responsibility? Another commenter asked if there would be a delay in the remediation which may cause further damage.

## Response 60:

If there is evidence of a release from the facility, the executive director may require an investigation into the nature and extent of the release and an assessment of measures necessary to correct an impact to groundwater. While the facility is in operation the owner/operator of the facility will be responsible for any costs associated with remediation activities. In addition, in accordance with the TCEQ's financial assurance requirements, the Application for a MSW storage and processing facility is required to include a written cost estimate, in current dollars, showing the cost of hiring a third party to close the facility by disposition of all processed and unprocessed materials in accordance with all applicable regulations. Prior to operating the facility, the owner/operator must establish and maintain FA in an amount equal to the closure cost estimate included in the Application. Continuous FA coverage for closure must be provided until all requirements of the final closure plan have been completed and the site is determined to be closed in writing by the executive director. The closure cost estimate for the facility is located in Part III, Appendix IIID of the Application and is equal to $87,975.00 (in 2011 dollars). If the Applicant abandons the facility or cannot afford to close or remediate a pending issue, the State of Texas will be liable for all additional costs to close the facility and remediate any potential problems. Remediation activities will be conducted as soon as practicable.

## Comment 61: Future Public Interest

One commenter asked, how far into the future is the public interest protected.

### Response 61:

In accordance with the TCEQ's financial assurance regulations for MSW facilities, prior to operating the facility, the owner/operator must establish and maintain FA in an amount equal to the closure cost estimate included in the Application. Continuous FA coverage for closure must be provided until all requirements of the final closure plan have been completed and the site is determined to be closed in writing by the executive director.

## Comment 62: Toxic Waste Spills

One commenter asked if the TCEQ considers the ability of the County to handle toxic waste spills and accidents that may occur due to the transportation of the waste.

### Response 62:

The spilling of toxic waste is not anticipated to be associated with this facility because the Application states that the facility is only requesting authorization to accept C & D waste. The TCEQ does not have any specific rules regarding the prevention of accidents that may occur as a result of transferring waste to the facility. However, the TCEQ rules do require the owner or operator to take steps to encourage that vehicles hauling waste to the facility effectively secure the load in order to prevent the escape of any waste by spilling. In addition, the TCEQ rules require the Application to include documentation of coordination with TxDOT regarding traffic and location restrictions. Please see Part II, Appendix IIC, TxDOT Documentation, for more information regarding transportation and the facility's TIA. The executive director has reviewed the Application and determined that it satisfies the rule requirements regarding transportation.

## Comment 63: SOP and Spills

One commenter stated that the SOP does not contain procedures regarding how the facility will manage spills that may occur within the registration boundary.

### Response 63:

In accordance with 30 TAC §330.225(b), the facility is required to ensure that any waste deposited in an unauthorized area will be removed immediately and disposed of properly. Part IV, Section 7.3 of the Application, relating to Spill Prevention and Control, contains procedures regarding how the facility will manage spills that occur within the registration boundary. The executive director has reviewed the Application and determined that it satisfies the rule requirements regarding spill prevention and control.

## Comment 64: Air Pollution

Several commenters stated that they have concerns regarding air pollution.

### Response 64:

In accordance with 30 TAC §330.245, air emissions from MSW facilities must not cause or contribute to a condition of air pollution as defined in the Texas Clean Air Act. The Application

is required to include procedures for ventilation and air pollution control. This includes: requiring the facility, all emission sources, and all constructed air pollution abatement devices to obtain all applicable air authorizations from the TCEQ Air Permits Division prior to the start of construction; implementing procedures for ventilation and odor control; and the proper reporting and control of air emissions. It is noted that Part IV, pages IV-17 through IV-19 of the Application include the required air pollution control information. Individuals are encouraged to report their concerns regarding suspected noncompliance with terms of any TCEQ authorization or environmental regulation. The executive director has reviewed the Application and determined that it satisfies the rule requirements regarding Ventilation and Air Pollution Control.

## Comment 65: Dust Suppression

One commenter stated that the SOP does not specify the frequency with which water-spraying to prevent dust will occur.

## Response 65:

In accordance with 30 TAC §330.5(a)(3), the SOP for a Type V facility is required to address the operational standards contained in 30 TAC Chapter 330, Subchapter E. The TCEQ regulations located in Subchapter E do not require the Application to specify the frequency with which water-spraying to prevent dust will occur. However, 30 TAC §330.237 does require that the facility must be operated in a way to manage dust from on-site and other access roadways so that it does not become a nuisance to surrounding areas. Part IV of the Application states that the entrance and access roads of the facility will be maintained in a reasonably dust free condition by periodic water spraying from a water truck, as necessary.

## Comment 66: Erosion

One commenter expressed concerns regarding erosion.

## Response 66:

All storage and processing activities will take place on top of a reinforced concrete tipping floor within the transfer station building and/or in the paved area outside the transfer station. Because these areas will be paved and/or enclosed there should not be any issues regarding erosion.

## Comment 67: Noise

A couple commenters expressed concerns regarding noise.

## Response 67:

In accordance with 30 TAC §330.239, the Applicant is required to take the necessary measures to minimize noise pollution. Noise at the proposed facility should not be an issue because waste processing will take place inside a mostly enclosed building. In addition, the facility will include a minimum buffer zone of 204 feet which will aid in reducing noise from the facility. Please see Part III, Appendix IIIB, Drawing III.B.1, General Site Plan, for more information regarding the facility buffer zones. Individuals are encouraged to report their concerns regarding suspected noncompliance with terms of any TCEQ authorization or environmental regulation. The

executive director has reviewed the Application and determined that it satisfies the rule requirements regarding noise pollution.

## Comment 68: Odor Management

One commenter stated that she has concerns regarding odor. Another commenter stated that the SOP does not include specific measures to manage odors.

## Response 68:

In accordance with 30 TAC §330.245, the owner or operator is required to prevent nuisance odors from leaving the boundary of the facility. If odors are found to be passing the facility boundary, the facility may be required to suspend operations until the nuisance is abated. The odor control plan for the facility is contained in Part IV of the Application. Some of the measures that the facility will use to control odors are: prohibiting the acceptance of putrescible, special, industrial, and liquid waste; the prohibition of open burning at the facility; restricting the unloading of waste to only inside the transfer station building; storing waste in odor retaining containers and vessels with tops; ensuring that processed and unprocessed waste may only be stored at the facility for a maximum of 72 hours; and incorporating large buffer zones. The executive director has reviewed the Application and determined that it satisfies the rule requirements regarding odor control.

## Comment 69: Fire Control

One commenter expressed concern that the facility may be prone to catching fire and that Waller County does not have the resources to put out the fire. Another commenter questioned whether the transfer station will need support from a nearby fire station.

## Response 69:

In accordance with 30 TAC §330.221, an application for a MSW storage and processing facility is required to demonstrate that an adequate supply of water under pressure is available for firefighting purposes, ensure that firefighting equipment is readily available, and include a fire protection plan. The fire protection plan must describe the source of fire protection, procedures for using the fire protection source, employee training and safety procedures, and shall comply with local fire codes. It is noted that the Applicant's Fire Protection Plan is included in Part IV of the Application. Additionally, the TCEQ rules do consider the use of a local firefighting department as an adequate method of fire protection. The executive director has reviewed the Application and determined that it satisfies the rule requirements regarding fire protection.

## Comment 70: Fire Extinguishers

One commenter stated that the type, size, and location of fire extinguishers have not been specifically addressed in the SOP.

## Response 70:

Part IV, Section 6, Fire Protection Plan, page IV-9 of the Application states, "At a minimum, all transfer station equipment and vehicles will be equipped with fire extinguishers, and two fire extinguishers will be located in the transfer station building." This section also states that, "The

facility will be equipped with fire extinguishers of a type, size, location, and number as recommended by the local fire department."

## Comment 71: Water Pressure

One commenter stated that the Application does not demonstrate that an adequate supply of water under pressure will be available for firefighting purposes. Another commenter stated that there is not enough water to handle fires at the site.

## Response 71:

TCEQ rule 30 TAC §330.221 requires an adequate supply of water under pressure to be available for firefighting purposes. Part IV, Section 6, Fire Protection Plan, page IV-9 of the Application states that a water well will supply water to a water supply tank and the water supply tank will be connected to a pump system that will convey water under pressure to a standpipe and hose reel located within the transfer station building. The tank will have a minimum capacity of 15,000 gallons and the pump system will have a minimum capacity of 500 [gallons per minute] consistent with a Class III system as specified under National Fire Protection Association fire codes. The executive director has reviewed the Application and determined that it satisfies the rule requirements regarding fire protection.

## Comment 72: Overloading of Waste

One commenter stated that the SOP does not include adequate guidance regarding the conditions that would constitute overloading, such as the particular quantity of waste that would create such a condition.

## Response 72:

TCEQ rule 30 TAC §330.241 states that the design capacity of a solid waste processing facility shall not be exceeded during operation. It would be considered overloading for a facility to accept waste in excess of their maximum waste acceptance rate or if the facility stored waste and recyclable materials in excess of 100 tons. Part IV of the Application states that the facility will have a maximum waste acceptance rate of 94 tons per day and that the maximum amount of waste and recyclable materials that may be stored on-site at any time is 100 tons. Therefore, if the proposed facility operates in accordance with their registration authorization, the facility should not experience overloading.

## Comment 73: Ponded Water

One commenter stated that the SOP does not include specific measures to control ponded water.

## Response 73:

Part IV of the Application states, "Any ponded water at the facility will be controlled to avoid its becoming a nuisance. In the event that objectionable odors do occur, appropriate measures will be taken to alleviate the condition. Site grading and maintenance will minimize the ponding of water over the paved areas. . . The tipping floor will be inspected daily for ponded water. The ponded water will be swept into the floor drains and conveyed to the storage tanks." The executive director has reviewed the Application and determined that it satisfies the rule requirements regarding ponded water.

## Comment 74: Access

One commenter stated that the application shows that access to the transfer station will be made through the Pintail Landfill entrance. This commentor also asked how will the transfer station be accessed if the Pintail Landfill is not approved.

## Response 74:

The Applicant has filed two separate and independent applications with the TCEQ – the landfill permit application, MSW 2377, and the transfer station registration application, MSW 40259. The location of the access point for the proposed transfer station is not dependent upon the approval of the landfill permit. Therefore, regardless of whether the landfill permit is approved, the transfer station entrance will be located as shown in Part III, Appendix IIIB, General Facility Design, Drawing IIIB.1, General Site Plan.

## Comment 75: Regrading of Roadways

One commenter stated that the SOP does not state how often the internal facility roadways will be regraded.

## Response 75:

In accordance with 30 TAC §330.5(a)(3), the SOP for a Type V facility is required to address the operational standards contained in 30 TAC Chapter 330, Subchapter E. The TCEQ regulations located in Subchapter E do not require the Application to specify the frequency with which the facility roadways will be regraded. However, 30 TAC §330.237 does require that all on-site and other access roadways to be maintained on a regular basis. Access roadways must be regraded as necessary to minimize depressions, ruts, and potholes. It is noted that Part IV, Section 7.15, Facility Inspection and Maintenance Schedule, states that facility roadways will be inspected weekly and regraded as needed.

## Comment 76: Speed Limits

One commenter stated that the SOP does not state what the speed limit will be on internal facility roadways.

## Response 76:

In accordance with 30 TAC §330.5(a)(3), the SOP for a Type V facility is required to address the operational standards contained in 30 TAC Chapter 330, Subchapter E. The TCEQ regulations located in Subchapter E do not require the Application to specify in its SOP the speed limit that will be in place on internal facility roadways.

## Comment 77: Windblown Waste

A few commenters stated that they are concerned about windblown waste. Another commenter stated that the SOP does not specify which devices will be used to control windblown material and litter, and the conditions that would trigger implementation of those devices.

## Response 77:

In accordance with 30 TAC §330.233, windblown material and litter is required to be collected

as necessary, at least once per day on days the facility is in operation, to minimize unhealthy, unsafe, or unsightly conditions. This rule also requires that litter scattered throughout the facility, along fences and access roads, and at the gate must be picked up once a day on the days the facility is in operation. However, the TCEQ rules do not require the Application to specify what type of devices will be used to minimize windblown waste. It is noted that Part IV, Section 7.6, Control of Windblown Material and Liter, states that fencing or screens will be located near the edge of the pavement on all sides of the transfer station to control windblown materials and litter. The Application also states that the facility will use additional litter control devices as necessary to control windblown waste. The executive director has reviewed the Application and determined that it satisfies the rule requirements regarding the control of windblown material and litter.

### Comment No. 78: Aesthetics

One commenter stated that transfer stations are not aesthetically pleasing.

### Response 78:

In accordance with 30 TAC §330.239, the owner or operator of a transfer station is required to provide screening or other measures to minimize adverse visual impacts. One method that the Applicant has proposed to use at the facility to minimize adverse visual impacts is to conduct all processing operations within the transfer station building, which consists of a metal building with three walls. In addition, Part III of the Application states that the facility will incorporate a minimum buffer zone of approximately 204 feet on all sides of the facility. The executive director has reviewed the Application and determined that it satisfies the rule requirements regarding visual screening.

### Comment 79: Inspections

One commenter stated that the TCEQ should hold surprise inspections at the transfer station.

### Response 79:

Pursuant to 30 TAC §330.73, after all initial construction activity has been completed and prior to accepting any solid waste, the owner or operator shall contact the executive director and region office in writing and request a pre-opening inspection. A pre-opening inspection shall be conducted by the executive director within 14 days of notification by the owner or operator that all construction activities have been completed. In addition, the TCEQ Region 12 Office will conduct routine facility inspections while the facility is in operation. Moreover, the TCEQ Region 12 Office will investigate all complaints associated with this facility. If the complaints warrant an inspection, the inspection may be unannounced.

### Comment 80: Load Inspection Report

One commenter stated that the SOP should include a final version of the load inspection report and that the SOP should have the following language removed, "the load inspection report may vary".

### Response 80:

In accordance with 30 TAC §330.219, the facility is required to record and retain all inspection

reports in their operating record. However, the TCEQ rules do not require a certain format for this report or restrict a facility from changing the format of this form in the future.

## Comment 81: Random Inspections

One commenter stated that the load inspection procedure in the SOP does not contain an adequately specific procedure for conducting random inspections and does not provide a minimum frequency for these inspections.

## Response 81:

In accordance with 30 TAC §330.5(a)(3), the SOP for a Type V facility is required to address the operational standards contained in 30 TAC Chapter 330, Subchapter E. The TCEQ regulations located in Subchapter E do not require the Application to include any requirements regarding random inspections. However, Part IV, Section 7.2.1, Load Inspection Procedure, page IV-14 of the Application, states, "A properly trained and qualified facility staff person will visually inspect all incoming waste loads. Should any indication of prohibited waste be detected, appropriate facility personnel will stop unloading of the vehicle to allow facility personnel to conduct a thorough evaluation of the load. The driver will be directed to a load inspection area, where the load will be discharged from the vehicle. The load inspector will break up the waste pile and inspect the material for any prohibited waste. Known prohibited waste will be placed back into the vehicle and the driver will be instructed to depart the facility. Should any regulated hazardous waste be detected, the entire load will be refused."

## Comment 82: Vegetation

One commenter requests information regarding how the agency will ensure that the facility will manage the vegetation within the registration boundary.

## Response 82:

The TCEQ rules do not contain regulations regarding the maintenance of vegetation within the registration boundary. Please check with Waller County to determine if there are any local regulations regarding the maintenance of vegetation on private property.

## Comment 83: Hours of Operation

A couple commenters requested information regarding the facility's hours of operation. One commenter stated that she would like to know the facility's waste acceptance hours. Another commenter stated that the facility has requested alternative waste acceptance and operating hours and has not provided justification why they are needed.

## Response 83:

In accordance with 30 TAC §330.229, the SOP is required to specify the operating hours of the facility and establishes standard waste acceptance and facility operating hours. Part IV of the Application states that the facility is requesting the standard waste acceptance and facility operating hours as detailed in 30 TAC §330.229(a). As stated in Part IV, Section 7.4, Operating Hours, page IV-15 of the Application, the facility will have waste acceptance hours from 7 a.m. to 7 p.m. from Monday through Friday; and will have facility operating hours from 5 a.m. to 9 p.m. from Monday through Friday.

## Comment 84: Applicant's Competency

A few commenters stated that they have concerns regarding the Applicant's ability to operate the facility.

## Response 84:

The TCEQ rules specifically prohibit the operation of a solid waste facility in a manner that causes, suffers, allows or contributes to the creation or maintenance of a nuisance or the endangerment of human health and welfare or the environment. The executive director expects that if the Applicant constructs and operates the facility in accordance with the TCEQ regulations and the provisions of an issued authorization, that human health and the environment will be protected. Individuals are encouraged to report their concerns regarding suspected noncompliance with terms of any TCEQ authorization or environmental regulation by calling TCEQ's 24-hour toll-free Environmental Complaints Hotline at 1-888-777-3186 or by sending an e-mail to complaint@tceq.texas.gov. TCEQ investigates all complaints. If a person or facility is found to be out of compliance with the terms and conditions of an issued authorization, rule or law, the person or facility may be subject to enforcement action.

## Comment 85: Staffing Levels

One commenter stated that the SOP does not identify positions that would exist at the time of authorization and that the Application does not demonstrate that staffing levels will be sufficient to handle the volume of waste to be processed by the facility.

## Response 85:

The TCEQ rules require that the facility hire a supervisor with a Class A or Class B license to supervise or manage the operations of the facility prior to the commencement of operation. However, the TCEQ rules do not require the Application to demonstrate that staffing levels will be sufficient to handle the volume of waste to be processed by the facility. Part IV, page IV-24, of the Application lists the organization chart for the facility. In addition, Part IV, page IV-25, of the Application provides a summary of the job descriptions, minimum qualifications, and required training for facility personnel.

The TCEQ appreciates your interest in environmental issues. If you have further questions regarding enforcement issues, please contact our Region 12 Office, located at 5425 Polk Avenue, Suite II, Houston, Texas 77023-1452, phone number (713) 767-3500.

Public Comment Letter
Pintail Landfill LLC
Pintail Landfill Transfer Station, MSW Registration No. 40259
Page 33
July 16, 2013

For questions regarding the review process of the referenced Application, please contact Mr. Ruben Meza, Jr., at (512) 239-2580. If responding by mail, please use mail code MC 124 after the recipient's name. For further information regarding our agency, please view our website at www.tceq.texas.gov.

Sincerely,

Christine M. Bergren
Manager, Municipal Solid Waste Permits Section
Waste Permits Division
Texas Commission on Environmental Quality

CMB/RM/dd

C

# Texas Commission on Environmental Quality



## Registration for Municipal
## Solid Waste (MSW) Management Site

### Issued under provisions of Texas
### Health & Safety Code
### Chapter 361

| | |
|---|---|
| MSW Registration No.: | 40259 |
| Name of Site Operator/Registrant: | Pintail Landfill, LLC |
| Property Owner: | Marengo Family Properties, Ltd. |
| Facility Name: | Pintail Landfill Transfer Station |
| Facility Address: | 24644 Highway 6, Hempstead, Texas 77445 |
| Classification of Site: | Type V Transfer Station |

The registrant is authorized to store and process wastes, and to recycle recovered materials in accordance with the limitations, requirements, and other conditions set forth herein. This registration is granted subject to the rules and Orders of the Commission and laws of the State of Texas. Nothing in this registration exempts the registrant from compliance with other applicable rules and regulations of the Texas Commission on Environmental Quality (TCEQ). This registration will be valid until canceled, amended, or revoked by the Commission.

*Approved, Issued* and *Effective* in accordance with Title 30 Texas Administrative Code (30 TAC) Chapter 330.

Issued Date: July 23, 2013

For the Commission

## Table of Contents

I.    **Size and Location of Facility** ............................................................... 3

II.   **Waste Management Units and Operations Authorized** .............................. 3

    A.    Days and Hours of Operation................................................................ 3
    B.    Wastes Authorized at this Facility.......................................................... 3
    C.    Wastes Prohibited at this Facility........................................................... 3
    D.    Waste Acceptance Rate ....................................................................... 3
    E.    Maximum Volume Available for Storage .................................................. 3
    F.    Waste Management Units Authorized ..................................................... 4
    G.    Changes, Additions, or Expansions........................................................ 4

III.   **Facility Design, Construction, and Operation** ...................................... 4

IV.   **Financial Assurance** ...................................................................... 5

    A.    General ............................................................................................ 5
    B.    Closure Financial Assurance ................................................................. 5
    C.    Closure Financial Assurance Amount ..................................................... 5
    D.    Closure Plan Modifications ................................................................... 5

V.    **Facility Closure** ............................................................................ 6

VI.   **Standard Registration Conditions** .................................................... 6

VII.  **Incorporated Regulatory Requirements** ............................................. 7

VIII. **Special Provisions** ...................................................................... 7

IX.   **Attachment A**............................................................................... 7

X.    **Attachment B**................................................................................ 7

## I.     Size and Location of Facility

A.     This Type V Transfer Station is located at 24644 Highway 6, in Hempstead, Waller County, Texas. The facility contains 410.37 acres.

B.     The legal description is contained in Part 1, Appendix 1C of the application.

C.     Coordinates and Elevation of Site Permanent Benchmark:

Latitude:                       30° 08' 12.73" N
Longitude:                    96° 04' 07.43" W
Benchmark Elevation:    259.31 feet above Mean Sea Level

## II.     Waste Management Units and Operations Authorized

A.     Days and Hours of Operation

This facility is authorized to accept waste from 7 am to 7 pm, Monday through Friday. The operating hours for operating heavy equipment and for transporting materials will be from 5 am to 9 pm, Monday through Friday.  The operator shall post the operating and waste acceptance hours on the site sign.

B.     Wastes Authorized at this Facility

The registrant is authorized to separate, store, and transfer construction and demolition waste, as defined in 30 TAC Section (§)330.3(33), from the construction and demolition of residential, community, commercial, institutional, and recreational activities.  All waste must be transferred to an authorized disposal facility. The facility is also authorized to recover recyclable materials and transfer the recovered recyclable materials to an authorized facility.

C.     Wastes Prohibited at this Facility

All liquid waste and solid waste not authorized in Provision II.B.

D.     Waste Acceptance Rate

Solid waste may be accepted for processing at this facility at a rate of up to 94 tons per day.

E.     Maximum Volume Available for Storage

The facility may store up to 100 tons of processed and unprocessed materials onsite. The 100 tons includes unprocessed and processed wastes, and all recyclable materials stored onsite. The maximum storage limit for unprocessed and processed wastes is 72 hours. Recyclable materials may be stored on site for a maximum of 180 days.

F.     Waste Management Units Authorized

The registrant is authorized to operate the facilities related to the separation, storage, and transfer of the wastes authorized, and recycling of the recovered materials, which shall include units, structures, appurtenances, or improvements as described in the registration application.

The waste management units authorized at this facility include: the transfer station building; roll-off boxes, transfer trailers, and other suitable containers; and one 5,000 gallon contaminated water storage tank.

G.     Changes, Additions, or Expansions

Any proposed facility changes must be authorized in accordance with TCEQ rules in 30 TAC Chapter 330 (Municipal Solid Waste) and 30 TAC Chapter 305 (Consolidated Permits).

## III. Facility Design, Construction, and Operation

A.     Facility design, construction, and operation must comply with this registration, the registration application as incorporated by reference in Attachment A, and the regulations in 30 TAC Chapter 330.

B.     The entire waste management facility shall be designed, constructed, operated, and maintained to prevent the release and migration of any waste, contaminant, or pollutant, and to prevent inundation or discharge from the areas surrounding the facility components. This site must be designed, constructed and maintained to collect spills and incidental precipitation in such a manner as to:

1.     preclude the release of any contaminated runoff or spills; and

2.     prevent washout of any waste by a 100-year storm.

C.     The site shall be designed and operated so as not to cause a violation of:

1.     the requirements of the Texas Water Code, §26.121;

2.     any requirements of the Federal Clean Water Act, including, but not limited to, the National Pollutant Discharge Elimination System (NPDES) requirements, §402 as amended; or Texas Pollutant Discharge Elimination System requirements;

3.     the requirements under the Federal Clean Water Act, §404, as amended; and

4.     any requirement of an area wide or statewide water quality management plan that has been approved under the Federal Clean Water Act, §208 or §319, as amended.

D.     All facility employees and other persons involved in facility operations shall be qualified, trained, and experienced to perform their duties so as to achieve compliance with this registration. The registrant shall further ensure that personnel are familiar with safety procedures, contingency plans, the requirements of the Commission's rules, and this registration, commensurate with their levels and positions of authority.

## IV.     Financial Assurance

A.     General

Authorization to operate the facility is contingent upon compliance with provisions contained in this registration and maintenance of financial assurance in accordance with 30 TAC Chapter 330 Subchapter K and 30 TAC Chapter 37.

B.     Closure Financial Assurance

Closure Financial Assurance. The amount of financial assurance posted for closure shall be provided annually in current dollars in an amount equal to closing the entire facility pursuant to 30 TAC §330.505. The owner and/or operator shall annually adjust the closure cost estimate and the dollar amount of the financial assurance for inflation within 60 days prior to the anniversary date of the registration pursuant to 30 TAC Chapter 37 Subchapter B. Continuous financial assurance coverage for closure must be provided until all requirements of the final closure plan have been completed and the site is determined to be closed in writing by the executive director.

C.     Closure Financial Assurance Amount

Within 60 days after the date of registration issuance or prior to the initial receipt of waste, the registrant shall provide financial assurance instrument(s) for demonstration of closure in an amount equal to but not less than $87,975.00 for closure in 2011 dollars. The amount of financial assurance to be posted annually shall be determined as described in Provisions IV.A. and IV.B of this registration and 30 TAC Chapter 37.

D.     Closure Plan Modifications

If the facility's closure plan is modified, the registrant shall provide new cost estimates in current dollars, which meet the requirements in 30 TAC Chapter 37 and 30 TAC Chapter 330, Subchapter L as applicable. Modifications shall be made pursuant to 30 TAC §305.70. The amount of the financial assurance mechanism shall be adjusted within 45 days after the modification is approved. Adjustments to the cost estimates and/or financial assurance instrument to comply with any financial assurance regulation that is adopted by the TCEQ subsequent to the issuance of this registration shall be initiated as a modification within 30 days after the effective date of the new regulation.



## V. Facility Closure

A. Closure shall commence:

1. Upon direction by the Executive Director of the TCEQ for failure to comply with the terms and conditions of this registration or violation of State or Federal regulations. The Executive Director is authorized to issue emergency orders to the registrant in accordance with §§5.501 and 5.512 of the Texas Water Code regarding this matter after considering whether an emergency requiring immediate action to protect the public health and safety exists;

2. Upon abandonment of the site;

3. Upon direction of the Executive Director for failure to secure and maintain adequate financial assurance as required; or

4. Upon registrant's notification to the TCEQ that the facility will no longer operate.

B. Site Completion Requirements:

The facility shall be completed and closed in accordance with Part III, Appendix IIIC (Closure Plan), Part III, Appendix IIID (Closure Cost Estimates), Part III of this Registration, and 30 TAC §330.21 – Closure, 30 TAC §330.451 – Applicability, 30 TAC §330.459 - Closure Requirements for Municipal Solid Waste Storage and Processing Units and 30 TAC §330.461 - Certification of Final Facility Closure.

## VI. Standard Registration Conditions

A. This registration is based on and the site owner/operator shall follow the registration application submittal dated August 1, 2011, and the revisions dated August 8, 2011, August 29, 2011, November 16, 2011, January 18, 2012, March 15, 2012, May 1, 2012, May 31, 2012, July 20, 2012, September 14, 2012, and October 18, 2012. These application submittals are hereby approved subject to the terms of this registration, the rules and regulations, and any orders of the TCEQ. These application materials are incorporated into this registration by reference in Attachment A as if fully set out herein. Any and all revisions to these elements shall become conditions of this registration upon the date of approval by the Commission. The registrant shall maintain the Application and all supporting documentation at the facility and make them available for inspection by TCEQ personnel.

B. Attachment B, consisting of temporary authorizations, modifications, and corrections to this registration, is hereby made a part of this registration.

C. The registrant shall comply with all conditions of this registration. Failure to comply with any condition may constitute a violation of the registration, the rules of the Commission, and the Texas Solid Waste Disposal Act and is grounds for an enforcement action, revocation, or suspension.

D. Inspection and entry onto the site by authorized personnel shall be allowed during the site operating life.

E. The provisions of this registration are severable. If any registration provision or the application of any registration provision to any circumstance is held invalid, the remainder of this registration shall not be affected.

F. Regardless of the specific designs contained in the registration application, the registrant shall be required to meet all performance standards in the registration, the application, or as required by local, State, and Federal laws.

G. If differences arise between these registration provisions and the Application, these registration provisions shall prevail.

H. The registrant shall comply with the requirements of the air permit exemption in 30 TAC §106.534, if applicable, and the applicable requirements of 30 TAC Chapters 106 and 116.

## VII. Incorporated Regulatory Requirements

A. The registrant shall comply with all applicable Federal, State, and local regulations and shall obtain any and all other required permits prior to the beginning of any operation authorized by this registration.

B. To the extent applicable to the activities authorized by this registration, the requirements of 30 TAC Chapters 37, 281, 305, and 330, and future revisions are adopted by reference and are hereby made provisions and conditions of this registration.

## VIII. Special Provisions

The facility must implement all roadway improvements specified in Part II, Appendix IIC of the registration application prior to their pre-opening inspection and operation of the transfer station.

## IX. Attachment A

The Registration Application.

## X. Attachment B

Temporary Authorizations, Modifications, and Corrections to MSW Registration No. 40259.

D

Westlaw.

C

**Effective:|See Text Amendments|**

Vernon's Texas Statutes and Codes Annotated Currentness
  Health and Safety Code (Refs & Annos)
    Title 5. Sanitation and Environmental Quality (Refs & Annos)
      Subtitle B. Solid Waste, Toxic Chemicals, Sewage, Litter, and Water (Refs & Annos)
        Chapter 361. Solid Waste Disposal Act (Refs & Annos)
          Subchapter A. General Provisions (Refs & Annos)
            **§ 361.002. Policy; Findings**

(a) It is this state's policy and the purpose of this chapter to safeguard the health, welfare, and physical property of the people and to protect the environment by controlling the management of solid waste, including accounting for hazardous waste that is generated.

(b) The storage, processing, and disposal of hazardous waste at municipal solid waste facilities pose a risk to public health and the environment, and in order to protect the environment and to provide measures for adequate protection of public health, it is in the public interest to require hazardous waste to be stored, processed, and disposed of only at permitted hazardous industrial solid waste facilities.

CREDIT(S)

Acts 1989, 71st Leg., ch. 678, § 1, eff. Sept. 1, 1989. Amended by Acts 1990, 71st Leg., 6th C.S., ch. 10, art. 2, § 1, eff. Sept. 6, 1990.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



C

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Health and Safety Code (Refs & Annos)
    Title 5. Sanitation and Environmental Quality (Refs & Annos)
      Subtitle B. Solid Waste, Toxic Chemicals, Sewage, Litter, and Water (Refs & Annos)
        Chapter 361. Solid Waste Disposal Act (Refs & Annos)
          Subchapter B. Powers and Duties of Texas Natural Resource Conservation Commission (Refs & Annos)
            →→ **§ 361.011. Commission's Jurisdiction: Municipal Solid Waste**

(a) The commission is responsible under this section for the management of municipal solid waste, excluding hazardous municipal waste, and shall coordinate municipal solid waste activities, excluding activities concerning hazardous municipal waste.

(b) The commission shall accomplish the purposes of this chapter by controlling all aspects of the management of municipal solid waste, excluding management of hazardous municipal waste, by all practical and economically feasible methods consistent with its powers and duties under this chapter and other law.

(c) The commission has the powers and duties specifically prescribed by this chapter relating to municipal solid waste management, excluding management of hazardous municipal waste, and all other powers necessary or convenient to carry out those responsibilities under this chapter.

(d) In matters relating to municipal solid waste management, excluding management of hazardous municipal waste, the commission shall consider water pollution control and water quality aspects and air pollution control and ambient air quality aspects.

(e) Repealed by Acts 1997, 75th Leg., ch. 1072, § 60(b)(1), eff. Sept. 1, 1997.

CREDIT(S)

Acts 1989, 71st Leg., ch. 678, § 1, eff. Sept. 1, 1989. Amended by Acts 1991, 72nd Leg., 1st C.S., ch. 3, § 8.02, eff. Sept. 1, 1991; Acts 1995, 74th Leg., ch. 76, § 11.20, eff. Sept. 1, 1995; Acts 1997, 75th Leg., ch. 1072, §§ 28, 60(b)(1), eff. Sept. 1, 1997.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

V.T.C.A., Health & Safety Code § 361.011

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

C

**Effective:|See Text Amendments|**

Vernon's Texas Statutes and Codes Annotated Currentness
  Health and Safety Code (Refs & Annos)
    Title 5. Sanitation and Environmental Quality (Refs & Annos)
      Subtitle B. Solid Waste, Toxic Chemicals, Sewage, Litter, and Water (Refs & Annos)
        Chapter 361. Solid Waste Disposal Act (Refs & Annos)
          Subchapter C. Permits
            **§ 361.061. Permits; Solid Waste Facility**

Except as provided by Section 361.090 with respect to certain industrial solid waste, the commission may require and issue permits authorizing and governing the construction, operation, and maintenance of the solid waste facilities used to store, process, or dispose of solid waste under this chapter.

CREDIT(S)

Acts 1989, 71st Leg., ch. 678, § 1, eff. Sept. 1, 1989. Amended by Acts 1995, 74th Leg., ch. 76, § 11.37, eff. Sept. 1, 1995.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

C

**Effective:|See Text Amendments|**

Vernon's Texas Statutes and Codes Annotated Currentness
  Health and Safety Code (Refs & Annos)
    Title 5. Sanitation and Environmental Quality (Refs & Annos)
      Subtitle B. Solid Waste, Toxic Chemicals, Sewage, Litter, and Water (Refs & Annos)
        Chapter 361. Solid Waste Disposal Act (Refs & Annos)
          Subchapter C. Permits
          ➡➡ **§ 361.090. Regulation and Permitting of Certain Industrial Solid Waste Disposal**

(a) The commission may not require a permit under this chapter for the collection, handling, storage, processing, and disposal of industrial solid waste that is disposed of within the boundaries of a tract of land that is:

(1) owned or otherwise effectively controlled by the owners or operators of the particular industrial plant, manufacturing plant, mining operation, or agricultural operation from which the waste results or is produced; and

(2) located within 50 miles from the plant or operation that is the source of the industrial solid waste.

(b) This section does not apply to:

(1) waste collected, handled, stored, processed, or disposed of with solid waste from any other source or sources; or

(2) hazardous waste.

(c) This section does not change or limit any authority the commission may have concerning:

(1) the requirement of permits and the control of water quality, or otherwise, under Chapter 26, Water Code; or

(2) the authority under Section 361.303.

(d) The commission may adopt rules under Section 361.024 to control the collection, handling, storage, processing, and disposal of the industrial solid waste to which this section applies to protect the property of others, public property and rights-of-way, groundwater, and other rights requiring protection.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(e) The commission may require a person who disposes or plans to dispose of industrial solid waste and claims to be exempt under this section to submit to the commission information that is reasonably required to enable the commission to determine if this section applies to the waste disposal activity.

CREDIT(S)

Acts 1989, 71st Leg., ch. 678, § 1, eff. Sept. 1, 1989.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

**C**

**Effective:|See Text Amendments|**

Vernon's Texas Statutes and Codes Annotated Currentness
  Health and Safety Code (Refs & Annos)
    Title 5. Sanitation and Environmental Quality (Refs & Annos)
      Subtitle B. Solid Waste, Toxic Chemicals, Sewage, Litter, and Water (Refs & Annos)
        Chapter 361. Solid Waste Disposal Act (Refs & Annos)
          Subchapter C. Permits
          ➡➡ **§ 361.111. Commission Shall Exempt Certain Municipal Solid Waste Management Facil- ities**

(a) The commission shall exempt from permit requirements a municipal solid waste management facility that is used in the transfer of municipal solid waste to a solid waste processing or disposal facility from:

(1) a municipality with a population of less than 50,000;

(2) a county with a population of less than 85,000;

<Text of subd. (3) as added by Acts 1993, 73rd Leg., ch. 802, § 5>

(3) a facility used in the transfer of municipal solid waste that will transfer 125 tons per day or less; and

<Text of subd. (3) as added by Acts 1993, 73rd Leg., ch. 899, § 2.08 and Acts 1993, 73rd Leg., ch. 1045, § 10>

(3) a facility used in the transfer of municipal solid waste that transfers or will transfer 125 tons a day or less; or

<Text of subd. (4) as added by Acts 1993, 73rd Leg., ch. 802, § 5 and Acts 1993, 73rd Leg., ch. 1045, § 10>

(4) a materials recovery facility that recycles for reuse more than 10 percent of its incoming nonsegregated waste stream if the remaining nonrecyclable waste is transferred to a permitted landfill not more than 50 miles from the materials recovery facility.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

<Text of subd. (4) as added by Acts 1993, 73rd Leg., ch. 899, § 2.08>

(4) a materials recovery facility that recycles for reuse more than 10 percent of its incoming nonsegregated waste stream if the remaining nonrecyclable waste is transferred to a permitted Type I landfill not farther than 50 miles from the materials recovery facility.

(b) The facility must comply with design and operational requirements established by commission rule that are necessary to protect the public's health and the environment.

<Text of subsec. (c) as added by Acts 1993, 73rd Leg., ch. 802, § 5>

(c) To qualify for this exemption, the applicant must hold a public meeting on the siting of the facility in the municipality or county where the facility is to be located.

<Text of subsec. (c) as added by Acts 1993, 73rd Leg., ch. 899, § 2.08 and Acts 1993, 73rd Leg., ch. 1045, § 10>

(c) To qualify for an exemption under this section, an applicant must hold a public meeting about the siting of the facility in the municipality or county in which the facility is or will be located.

CREDIT(S)

Added by Acts 1990, 71st Leg., 6th C.S., ch. 10, art. 2, § 17, eff. Sept. 6, 1990. Amended by Acts 1993, 73rd Leg., ch. 802, § 5, eff. June 18, 1993; Acts 1993, 73rd Leg., ch. 899, § 2.08, eff. Aug. 30, 1993; Acts 1993, 73rd Leg., ch. 1045, § 10, eff. Sept. 1, 1993.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



C

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Health and Safety Code (Refs & Annos)
    Title 5. Sanitation and Environmental Quality (Refs & Annos)
      Subtitle B. Solid Waste, Toxic Chemicals, Sewage, Litter, and Water (Refs & Annos)
        Chapter 361. Solid Waste Disposal Act (Refs & Annos)
          Subchapter K. Appeals; Joinder of Parties (Refs & Annos)
            **§ 361.321. Appeals**

(a) A person affected by a ruling, order, decision, or other act of the commission may appeal the action by filing a petition in a district court of Travis County.

(b) A person affected by a ruling, order, decision, or other act of a county, or of a political subdivision exercising the authority granted by Section 361.165, may appeal by filing a petition in a district court with jurisdiction in the county or political subdivision.

(c) Except as provided by Section 361.322(a), the petition must be filed not later than the 30th day after the date of the ruling, order, decision, or other act of the governmental entity whose action is appealed. Service of citation must be accomplished not later than the 30th day after the date on which the petition is filed.

(d) The plaintiff shall pursue the action with reasonable diligence. The court shall presume that the action has been abandoned if the plaintiff does not prosecute the action within one year after it is filed and shall dismiss the suit on a motion for dismissal made by the governmental entity whose action is appealed unless the plaintiff, after receiving notice, can show good and sufficient cause for the delay.

(e) Except as provided by Section 361.322(e), in an appeal from an action of the commission, a county, or a political subdivision exercising the authority granted by Section 361.165, the issue is whether the action is invalid, arbitrary, or unreasonable.

CREDIT(S)

Acts 1989, 71st Leg., ch. 678, § 1, eff. Sept. 1, 1989. Amended by Acts 1990, 71st Leg., 6th C.S., ch. 10, art. 2, § 28, eff. Sept. 6, 1990; Acts 1995, 74th Leg., ch. 76, § 11.71, eff. Sept. 1, 1995.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

V.T.C.A., Health & Safety Code § 361.321

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

C

**Effective: June 20, 2003**

Vernon's Texas Statutes and Codes Annotated Currentness
 Health and Safety Code (Refs & Annos)
  Title 5. Sanitation and Environmental Quality (Refs & Annos)
   Subtitle B. Solid Waste, Toxic Chemicals, Sewage, Litter, and Water (Refs & Annos)
    Chapter 361. Solid Waste Disposal Act (Refs & Annos)
     Subchapter N. Waste Reduction Programs; Disposal Fees (Refs & Annos)
      →→ **§ 361.428. Composting Program**

(a) The commission shall put in place incentives for a composting program that is capable of achieving at least a 15 percent reduction in the amount of the municipal solid waste stream that is disposed of in landfills by January 1, 1994.

(b) The commission shall adopt rules establishing minimum standards and guidelines for the issuance of permits for processes or facilities that produce compost that is the product of material from the typical mixed solid waste stream generated by residential, institutional, commercial, or industrial sources. A reduction in the mixed solid waste stream that occurs as a result of the beneficial reuse of compost produced by a facility permitted under this subsection shall be used in achieving the goal established under Section 361.422. The minimum standards must include end-product standards and a definition of beneficial reuse. The commission shall consider regulations issued by the United States Environmental Protection Agency in developing minimum standards. Beneficial reuse does not include landfilling or the use of compost as daily landfill cover.

(c) A composting facility may not accept mixed municipal solid waste from a governmental unit for composting purposes at that facility unless residents have reasonable access to household hazardous waste collection and source-separated recycling programs in the area. The commission shall establish standards for household hazardous waste collection programs and source-separated recycling programs that qualify under this section.

(d) A person may not commercially compost grease trap waste, as defined by the commission, unless the person has first obtained a permit for composting grease trap waste issued by the commission under this section on or after September 1, 2003.

(e) The permit to compost grease trap waste must meet the minimum standards of a permit issued under rules adopted under Subsection (b).

CREDIT(S)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Added by Acts 1991, 72nd Leg., ch. 303, § 1, eff. Sept. 1, 1991. Amended by Acts 1993, 73rd Leg., ch. 899, § 1.13, eff. Aug. 30, 1993; Acts 2003, 78th Leg., ch. 596, § 1, eff. June 20, 2003.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

 Westlaw.

▷

**Effective: September 1, 2001**

Vernon's Texas Statutes and Codes Annotated Currentness
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle A. Executive Agencies
        Chapter 5. Texas Commission on Environmental Quality (Refs & Annos)
          Subchapter D. General Powers and Duties of the Commission
            → → **§ 5.103. Rules**

(a) The commission shall adopt any rules necessary to carry out its powers and duties under this code and other laws of this state.

(b) The commission shall adopt reasonable procedural rules to be followed in a commission hearing. The executive director may recommend to the commission for its consideration any rules that he considers necessary.

(c) Rules shall be adopted in the manner provided by Chapter 2001, Government Code. As provided by that Act, the commission must adopt rules when adopting, repealing, or amending any agency statement of general applicability that interprets or prescribes law or policy or describes the procedure or practice requirements of an agency. The commission shall follow its own rules as adopted until it changes them in accordance with that Act.

(d) The commission shall include as a part of each rule the commission adopts, and each proposed rule for adoption after the effective date of this subsection, a citation to the statute that grants the specific regulatory authority under which the rule is justified and a citation of the specific regulatory authority that will be exercised. If no specific statutory authority exists and the agency is depending on this section, citation of this section, or Section 5.102 or 5.013, is sufficient. A rule adopted in violation of this subsection is void.

CREDIT(S)

Added by Acts 1985, 69th Leg., ch. 795, § 1.001, eff. Sept. 1, 1985. Amended by Acts 1993, 73rd Leg., ch. 802, § 1, eff. June 18, 1993; Acts 1995, 74th Leg., ch. 76, § 5.95(49), eff. Sept. 1, 1995; Acts 2001, 77th Leg., ch. 965, § 1.09, eff. Sept. 1, 2001.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

V.T.C.A., Water Code § 5.351                                                    Page 1

C

**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Water Code (Refs & Annos)
    Title 2. Water Administration (Refs & Annos)
      Subtitle A. Executive Agencies
        Chapter 5. Texas Commission on Environmental Quality (Refs & Annos)
          Subchapter I. Judicial Review
          → → **§ 5.351. Judicial Review of Commission Acts**

(a) A person affected by a ruling, order, decision, or other act of the commission may file a petition to review, set aside, modify, or suspend the act of the commission.

(b) A person affected by a ruling, order, or decision of the commission must file his petition within 30 days after the effective date of the ruling, order, or decision. A person affected by an act other than a ruling, order, or decision must file his petition within 30 days after the date the commission performed the act.

CREDIT(S)

Amended by Acts 1985, 69th Leg., ch. 795, § 1.001, eff. Sept. 1, 1985.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

E

**30 TAC § 330.3**

Tex. Admin. Code tit. 30, § 330.3

1. Texas Administrative Code
   Title 30. Environmental Quality
    Part 1. Texas Commission on Environmental Quality
     Chapter 330. Municipal Solid Waste
      <u>Subchapter A</u>. General Information
       **§ 330.3. Definitions**

...

(33) Construction or demolition waste--Waste resulting from construction or demolition projects; includes all materials that are directly or indirectly the by-products of construction work or that result from demolition of buildings and other structures, including, but not limited to, paper, cartons, gypsum board, wood, excelsior, rubber, and plastics.

...

(117) Processing--Activities including, but not limited to, the extraction of materials, transfer, volume reduction, conversion to energy, or other separation and preparation of solid waste for reuse or disposal, including the treatment or neutralization of waste, designed to change the physical, chemical, or biological character or composition of any waste to neutralize such waste, or to recover energy or material from the waste, or render the waste safer to transport, store, dispose of, or make it amenable for recovery, amenable for storage, or reduced in volume.

...

30 TAC § 330.9

Tex. Admin. Code tit. 30, § 330.9

Texas Administrative Code Currentness
  Title 30. Environmental Quality
    Part 1. Texas Commission on Environmental Quality
      Chapter 330. Municipal Solid Waste
        Subchapter A. General Information
        **§ 330.9. Registration Required**

(a) Except as provided in §§ 330.7, 330.11, 330.13, or 330.25 of this title (relating to Permit Required; Notification Required; Waste Management Activities Exempt from Permitting, Registration, or Notification; Relationship with County Licensing System), no person may cause, suffer, allow, or permit any activity of storage, processing, removal, or disposal of any municipal solid waste (MSW) unless that activity is authorized by a registration or other authorization from the commission. In the event this requirement is violated, the executive director may seek recourse against not only the person that stored, processed, or disposed of the waste but also against the generator, transporter, owner or operator, or other person who caused, suffered, allowed, or permitted waste to be stored, processed, or disposed. No person may commence physical construction of a new MSW management facility subject to this registration requirement without first having submitted a registration application in accordance with §§ 330.57, 330.59, 330.61, 330.63, and 330.65 of this title (relating to Permit and Registration Application Procedures) and received a registration from the commission. A person shall include a statement justifying the facility's eligibility for a registration as established under this section. A person shall submit a claim for a registration by rule in duplicate with one copy sent directly to the appropriate Texas Commission on Environmental Quality regional office.

(b) A registration is required for an MSW transfer station facility that is used in the transfer of MSW to a solid waste processing or disposal facility from any of the following:

    (1) a municipality with a population of less than 50,000;

    (2) a county with a population of less than 85,000;

    (3) a facility used in the transfer of MSW that transfers or will transfer 125 tons per day or less; or

    (4) a transfer station located within the permitted boundaries of an MSW Type I or Type IV facility as specified in § 330.5(a) of this title (relating to Classification of Municipal Solid Waste Facilities).

(c) A registration is required to establish a waste-separation/recycling facility established at a permitted MSW facility if owned by the permittee.

(d) A registration is required for a facility where the only operation is the storage and/or processing of used and scrap tires as provided for in Chapter 328 of this title (relating to Waste Minimization and Recycling). These facilities shall be registered with the executive director in accordance with Chapter 328 of this title. Failure to operate such registered facilities in accordance with the requirements established in Chapter 328 of this title may be grounds for the revocation of the registration.

(e) A licensed hospital may function as a medical waste collection and transfer facility for generators that generate less than 50 pounds of untreated medical waste per month and that transport their own waste if:

    (1) the hospital is located in an incorporated area with a population of less than 25,000 and in a county with a population of less than one million; or

    (2) the hospital is located in an unincorporated area that is not within the extraterritorial jurisdiction of a city with a population more than 25,000 or within a county with a population of

more than one million. The hospital shall submit a request to the executive director for registration as a medical waste collection station.

(f) A registration is required for any new MSW Type V transfer station that includes a material recovery operation that meets all of the following requirements.

    (1) Materials recovery. The owner or operator must recover 10% or more by weight or weight equivalent of the total incoming waste stream for reuse or recycling; ensure that the incoming waste has already been reduced by at least 10% through a source-separation recycling program; or, also operate one or more source-separation recycling programs in the county where the transfer station is located and those source-separation recycling programs manage a total weight or weight equivalent of recyclable materials equal to 10% or more by weight or weight equivalent of the incoming waste stream to all transfer stations to which credit is being applied. The owner or operator must demonstrate in the registration application the method that will be used to assure that the 10% requirement is achieved.

    (2) Distance to a landfill. The transfer facility must demonstrate in the registration application that it will transfer the remaining nonrecyclable waste to a landfill not more than 50 miles from the facility.

(g) Except as provided in § 330.11(d) of this title, a registration is required for an MSW Type V processing facility that processes only grease trap waste, grit trap waste, or septage or a combination of these three liquid wastes in accordance with either paragraph (1) or (2) of this subsection. For the purposes of this section, grit trap waste means grit trap waste from commercial car washes and excludes grit trap waste from other generators.

    (1) The facility must attain a 10% recovery of material for beneficial use from the incoming waste. Recovery of material for beneficial use is considered to be the recovery of fats, oils, greases, and the recovery of food solids for composting, but does not include the recovery of water. The Type V processing facilities issued a registration under a permit exemption based on 10% recovery of material for beneficial use must maintain records in accordance with the requirements of § 330.219(b)(9) of this title (relating to Recordkeeping and Reporting Requirements). Records and a report must be provided on a quarterly basis to the executive director that demonstrate that at least 10% of the volume of the waste received was processed to recover solid material that was recycled or reused. Failure to achieve the relevant percent recycling rate in any two quarters within any one-year period will cause a registration to terminate and will require the owner or operator of the facility to obtain a permit to continue facility operations. The quarterly report must provide the volume received, percent solids, and the method of determining the percent solids, processed, disposed, and recycled or reused. Records must be kept on a volume basis in gallons except that solids passing the paint filter test may be reported in cubic yard volume converted to gallons. The methods of recycling or reuse must be specified in the report. Records must be kept for solids and recyclable material leaving these facilities in the form of manifests, shipping documents, or trip tickets. The quarterly report must include manifests, shipping documents, or trip tickets to show where the recyclable material was taken for recycling, and the recycled material must be reconciled with the volume of waste received. Water discharged from processing is not allowed to be counted as part of the 10% recovery of material. Recovery and recycling or reuse of fats, oils, and greases may be considered a part of recycling for this activity. Composting of solids resulting from waste processing may be considered to be recycling as part of this activity. Any material such as lime, polymer, or flocculent added as part of the facility process is not allowed to be considered as part of the 10% recovery of material from the waste stream and must be subtracted from the material considered as recycled. Diversion of material from the waste stream without processing is not considered to be recycling as part of this activity.

    (2) The Type V processing facility must be located at a manned treatment facility that is permitted under Texas Water Code, Chapter 26; is permitted to discharge at least one million gallons per day; and is owned by and operated for the benefit of a political subdivision of this state. Facilities that have received a permit and wish to add capacity may apply for a registration in lieu of a permit amendment if the facilities meet the registration requirements established in this chapter.

(h) A registration is required for a mobile liquid waste processing unit that processes only grease trap waste, grit trap waste, or septage or a combination of these three liquid wastes. For the purposes of this section, grit trap waste means grit trap waste from commercial car washes and excludes grit trap waste from other generators. Registration applications shall contain the information specified in §§ 330.59(a) and (e)-(h), 330.61(a) and (b), and 330.63(a), (d)(6), (h), and (j) of this title (relating to Contents of Part I of the Application; Contents of Part II of the Application; and Contents of Part III of the Application). The following requirements also apply.

(1) Mobile liquid waste processing shall be limited to the processing of liquid waste while at the generator's trap.

(2) Effluent from the processing of the liquid waste must be discharged to the generator's trap or interceptor.

(3) The mobile liquid waste processing units regulated under this section include truck-mounted processes that are also known as separator trucks, and any other liquid waste processes that are not considered to be fixed to a specific location.

(4) This section is not meant to supplant rules or ordinances of local governments where stricter standards are in effect.

(5) This section is not applicable to septage if waste has received only a pH adjustment prior to or during transportation for disposal at a treatment facility permitted under Texas Water Code, Chapter 26, or other authorized facility. Transporters who only adjust septage pH during transportation shall register in accordance with § 312.142 of this title (relating to Transporter Registration).

(i) A registration is required for an MSW Type VI facility that demonstrates new management methods for processing or handling grease trap waste, grit trap waste, septage, or a combination of these three liquid wastes. For the purposes of this section, grit trap waste means grit trap waste from commercial car washes and excludes grit trap waste from other generators. Those facilities meeting this exemption must obtain a registration by meeting the operational criteria and design criteria established in § 330.63(d)(9) of this title.

(j) A registration is required for the following material recovery operations from a landfill. The following operations are subject to the general requirements found in § 330.601 of this title (relating to General Requirements), and the requirements set for soil end product standards in § 330.615 of this title (relating to Final Soil Product Grades and Allowable Uses), and the air quality requirements in § 330.607 of this title (relating to Air Quality Requirements):

(1) operations that recover reusable or recyclable material buried in permitted or closed MSW landfill facilities, or MSW landfill facilities that were never permitted;

(2) operations that reclaim soil from permitted or closed MSW landfills, or from MSW landfill facilities that were never permitted; and

(3) facilities that have received prior approval for excavation of buried materials through permits, permit amendments, or other agency authorization, which are exempt from further authorization requirements, as established in this subchapter, for the specific authorization received. Soil final product standards shall be applicable for all registered facilities.

(k) A registration by rule is granted for the owner or operator of a Type IX MSW facility that recovers landfill gas for beneficial use if all of the following conditions are met.

(1) The owner or operator shall submit the following information at least 60 days prior to commencing operations:

(A) a large-scale plan drawing of the facility showing the following:

(i) facility boundaries (show permit boundaries and/or boundaries and dimensions of tract or land or closed MSW landfill units on which the gas recovery system is to be developed); and

(ii) landfill gas treatment, gas compression, electrical power generation equipment, and any other beneficial gas-use equipment, indicating limits of waste placement and additional easements required;

(B) for enclosed structures, provisions for fire control facilities (fire hydrants, fire extinguisher, water tanks, and waterwell), continuous methane monitoring, and explosion-proof fixtures;

(C) a discussion of the proposed method for condensate disposal, including during the landfill post-closure care period;

(D) an estimation of average daily gas production;

(E) an estimation of the design daily gas production;

(F) descriptions of the process units;

(G) a cost estimate for closure following the requirements of § 330.505 of this title (relating to Closure Cost Estimates for Storage and Processing Units); and

(H) a description of the financial assurance mechanism required by Chapter 37, Subchapter R of this title (relating to Financial Assurance for Municipal Solid Waste Facilities).

(2) The owner or operator shall acquire all authorizations regarding air emissions for the facility and comply with the following regulations:

(A) Subchapter E of this chapter (relating to Operational Standards for Municipal Solid Waste Storage and Processing Units);

(B) § 330.459 and § 330.461 of this title (relating to Closure Requirements for Municipal Solid Waste Storage and Processing Units; and Certification of Final Facility Closure); and

(C) § 330.505 of this title.

(l) A registration by rule is granted for persons that plan to transport untreated medical waste and that are not the generator of the waste if all of the following conditions are met.

(1) The registrant completes registration forms provided by the commission and provides the following information at least 60 days prior to commencing operations:

(A) name, address, and telephone number of registrant;

(B) name, address, and telephone number of partners, corporate officers, and directors; and

(C) description of each transportation unit, including:

(i) make, model, and year;

(ii) motor vehicle identification number, if applicable;

(iii) license plate (tag) number, including state and year; and

(iv) name of transportation unit owner.

(2) The owner or operator submits the fee required by § 330.1211(l) of this title (relating to Transporters of Untreated Medical Waste) along with the claim for the registration by rule.

(3) Registrations by rule expire after one year. The owner or operator must submit an annual fee in accordance with § 330.1211(l) of this title. Failure to timely pay the annual fee eliminates the option to manage wastes until the owner or operator claims a new or renewed registration by rule.

(4) Persons that claim the registration maintain a copy of the registration form, as annotated by the executive director with an assigned registration number, at their designated place of business and with each transportation unit used to transport untreated medical waste.

(5) The owner or operator submits annual summary reports in accordance with applicable provisions in § 330.1211(m) of this title.

(m) A registration by rule is granted for owners or operators of mobile treatment units conducting on-site treatment of medical waste who are not the generator if the following conditions are met.

(1) The registrant completes registration forms provided by the commission and provides the following information at least 60 days prior to commencing operations or expiration of a registration issued under the former rules before the comprehensive rule revisions in this chapter as adopted in 2006 (2006 Revisions) became effective:

(A) name, address, and telephone number of registrant;

(B) name, address, and telephone number of partners, corporate officers, and directors;

(C) description of each mobile treatment unit, including:

(i) make, model, and year;

(ii) motor vehicle identification number, if applicable; and

(iii) license plate (tag) number, including state and year;

(D) name of mobile treatment unit owner;

(E) description of approved treatment method to be employed and chemical preparations, as well as the procedure to be utilized for routine performance testing/parameter monitoring;

(F) evidence of competency;

(G) a description of the management and disposal of process waters generated during treatment events;

(H) a written contingency plan that describes the handling and disposal of waste in the event of treatment failure or equipment breakdown; and

(I) an estimate of the cost to remove and dispose of waste and disinfect the waste treatment equipment and evidence of financial assurance using procedures specified in Subchapter L of this chapter (relating to Closure, Post-Closure, and Corrective Action Cost Estimates) and Chapter 37, Subchapter R of this title.

(2) The owner or operator submits the fee required by § 330.1221(l) of this title (relating to On-Site Treatment Services on Mobile Treatment Units) along with the claim for the registration by rule.

(3) The executive director will send a copy of the registration form, annotated with an assigned registration number, to the owner or operator,

(4) Registrations by rule expire after one year. The owner or operator must submit an annual renewal fee in accordance with § 330.1221(l) of this title. Failure to timely pay the annual fee eliminates the option to manage wastes until the owner or operator claims a new or renewed registration by rule.

(5) The owner or operator submits annual summary reports in accordance with applicable provisions in § 330.1221(m) of this title.

(6) Providers of on-site treatment of medical waste in mobile units notify the executive director, by letter, within 30 days of any changes to their registration if:

    (A) the method employed to treat medical waste changes;

    (B) the office or place of business is moved;

    (C) the name of registrant or owner of the operation is changed;

    (D) the name of the partners, corporate directors, or corporate officers change; or

    (E) the unit information changes.

(n) A registration is required for facilities that store or process untreated medical waste that is received from off-site sources. For the purposes of this subsection, off-site shall be based on the definition of on-site found in § 330.1205(b) of this title (relating to Definitions).

(o) A registration is required for a new MSW transfer station that is used only in the transfer of grease trap waste, grit trap waste, septage, or other similar liquid waste if the facility used in the transfer will receive 32,000 gallons per day or less.

(p) A registration is required for a new liquid waste transfer facility to be located on, or at, other commission-authorized facilities.

**Source:** The provisions of this § 330.9 adopted to be effective March 27, 2006, 31 TexReg 2502.

30 TAC § 330.9, 30 TX ADC § 330.9

Current through 40 Tex.Reg. No. 1152, dated March 6, 2015, as effective on or before March 6, 2015

Copr. (C) 2015. All rights reserved.

END OF DOCUMENT

(C) 2011 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.